**Exhibit B**

# BOOKLET A

Booklet A includes ONE ITEM
to be completed and signed:

- Stockholders Agreement

Booklet A <u>AND</u> the Election Form (both completed and executed) are required to make the Equity Election Without Subscription. Please see the Election Form for a complete summary of the steps needed to make the Equity Election Without Subscription.

If you have any questions you may contact the Solicitation Agent at (646) 282-1800.

# STOCKHOLDERS AGREEMENT

Stockholders Agreement (this "Agreement"), dated as of _____, 2009, by and among Key Plastics Corporation, a Delaware corporation (the "Company"), Wayzata Recovery Fund LLC, a Delaware limited liability company ("Wayzata Recovery"), Wayzata Opportunities Fund II, L.P., a Delaware limited partnership ("Wayzata Opportunities"), Wayzata Opportunities Fund Offshore II, L.P., a Delaware limited partnership ("Wayzata Offshore", and together with Wayzata Recovery and Wayzata Opportunities, each, a "Wayzata Party" and collectively, the "Wayzata Parties"), the persons set forth on Schedule A attached hereto (each, a "DDJ Party" and collectively, the "DDJ Parties"), and the persons set forth on Schedule B attached hereto (the "Other Investors") who have acquired on the date hereof shares of common stock of the Company, par value $0.01 per share ("Common Shares") (the Wayzata Parties, the DDJ Parties and the Other Investors being the "Holders").

The Company and each of the Holders desire, for their mutual benefit and protection, to enter into this Agreement to set forth their respective rights and obligations with respect to their Common Shares (whether issued or acquired hereafter).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.

## BOARD OF DIRECTORS AND GOVERNANCE RIGHTS

Section 1.1    Nomination Rights; Voting.

(a)    At any annual or special meeting of stockholders or by written consent, each Holder will vote its Common Shares to fix the number of members of the board of directors of the Company (the "Board of Directors") at five (5) or such other number as may be required by this Section 1.1.

(b)    So long as the Wayzata Parties and their Permitted Transferees own, collectively, (i) at least fifty percent (50%) of the issued and outstanding Common Shares, the Wayzata Parties will be entitled to nominate three (3) persons to serve as directors of the Company, (ii) at least thirty percent (30%), but less than fifty percent (50%), of the issued and outstanding Common Shares, the Wayzata Parties will be entitled to nominate two (2) persons to serve as directors of the Company, and (iii) at least fifteen percent (15%), but less than thirty percent (30%), of the issued and outstanding Common Shares, the Wayzata Parties will be entitled to nominate one (1) person to serve as a director of the Company.  Any person nominated by the Wayzata Parties to serve as a director of the Company shall hereinafter be referred to as a "Wayzata Nominee" and all such persons nominated by the Wayzata Parties to serve as directors of the Company shall collectively be referred to as the "Wayzata Nominees".

(c)    So long as the DDJ Parties and their Permitted Transferees own, collectively, at least fifteen percent (15%) of the issued and outstanding Common Shares, the DDJ

Parties will be entitled to nominate one (1) person to serve as a director of the Company (the "DDJ Nominee").

(d)     The chief executive officer of the Company shall be nominated by the DDJ Parties and the Wayzata Parties to serve as a director of the Company (such nominee, the "CEO Nominee"). For the avoidance of doubt, it is understood that no party shall have the right to select the chief executive officer of the Company pursuant to this Section 1.1(d).

(e)     The Board of Directors as of the date of this Agreement consists of the following members:

| Name of Director | Type of Nominee |
|---|---|
|  | Wayzata Nominee |
|  | Wayzata Nominee |
|  | Wayzata Nominee |
|  | DDJ Nominee |
|  | CEO Nominee |

(f)     Notwithstanding anything to the contrary in this Article I, each Holder shall have the right to nominate candidates to the Board of Directors in accordance with the procedures set forth in the Company's bylaws.

Section 1.2     Assignment of Nomination Right.

(a)     The DDJ Parties may assign its right to nominate a director of the Company (in accordance with Section 1.1(c) above) to any Transferee of its Common Shares so long as: (i) the Transferee is acquiring at least 15% of the issued and outstanding Common Shares; (ii) the Transfer of Common Shares by the DDJ Parties is made in compliance with the terms of this Agreement (including, without limitation, Section 2.2); and (iii) the Transferee shall be reasonably acceptable to the Wayzata Parties.

(b)     The Wayzata Parties may assign their right, in whole or in part, to nominate one or more directors of the Company (in accordance with Section 1.1(b) above) to any Transferee of all or part of the Wayzata Parties' Common Shares made in compliance with the terms of this Agreement.

Section 1.3     Election of Nominees. Each party hereto will use its respective reasonable best efforts to cause the Wayzata Nominees, the DDJ Nominee and the CEO Nominee to be elected in any and all elections of the Board of Directors held during the term of this Agreement. Without limiting the generality of the foregoing, each party hereto will vote, consent or cause to be voted for the election of the Wayzata Nominees, the DDJ Nominee and

the CEO Nominee in all elections of the Board of Directors or written consents in lieu thereof held during the term of this Agreement, all securities that such party has the power to vote or consent (or in respect of which such party has the power to direct the vote or consent).

Section 1.4    Vacancies.

(a)    Each of the Wayzata Nominees will hold office as directors of the Company for such term as is provided in the Company's organizational documents and applicable law or until his or her death, resignation, incapacity or removal from the Board of Directors or until their successor has been duly elected and qualified in accordance with the provisions of this Agreement. If any of the Wayzata Nominees ceases to serve as a director of the Company for any reason during his or her term (other than as a result of a decrease in the collective ownership of Common Shares by the Wayzata Parties pursuant to Section 1.1(b)), a nominee for the vacancy/vacancies resulting therefrom will be designated by the Wayzata Parties. In the event any Wayzata Nominee ceases to serve as a director of the Company as a result of a decrease in the collective ownership of Common Shares pursuant to Section 1.1(b), such replacement director shall be determined by the Holders holding a majority of then outstanding Common Shares; provided, however, that such replacement director shall not be an Affiliate of the Wayzata Parties.

(b)    The DDJ Nominee will hold office as a director of the Company for such term as is provided in the Company's organizational documents and applicable law or until his or her death, resignation, incapacity or removal from the Board of Directors or until his or her successor has been duly elected and qualified in accordance with the provisions of this Agreement. If the DDJ Nominee ceases to serve as a director of the Company for any reason during his or her term (other than as a result of a decrease in the collective ownership of Common Shares by the DDJ Parties pursuant to Section 1.1(c)), a nominee for the vacancy resulting therefrom will be designated by the DDJ Parties. In the event the DDJ Nominee ceases to serve as a director of the Company as a result of a decrease in the collective ownership of Common Shares pursuant to Section 1.1(c), such replacement director shall be determined by the Holders holding a majority of then outstanding Common Shares; provided, however, that such replacement director shall not be an Affiliate of the DDJ Parties.

(c)    The CEO Nominee will hold office as a director of the Company for so long as such Person remains as chief executive officer of the Company. If the CEO Nominee ceases to serve as a director of the Company for any reason during his or her term, upon the hiring of a new chief executive officer of the Company, such replacement chief executive officer shall be nominated by the DDJ Parties and the Wayzata Parties to fill the vacancy resulting therefrom. For the avoidance of doubt, it is understood that no party shall have the right to nominate or otherwise select the replacement chief executive officer of the Company pursuant to this Section 1.4(c).

Section 1.5    Removal of Directors. Each Holder agrees to vote, or consent with respect to, its Common Shares to remove any director(s) subject to removal pursuant to Section 1.1(b), Section 1.1(c) and Section 1.1(d). Notwithstanding the foregoing, if the number of directors permitted to be nominated by a Holder is reduced and such Holder so designates a specific individual or individuals of its designees to be removed, then the other Holders agree to vote for the removal of the individual so designated.

Section 1.6 <u>Compensation and Indemnification</u>. The board members shall be entitled to receive compensation for their services and be reimbursed for reasonable out-of-pocket expenses incurred in connection therewith; <u>provided</u>, that no member of the Board of Directors that is also an employee of a Wayzata Party, a DDJ Party or any of their respective Affiliates shall be entitled to receive compensation for his or her services. The certificate of incorporation or bylaws of the Company shall at all times provide for indemnification and limitation on the liability of directors of the Company to the fullest extent permitted by law. The Company shall obtain and at all times maintain directors' and officers' liability insurance coverage on commercially reasonable terms.

Section 1.7 <u>Committees</u>. At the request of any of the Wayzata Parties, each Holder shall use its respective reasonable best efforts to cause two (2) Wayzata Nominees to be placed on the compensation committee of the Board of Directors or any committee of the Board of Directors. At the request of any of the DDJ Parties, each Holder shall use its respective reasonable best efforts to cause the DDJ Nominee to be placed on the compensation committee of the Board of Directors or any committee of the Board of Directors.

Section 1.8 <u>Initial Public Offering</u>. The Company may not initiate an initial public offering of the Company's Common Shares pursuant to an effective registration statement under the Securities Act (an "<u>IPO</u>") without the approval of such number of directors of the Board of Directors equal to at least a majority of the entire Board of Directors of the Company plus one (1).

Section 1.9 <u>Member Approval</u>. Unless the Board of Directors unanimously agrees otherwise, the following actions may only be taken by the Company with the approval of the Holders holding at least sixty-six and two-thirds percent (66-2/3%) of the issued and outstanding Common Shares of the Company calculated as of the close of business on the day immediately prior to any vote or action by written consent of the Holders:

(a) the purchase, exchange or other acquisition, whether in a single transaction or series of related transactions or by any other manner (including by way of merger, consolidation, business combination or similar transaction involving the Company or any of its subsidiaries), of any equity securities or assets of any Person (other than a wholly-owned subsidiary of the Company) with a fair market value in excess of $25.0 million;

(b) the sale, transfer, lease, license or other disposition of assets or properties with an aggregate fair market value in excess of $25.0

million;

(c) the incurrence of indebtedness for borrowed money, or the assumption, guaranteeing, endorsement or otherwise becoming responsible for any obligations of another Person, in each case, in excess of $20.0 million, except in connection with any of transactions described in Section 1.9(a) and Section 1.9(b) above, in which Section 1.9(a) or Section 1.9(b), as applicable, shall apply;

(d) enter into any transaction or agreement with any Holder or any of its Affiliates, for aggregate payments or with an aggregate value, in any 12-month period, in excess of $1.0 million in any one transaction or series of related transactions;

(e) any voluntary recapitalization pursuant to which any principal amount of indebtedness of the Company or any of its subsidiaries is converted into not less than fifty percent (50%) of the issued and outstanding Common Shares; and

(f) any reorganization, liquidation or dissolution (other than in connection with any transaction described in Section 1.9(a) or Section 1.9(b) above (in which Section 1.9(a) or Section 1.9(b), as applicable, shall apply) or in the course of a proceeding under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code")).

Section 1.10    Expiration or Termination. The provisions of this Article I shall expire upon consummation of an IPO.

## ARTICLE II.

## RESTRICTIONS ON TRANSFER

Section 2.1 <u>General Restrictions on Transfer</u>. Each Holder agrees that, until the consummation of an IPO, it will not, directly or indirectly, sell, hypothecate, give, convey, bequeath, transfer, assign, pledge or in any other way whatsoever encumber or dispose (any such event, a "<u>Transfer</u>") of any Common Shares now owned or hereafter acquired by such party (or any interest therein) to any other Person, except in compliance with the terms of this Agreement; <u>provided</u>, that as a condition to any Transfer, the intended Transferee expressly and in writing agrees to be bound by the terms of this Agreement as a Holder by signing a signature page to this Agreement in the form attached as <u>Exhibit A</u> hereto. Any transferee of Common Shares made in compliance with the terms of this Agreement is called a "<u>Transferee</u>".

Section 2.2 <u>Transfers to Competitors</u>. Each Holder agrees that, until the consummation of an IPO, it will not Transfer any Common Shares now owned or hereafter acquired by such party (or any interest therein) to any Competitor (other than any Transfer pursuant to Article IV).

Section 2.3 <u>Right of First Refusal</u>.

(a)     If any Holder or any of its Permitted Transferees (each, solely for purposes of this Section 2.3, a "<u>Right of First Refusal Stockholder</u>") receives a bona fide offer (a "<u>Transfer Offer</u>") to acquire any or all of its Common Shares (solely for purposes of this Section 2.3, the "<u>Transfer Stock</u>") from any Person that is not a party to this Agreement (other than a Permitted Transferee of such Holder), such Right of First Refusal Stockholder shall cause such Transfer Offer to be reduced to writing and shall notify each of the Wayzata Parties and the Company of its wish to accept such Transfer Offer (the "<u>Transfer Notice</u>"). Such Transfer Notice shall set forth (i) the name of the third party or parties, (ii) the prospective purchase price for the Transfer Stock, and (iii) all other material terms and conditions contained in the Transfer Offer. The Transfer Notice shall constitute an irrevocable offer by the Right of First Refusal Stockholder ("<u>First Refusal Offer</u>") to sell all, but not less than all, of the Transfer Stock to any of Wayzata Parties at a price equal to the price contained in the Transfer Notice and on other terms and conditions not less favorable to the Wayzata Parties than those contained in the Transfer Offer. The Wayzata Parties shall have the irrevocable right and option (the "<u>Right of First Refusal Offer</u>") to accept the First Refusal Offer as to all, but not less than all, of the shares of the Transfer Stock pursuant to the First Refusal Offer. If the Wayzata Parties desire to purchase the Transfer Stock, any Wayzata Party or Parties shall provide the Right of First Refusal Stockholder with an irrevocable written notice of acceptance of the First Refusal Offer, which shall be binding on such Wayzata Party or Parties for all of the Transfer Stock, within five (5) business days after the date of the Transfer Notice (the "<u>Notice Period</u>"), and such Wayzata Party or Parties shall simultaneously provide a copy to the Company.

(b)     The closing of the purchase of the Transfer Stock by any Wayzata Party pursuant to this Section 2.3 shall take place at the principal office of the Company on the date specified in the Transfer Offer (which date shall not be less than the later of (i) thirty (30) business days following the date of the Transfer Notice and (ii) ten (10) days following the receipt of all

necessary governmental approvals). The purchase price for the purchase of Transfer Stock shall be paid in cash (by wire transfer of immediately available funds to an account specified in writing by the recipients thereof at least three (3) business days prior to the date of such closing) or by certified or official bank check, against delivery of certificates representing the Transfer Stock so purchased, duly endorsed in blank for transfer or accompanied by a stock power duly executed in blank.

(c)     If the provisions of this Section 2.3 have been complied with in all respects, the Right of First Refusal Stockholder shall have the right for a 90-day period following the expiration of the Notice Period to Transfer the shares of Transfer Stock to the third party on the terms set forth in the Transfer Notice (or on other terms no more favorable to the Right of First Refusal Stockholder) without further notice to the Wayzata Parties, but after such 90-day period no such Transfer may be made without again giving notice to the Wayzata Parties of the proposed Transfer and complying with the requirements of this Section 2.3; provided, however, that in the event such Transfer of the Transfer Stock by the Right of First Refusal Stockholder pursuant to this Section 2.3(c) shall (i) be prohibited by law or (ii) require the approval of any governmental authority, the 90-day period described above shall be suspended until such time as (x) in the case of (i) above, such prohibition first lapses or (y) in the case of (ii) above, such approval is granted.

(d)     The provisions of this Section 2.3 shall (i) not apply to any Transfer pursuant to Article IV and (ii) expire upon the consummation of an IPO.

Section 2.4     Right of First Offer.

(a)     If any of the Wayzata Parties or any of their Permitted Transferees (each, solely for purposes of this Section 2.4, a "Right of First Offer Stockholder") desires to Transfer any or all of its Common Shares (solely for purposes of this Section 2.4, the "ROFO Stock") to any Person, such Right of First Offer Stockholder shall first deliver to the Company and DDJ (on behalf of the DDJ Parties) a writing (the "ROFO Notice"), which shall (i) state the Right of First Offer Stockholder's intention to propose a Transfer of ROFO Stock to one or more third parties and (ii) offer the DDJ Parties the option (in accordance with this Section 2.4) to acquire up to one hundred percent (100%), but no fewer than fifty percent (50%), of the maximum number of shares of ROFO Stock that are proposed to be Transferred (the "Right of First Offer"). The Right of First Offer shall remain open and irrevocable for the periods set forth below (and, to the extent the Right of First Offer is accepted during such periods, until the consummation of the sale contemplated by the Right of First Offer in accordance with Section 2.4(b)). The DDJ Parties shall have the right and option, for a period of five (5) business days after receipt of the Right of First Offer Notice (the "Right of First Offer Acceptance Period"), to submit to the Right of First Offer Stockholder the proposed terms and conditions of the Transfer of up to one hundred percent (100%), but no fewer than fifty percent (50%), of the maximum number of shares of ROFO Stock contained in the ROFO Notice (the "Offered ROFO Stock") (including, without limitation, the purchase price thereof and a summary of the other material terms and conditions of the proposed Transfer) pursuant to which the DDJ Parties propose to acquire the Offered ROFO Stock (the "ROFO Proposal"). The ROFO Proposal shall constitute an irrevocable offer by the DDJ Parties to purchase the Offered ROFO Stock at a price equal to the price contained in the ROFO Proposal. The Right of First Offer Stockholder shall have the irrevocable right and option to accept the ROFO Proposal as to the Offered ROFO Stock pursuant to the ROFO Proposal. If the Right of

First Offer Stockholder desires to sell the Offered ROFO Stock to the DDJ Parties, it shall provide the DDJ Parties with an irrevocable written acceptance notice (the "ROFO Acceptance Notice"), which shall be binding on the Right of First Offer Stockholder for all of the Offered ROFO Stock, within fifteen (15) days after the date of the ROFO Proposal (the "ROFO Proposal Notice Period"), and the Right of First Offer Stockholder shall, simultaneously with its delivery of the ROFO Acceptance Notice to the DDJ Parties, provide a copy of the ROFO Acceptance Notice to the Company and a Tag-Along Sale Notice to each Holder in accordance with Section 3.1 hereto (to the extent applicable).

(b)      If the DDJ Parties submit a ROFO Proposal to purchase the Offered ROFO Stock within the Right of First Offer Acceptance Period, but elect not to purchase all of the ROFO Stock that is proposed to be Transferred, then the Right of First Offer Stockholder may proceed to consummate a Transfer of the remaining number of Common Shares that is equal to the difference between (x) the shares of ROFO Stock that are proposed to be Transferred by the Right of First Offer Stockholder and (y) the shares of Offered ROFO Stock (the "Remaining ROFO Stock") to any Person at a price per share and on such other terms and conditions as are acceptable to the Right of First Offer Stockholder in its sole discretion, within 120 days after the expiration of the Right of First Offer Acceptance Period (the "Sale Period"). In the event that the Right of First Offer Stockholder determines, at any time during the Sale Period, that the terms and conditions of the proposed Transfer are undesirable, the Right of First Offer Stockholder may terminate the offer and reinstate the procedure in this Section 2.4 without waiting for the expiration of the Sale Period.

(c)      If the DDJ Parties elect not to submit a ROFO Proposal within the Right of First Offer Acceptance Period, then the Right of First Offer Stockholder may proceed to consummate a Transfer of the ROFO Stock to any Person at a price per share and on such other terms and conditions as are acceptable to the Right of First Offer Stockholder in its sole discretion, within the Sale Period.

(d)      If the provisions of this Section 2.4 have been complied with in all respects and the DDJ Parties have provided a ROFO Proposal that has not been accepted by the Right of First Offer Stockholder, the Right of First Offer Stockholder shall have the right for a 120-day period following receipt of the ROFO Proposal to Transfer the shares of Offered ROFO Stock at a price not less than the price, and on terms and conditions not more favorable to the purchaser thereof than the terms and conditions, stated in the ROFO Proposal, without further notice to the DDJ Parties, but after such 120-day period no such Transfer may be made without again giving notice to the DDJ Parties of the proposed Transfer and complying with the requirements of this Section 2.4; provided, however, that in the event such Transfer of the Offered ROFO Stock by the Right of First Offer Stockholder pursuant to this Section 2.4(d) shall (i) be prohibited by law or (ii) require the approval of any governmental authority, the 120-day period described above shall be suspended until such time as (x) in the case of (i) above, such prohibition first lapses or (y) in the case of (ii) above, such approval is granted.

(e)      The closing of the purchase of the Offered ROFO Stock by the DDJ Parties pursuant to this Section 2.4 shall take place at the principal office of the Company on the date specified in the ROFO Proposal (which date shall not be less than the later of (i) thirty (30) business days following the date of the ROFO Proposal and (ii) ten (10) days following the receipt

of all necessary governmental approvals), which date shall also be the Tag-Along Sale Date, to the extent applicable. The purchase price for the purchase of Offered ROFO Stock shall be paid in cash (by wire transfer of immediately available funds to an account specified in writing by the recipients thereof at least three (3) business days prior to the date of such closing) or by certified or official bank check, against delivery of certificates representing the Offered ROFO Stock so purchased, duly endorsed in blank for transfer or accompanied by a stock power duly executed in blank.

(f)     Prior to any Transfer of Common Shares by a Right of First Offer Stockholder pursuant to this Section 2.4, the Right of First Offer Stockholder shall, in addition to complying with the provisions of this Section 2.4, comply with the provisions of Section 3.1 hereof, if applicable.

(g)     The provisions of this Section 2.4 shall (i) not apply to any Transfer pursuant to Article IV of this Agreement, (ii) not apply to Transfers to Permitted Transferees, (iii) not apply to any Transfer or Transfers by any Wayzata Party to any Person or Persons (other than Permitted Transferees) of up to five percent (5%) (in the aggregate of all such Transfers) of the issued and outstanding Common Shares as calculated as of the date of this Agreement and (iv) expire upon earlier to occur of (A) the date on which the DDJ Parties and their Permitted Transferees cease to own at least fifteen percent (15%) of the issued and outstanding Common Shares or (B) the consummation of an IPO.

Section 2.5     Compliance with Securities Laws. No Holder shall Transfer any Common Shares, and the Company shall not transfer on its books any Common Shares, unless:

(a)     such Transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended (together with the rules and regulations promulgated thereunder, the "Securities Act"), and is in compliance with any applicable state securities or blue sky laws, or, if requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company (it being acknowledged that Latham & Watkins LLP shall be deemed to be reasonably satisfactory to the Company), to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and any applicable state securities or blue sky laws;

(b)     the certificates, if any, representing such Common Shares issued to the transferee shall bear the following legend (or one to substantially similar effect):

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS CONTAINED IN A STOCKHOLDERS AGREEMENT (AS SUCH

AGREEMENT MAY BE AMENDED FROM TIME TO TIME, THE "STOCKHOLDERS AGREEMENT"). THE STOCKHOLDERS AGREEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN PROVISIONS RELATING TO THE TRANSFER OF THE SECURITIES SUBJECT TO SUCH AGREEMENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE HYPOTHECATION OR OTHER DISPOSITION OF THE SHARES REPRESENTED BY THIS CERTIFICATE, DIRECTLY OR INDIRECTLY, MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT APPLICABLE TO THE SECURITIES REPRESENTED BY THIS CERTIFICATE."; and

(c) such Transfer shall not require the Company to register any Common Shares (or any other of the Company's equity securities) under the Exchange Act or applicable state securities or blue sky laws.

Section 2.6    Improper Transfer. Any attempt to Transfer or otherwise encumber any Common Shares in violation of this Agreement shall be null and void and neither the Company nor any registrar or transfer agent of such Common Shares shall give any effect to such attempted Transfer or encumbrance in its stock records.

Section 2.7    Involuntary Transfer. In the case of any Transfer of title or beneficial ownership of Common Shares upon default, foreclosure, forfeit, court order or otherwise than by a voluntary decision on the part of a Holder (an "Involuntary Transfer"), such Holder (or such Holder's legal representatives) shall promptly (but in no event later than five (5) days after such Involuntary Transfer) furnish written notice to the Company indicating that the Involuntary Transfer has occurred, specifying the name of the Person to whom such Common Shares has been Transferred, giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the Involuntary Transfer. Nothing in this Section 2.7 shall be deemed to vest any Person who becomes a holder of Common Shares pursuant to an Involuntary Transfer with any rights under this Agreement.

Section 2.8    Certain Definitions. For purposes of this Agreement:

(a) An "Affiliate" of any Person means any other Person directly or indirectly controlling, controlled by or under common control with the first Person.

(b) "Competitor" means any Person that, directly or indirectly, engages in, or possesses an equity interest in, any business enterprise or other venture that competes with any business that the Company or any of its subsidiaries currently engages in or, with the consent of the Board of Directors, will engage in after the date of this Agreement; provided, however, that no Person shall be deemed to be a Competitor solely as a result of such Person's beneficial ownership for investment purposes of less than an aggregate of five percent (5%) of any class of equity securities of another Person which are registered under Section 13 of the Exchange Act.

(c)  · The term "<u>control</u>" (including, with correlative meanings, the terms "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, a natural person cannot be "controlled by" another Person.

(d)  "<u>Person</u>" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

(e)  "<u>Permitted Transferee</u>" means, with respect to any Holder, (i) any Affiliate of such Holder, (ii) any funds or accounts under common management with, or operated by, such Holder, (iii) with respect to the Wayzata Parties, any other Person controlled, directly or indirectly, by Wayzata Investment Partners LLC, a Delaware limited liability company, or (iv) with respect to the DDJ Parties, any other Person controlled, directly or indirectly, by DDJ Capital Management, a Delaware limited liability company ("<u>DDJ</u>").

## ARTICLE III.

## TAG ALONG RIGHTS

Section 3.1  <u>Tag-Along Rights.</u>

(a)  <u>Right to Participate in Sale.</u> Should any Wayzata Party or any of its Permitted Transferees propose to Transfer any Common Shares, other than Transfers to Permitted Transferees (a "<u>Tag-Along Sale</u>", and such Holder, the "<u>Transferor</u>"), the Transferor shall afford each other Holder the opportunity to participate proportionately in such Tag-Along Sale in accordance with this Section 3.1. Each Holder shall have a proportionate right, but not the obligation, to participate in such Tag-Along Sale. The number of Common Shares (the "<u>Tag-Along Allotment</u>") that each Holder will be entitled to include in such Tag-Along Sale shall be determined by multiplying (a) the number of Common Shares held by such Holder as of the close of business on the day immediately prior to the Tag-Along Notice Date by (b) a fraction (the "<u>Tag-Along Fraction</u>"), the numerator of which shall equal the number of Common Shares proposed by the Transferor to be sold or otherwise disposed of pursuant to the Tag-Along Sale and the denominator of which shall equal the total number of Common Shares that are beneficially owned by the Transferor as of the close of business on the day immediately prior to the Tag-Along Notice Date.

(b)  <u>Sale Notice.</u> The Transferor shall provide each Holder with written notice (the "<u>Tag-Along Sale Notice</u>") not more than sixty (60) nor less than twenty (20) days prior to the proposed date of the Tag-Along Sale (the "<u>Tag-Along Sale Date</u>"). Each Tag-Along Sale Notice shall set forth: (i) the number of shares proposed to be transferred or sold by the Transferor; (ii) the proposed amount and form of consideration to be paid for such shares and the terms and conditions of payment offered by each proposed purchaser; (iii) the aggregate number of Common Shares held of record by the Transferor as of the close of business on the day immediately preceding the date of the Tag-Along Notice (the "<u>Tag-Along Notice Date</u>"); (iv) such Holders'

Tag-Along Allotment assuming such Holder elected to sell the maximum number of Common Shares as possible; (v) confirmation that the proposed purchaser or transferee has been informed of the "Tag-Along Rights" provided for in this Section 3.1 and has agreed to purchase the Common Shares in accordance with the terms hereof; and (vi) the Tag-Along Sale Date.

      (c)    <u>Tag-Along Notice</u>.

        (i) If a Holder wishes to participate in the Tag-Along Sale, such Holder shall provide written notice (the "<u>Tag-Along Notice</u>") to the Transferor within fourteen (14) days following the receipt of the Tag-Along Sale Notice. The Tag-Along Notice shall set forth the number of Common Shares that such Holder elects to include in the Tag-Along Sale, which shall not exceed such Holder's Tag-Along Allotment. During such fourteen (14) day period, the Company shall provide the Holders, as applicable, with such financial data and information as the Holders, as applicable, shall reasonably request; <u>provided, however</u>, that any such Holder, as applicable, shall agree to hold in confidence and trust all information so provided; and, provided, further, that the Company may withhold any such financial data and information as may be reasonably necessary (in the Company's sole discretion) to preserve the attorney-client privilege between the Company and its counsel or to protect confidential proprietary information. The Tag-Along Notice shall also specify the aggregate number of additional Common Shares owned of record as of the close of business on the day immediately preceding the Tag-Along Notice Date by such Holder, if any, which such Holder desires also to include in the Tag-Along Sale ("<u>Additional Shares</u>") in the event there is any under-subscription for the entire amount of all Holders' Tag-Along Allotments. The Tag-Along Notice given by each Holder shall constitute such Holder's binding agreement to sell the Common Shares specified in such Tag-Along Notice (including any Additional Shares to the extent such Additional Shares are to be included in the Tag-Along Sale pursuant to the apportionment described above) on the terms and conditions applicable to the Tag-Along Sale, subject to the provisions of Section 3.1; <u>provided, however</u>, that in the event that there is any material change in the terms and conditions of such Tag-Along Sale applicable to any Holder after delivery of a Tag-Along Notice or in the event that the Transferor reduces the number of shares which they intend to Transfer in the Tag-Along Sale, then, notwithstanding anything herein to the contrary, such Holder shall have the right to withdraw from participation in the Tag-Along Sale with respect to all of its Common Shares affected thereby.

        (ii) If the aggregate number of Common Shares proposed to be included by a Holder in any Tag-Along Sale (without taking into account any Additional Shares) is less than the aggregate Tag-Along Allotments of all of the Holders (such difference, the "<u>Excess Allotment</u>"), then the Excess Allotment shall be allocated among the Transferor and each Holder who has indicated a desire to sell Additional Shares pursuant to a Tag-Along Notice *pro rata* based upon the number of Common Shares owned by each of them as of the close of business on the day immediately prior to the Tag-Along Notice Date; <u>provided</u>, that if application of the foregoing provision does not result in allocation of the entire Excess Allotment, then the balance shall be allocated among the Transferor and each Holder with remaining Additional Shares *pro rata* based upon the number of Common Shares owned by each of them as of the close of business

on the day immediately prior to the Tag-Along Notice Date and so on until the entire Excess Allotment has been allocated. The Transferor shall notify each Holder with Additional Shares to be included in the Tag-Along Sale of the number of such Additional Shares to be so included no later than the fifth (5th) day prior to the Tag-Along Sale Date.

(iii) If a Tag-Along Notice is not received by the Transferor from any Holder within the 14-day period specified above, the Transferor shall have the right to sell or otherwise transfer the number of shares specified in the Tag-Along Sale Notice to the proposed purchaser or transferee without any participation by such Holder, but only on terms and conditions which are no more favorable in any material respect to the Transferor than as stated in the Tag-Along Sale Notice and only if such Tag-Along Sale occurs on a date within sixty (60) business days of the Tag-Along Sale Date. If such Tag-Along Sale does not occur within such 60-day period, the Common Shares that were to be subject to such Tag-Along Sale thereafter shall continue to be subject to all of the provisions of this Section 3.1.

(d) <u>Terms of Tag-Along Sale; Cooperation</u>. Any sales of Common Shares by a Holder as a result of the "Tag-Along Rights" provided under this Section 3.1 shall be on the same terms and conditions as the proposed Tag-Along Sale by the Transferor. It is acknowledged that each Holder participating in such Tag-Along Sale will be entitled to receive the same form of consideration for each of its Common Shares as is received by the Transferor, unless any Transferor is given an option as to the form and amount of consideration to be received in connection with such Tag-Along Sale, in which case all Holders of Common Shares will be given the same such option. Each Holder participating in any Tag-Along Sale shall cooperate in good faith with the Transferor and the Company in connection with the consummation of such Tag-Along Sale, including, without limitation, by executing a document containing customary representations, warranties, indemnities and agreements as requested by the purchaser in connection with such Tag-Along Sale, which shall be in substantially the same form that is executed by the Transferor in connection with such Tag Along Sale; <u>provided</u>, <u>however</u>, that no Holder participating in such Tag-Along Sale shall be required to make any representations and warranties as to itself other than representations as to its good standing, due authorization, due execution, enforceability, lack of conflicts, title to Common Shares and investment qualifications (<u>provided</u>, that, for the avoidance of doubt, the foregoing shall in no way serve as a restriction on the indemnification obligations of such Holders in connection with such Tag-Along Sale); and <u>provided</u>, <u>further</u>, that, notwithstanding the foregoing, the liability for any indemnity obligations of any Holder under such document shall be several and not joint and, to the extent applicable, with respect to representations and warranties of the Company and such Holder, shall not exceed the aggregate cash consideration received by such Holder in connection with such transaction except with respect to claims related to (a) fraud, willful misconduct or willful breach by the Company or any such Holder and (b) a breach of any representation or warranty of such Holder relating to its good standing, due authorization, due execution, enforceability, lack of conflicts, title to Common Shares and investment qualifications.

(e) <u>Authority to Record Transfer/Delivery of Certificates</u>. On the Tag-Along Sale Date, each Holder, if a participant in the applicable Tag-Along Sale, (a) authorizes the Company (or the Company's transfer agent, if any) to record in the Company's books and records the transfer of all of such Holder's Common Shares included in such Tag-Along Sale which are

not represented by one or more certificates from the Holder to the purchaser in the Tag-Along Sale and (b) shall deliver all certificates, if any, which represent Common Shares owned by such Holder included in such Tag-Along Sale, duly endorsed for transfer with signatures guaranteed, to the purchaser in the Tag-Along Sale, in the manner and at the address indicated in the Tag-Along Notice, in each case against delivery of the purchase price for such shares. In addition, each Holder, if a participant in the applicable Tag-Along Sale, shall take all action as the Transferor or the purchaser in the Tag-Along Sale shall reasonably request as necessary to vest in the purchaser in the Tag-Along Sale all Common Shares owned by such Holder included in such Tag Along Sale, whether in certificated or uncertificated form, free and clear of all liens, charges and encumbrances of any kind.

(f)     Exempt Transfers. The provisions of this Section 3.1 shall not apply (i) to any Transfer or Transfers (other than purchases by the Company described in clause (iii) below) by any Wayzata Party to any Person or Persons (other than Permitted Transferees) of up to five percent (5%) (in the aggregate of all such Transfers) of the issued and outstanding Common Shares as calculated as of the date of this Agreement, (ii) to any sale of Common Shares in a bona fide underwritten offering of Common Shares pursuant to an effective registration statement under the Securities Act, and (iii) to any purchase by the Company of its Common Shares; provided, that such purchase is made *pro rata* among all Holders of Common Shares.

(g)     Termination of Tag-Along Rights. The provisions of this Section 3.1 shall expire upon the consummation of an IPO.

## ARTICLE IV.

## DRAG-ALONG SALES

Section 4.1     Right to Require Sale. Notwithstanding any other provision of this Agreement, if the Wayzata Parties desire to (a) Transfer such number of Common Shares of the Company held by the Wayzata Parties equal to at least a majority of the then issued and outstanding Common Shares to a third Person or third Persons who are not Affiliates of the Wayzata Parties (a "Third Party"); (b) effect a business combination of the Company (whether by merger, consolidation or otherwise) with such Third Party; or (c) sell all or substantially all the assets of the Company to such Third Party (any of the transactions described in clauses (a), (b) and (c), an "Acquisition Proposal"), then, upon the demand of any Wayzata Party, each other Holder (solely for the purpose of this Article IV, an "Other Holder") shall be required, as the case may be, (x) to sell to such Third Party a number of Common Shares, if any, equal to the number of shares specified in the applicable Drag-Along Notice (as defined below) (it being expressly agreed and understood that in connection with any Acquisition Proposal for less than 100% of the total outstanding Common Shares, each Other Holder shall be required to sell that percentage of its Common Shares equal to the percentage of Common Shares then held by the Wayzata Parties that are being sold by the Wayzata Parties in connection with such Acquisition Proposal), for the same consideration and on the same purchase terms and conditions as the Wayzata Parties have agreed to with such Third Party and (y) to vote all of the Common Shares beneficially owned by such Other Holder in favor of such Acquisition Proposal and take all other necessary or desirable actions within such Other Holder's control (including, without limitation, by attending meetings in person or by proxy for the purpose of obtaining a quorum, executing

written consents in lieu of meetings and refraining from exercising appraisal rights with respect to any such Acquisition Proposal), to cause the approval of such Acquisition Proposal.

Section 4.2    Drag-Along Notice.  Prior to consummating any Acquisition Proposal, if any Wayzata Party elects to exercise the option described in this Article IV, the Wayzata Parties shall provide each Other Holder with written notice (the "Drag-Along Notice") not more than sixty (60) nor less than twenty (20) days prior to the proposed closing date (the "Drag-Along Sale Date") therefor.  The Drag-Along Notice shall be accompanied by a copy of any written agreement relating to the Acquisition Proposal and shall set forth, if applicable: (a) the proposed amount and form of consideration to be paid per share of Common Shares and the terms and conditions of payment offered by the Third Party; (b) the aggregate number of Common Shares held by the Wayzata Parties as of the close of business on the day prior to the date of the Drag-Along Notice; (c) the number of Common Shares held by the Wayzata Parties that are proposed to be Transferred in the Acquisition Proposal; (d) the Drag-Along Sale Date; and (e) confirmation that the Third Party has agreed to purchase the Other Holders' Common Shares in accordance with the terms hereof.

Section 4.3    Authority to Record Transfer/Delivery of Certificates.  On the Drag-Along Sale Date, each Other Holder, if a participant in the applicable Drag-Along Sale, (a) authorizes the Company (or the Company's transfer agent, if any) to record in the Company's books and records the transfer of all of such Other Holder's Common Shares included in such Drag-Along Sale which are not represented by one or more certificates, from such Other Holder to the purchaser in the Drag-Along Sale and (b) shall deliver all certificates, if any, which represent Common Shares owned by such Other Holder included in such Drag-Along Sale, duly endorsed for transfer with signatures guaranteed (if applicable or required), to the purchaser in the Drag-Along Sale, in the manner and at the address indicated in the Drag-Along Notice, in each case against delivery of the purchase price for such shares.  In addition, each Other Holder, if a participant in the applicable Drag-Along Sale, shall take all action as the Wayzata Parties or the purchaser in the Drag-Along Sale shall reasonably request as necessary to vest in the purchaser in the Drag-Along Sale all Common Shares owned by such Other Holder included in such Drag Along Sale, whether in certificated or uncertificated form, free and clear of all liens, charges and encumbrances of any kind.

Section 4.4    Consideration.  The provisions of this Article IV shall apply regardless of the form of consideration received in the Drag-Along Sale.  It is acknowledged that each Other Holder will be entitled to receive the same form of consideration for each of its Common Shares as is received by the Wayzata Parties in connection with such Drag-Along Sale, unless the Wayzata Parties are given an option as to the form and amount of consideration to be received in connection with such Drag-Along Sale, in which case all Other Holders will be given the same such option.

Section 4.5    Cooperation.  Each Other Holder shall cooperate in good faith with the Wayzata Parties in connection with the consummation of the Drag-Along Sale, including, without limitation, by executing a document containing customary representations, warranties, indemnities and agreements as requested by any Third Party in connection with the Drag-Along Sale; provided, however, that no Other Holder shall be required to make any representations and warranties as to itself other than representations as to its good standing, due authorization, due

execution, enforceability, lack of conflicts, title to its Common Shares and investment qualifications (provided, that, for the avoidance of doubt, the foregoing shall in no way serve as a restriction on the indemnification obligations of an Other Holder in connection with a Drag-Along Sale); and provided, further, that, notwithstanding the foregoing, the liability for any indemnity obligations of any Other Holder under such document shall be several and not joint and, to the extent applicable, with respect to representations and warranties of the Company and such Other Holder, shall not exceed the aggregate cash consideration received by such Other Holder in connection with such transaction except with respect to claims related to (a) fraud, willful misconduct or willful breach by the Company or such Other Holder and (b) a breach of any representation or warranty of such Other Holder relating to its good standing, due authorization, due execution, enforceability, lack of conflicts, title to its Common Shares and investment qualifications.

Section 4.6    Termination of Drag-Along Rights. The provisions of this Article IV shall expire upon the consummation of an IPO.

## ARTICLE V.

## REGISTRATION RIGHTS

Section 5.1    Definitions.  For purposes of this Agreement:

(a)    "Commission" means the United States Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(b)    "Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated by the Commission thereunder.

(c)    "Registrable Securities" means Common Shares.

(d)    "Short-Form Registration" means any registration statement effected on Form S-3 or any comparable or successor form or forms or any similar short-form registration.

Section 5.2    Demand Registration.

(a)    Commencing on that date that is six (6) months after the consummation of an IPO, subject to the terms and conditions of this Agreement, upon written notice delivered by any Wayzata Party (a "Wayzata Demand") requesting that the Company effect the registration (a "Wayzata Demand Registration") under the Securities Act of any or all of the Registrable Securities held by the Wayzata Parties or any of their Permitted Transferees, which Wayzata Demand shall specify the number of such Registrable Securities to be registered and the intended method or methods of disposition of such Registrable Securities, the Company shall promptly give written notice of such Wayzata Demand to all Persons who may have piggyback registration rights with respect to such Wayzata Demand Registration and shall use its best efforts to effect the registration under the Securities Act and applicable state securities laws of:

(i)    the Registrable Securities which the Company has been so requested to register by such Persons in the Wayzata Demand, and

(ii)    all other Registrable Securities which the Company has been requested to register by the Holders thereof by written request given to the Company within thirty (30) days after the giving of such written notice by the Company, all to the extent requisite to permit the disposition (in accordance with such intended methods of disposition) of the Registrable Securities to be so registered.

(b)    If the filing, initial effectiveness or continued use of a Registration Statement with respect to a Wayzata Demand Registration would require the Company to make a public disclosure of material non-public information, which disclosure in the good faith judgment of the Board of Directors (after consultation with external legal counsel) (i) would be required to be made in any Registration Statement so that such Registration Statement would not be materially misleading, (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such Registration Statement and (iii) would reasonably be expected to be materially adverse to the Company or its business or on the Company's ability to effect a material proposed acquisition, disposition, financing, reorganization, recapitalization or similar transaction, then the Company may, upon giving prompt written notice of such action to the Holders participating in such registration, delay the filing or initial effectiveness of, or suspend use of, such Registration Statement; provided, that the Company shall not be permitted to do so for periods exceeding, in the aggregate, 90 days during any 12-month period. In the event the Company exercises its rights under the preceding sentence, such Holders agree to suspend, promptly upon their receipt of the notice referred to above, their use of any prospectus relating to such registration in connection with any sale or offer to sell Registrable Securities. If the Company so postpones the filing of a prospectus or the effectiveness of a Registration Statement, such Wayzata Party shall be entitled to withdraw its request. The Company will pay all Registration Expenses incurred in connection with any such aborted registration or prospectus. The Company shall not be obligated to take any action to effect or complete any registration pursuant to this Section 5.2 following the filing of, and for 180 days immediately following the effective date of, any Registration Statement or offering document pertaining to Registrable Securities of the Company (other than a registration pursuant to Form S-3), if such Registration Statement has become effective or the Company is actively employing in good faith commercially reasonable best efforts to cause such Registration Statement to become effective.

Section 5.3    Piggyback Registration. Other than pursuant to an IPO, whenever the Company proposes to register any of its securities, including any registration or listing pursuant to Section 5.2, and the registration form to be filed may be used for the registration, listing or qualification for distribution of Registrable Securities, the Company will give prompt written notice (the "Registration Notice") to all Holders of its intention to effect such a registration at least ten (10) business days before the anticipated registration date and will include in such registration all Registrable Securities held by the Holders with respect to which the Company has received written requests for inclusion therein within ten (10) business days after the date of such Registration Notice (a "Piggyback Registration"). The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 5.3 (and not pursuant to Section 5.2) prior to the effectiveness of such registration whether or not any Holder has elected to include any Registrable Securities in such registration.

Section 5.4    Priority on Registrations. Notwithstanding anything to the contrary in this Agreement, if the managing underwriters of an underwritten offering of Registrable Securities informs the Company that the number of securities requested to be included in such offering, including pursuant to this Article V, exceeds the number which can be sold without materially adversely affecting the marketability of such offering (including a material adverse effect on the per Share offering price) (a "Cutback Event"), the Company will include in such registration or prospectus only such number of securities that in the reasonable opinion of such underwriters can be sold without causing a Cutback Event, which securities will be so included in the following order of priority:

(a)    for registrations pursuant to Section 5.2, first, Registrable Securities of the Holders who have requested registration of their Registrable Securities pursuant to Section 5.2 or Section 5.3 and second, any securities proposed to be registered by the Company or any other Person, in each case *pro rata* on the basis of the aggregate number of such Registrable Securities or securities, as applicable, proposed to be registered by the applicable holders thereof; and

(b)    for any other registrations, first, Registrable Securities of the Holders who have requested registration of their Registrable Securities pursuant to Section 5.3 and second, any securities proposed to be registered by the Company or any other Person, in each case *pro rata* on the basis of the aggregate number of such Registrable Securities or securities, as applicable, proposed to be registered by the applicable holders thereof.

Section 5.5    Registration Procedures.

(a)    In the event that Holders request that any of their Registrable Securities be registered pursuant to this Article V, the Company will use its reasonable best efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of disposition thereof and as soon as possible:

(i)    prepare and file with the Commission a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective as soon as practicable thereafter; and before filing a Registration Statement or prospectus or any amendments or supplements thereto, furnish to Demand Counsel (as defined below) and the underwriter or underwriters, if any, copies of all such documents proposed to be filed, including documents incorporated by reference in the prospectus and the exhibits thereto, and Demand Counsel (and the underwriter(s), if any) shall have the opportunity to review and comment thereon, and the Company will make such changes and additions thereto as reasonably requested by such Holders (and the underwriter(s), if any) prior to filing any Registration Statement or amendment thereto or any prospectus or any supplement thereto;

(ii)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be required to keep such Registration Statement effective for a period of not less than 180 days, or such shorter period as is necessary to

complete the distribution of the securities covered by such Registration Statement and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the seller or sellers of such Registrable Securities set forth in such Registration Statement;

(iii)     furnish to the seller or sellers of such Registrable Securities such number of copies of such Registration Statement, each amendment and supplement thereto, the prospectus included in such Registration Statement (including each preliminary prospectus), any and all transmittal letters or other correspondence with the Commission and such other documents as such sellers and any underwriter(s) may reasonably request in order to facilitate the disposition of the Registrable Securities;

(iv)     use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller of such Registrable Securities and any underwriter(s) reasonably requests and do any and all other acts and things that may be reasonably necessary or advisable to enable any such seller and any underwriter(s) to consummate the disposition in such jurisdictions of the Registrable Securities, provided that the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction;

(v)     notify each seller of such Registrable Securities and Demand Counsel and any underwriter(s), at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of any event as a result of which the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits any material fact necessary to make the statements therein not misleading, and, at the request of such sellers or any underwriter(s), the Company shall prepare a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading;

(vi)     in the case of an underwritten offering, (A) enter into such agreements (including underwriting agreements in customary form) as are customary in an underwritten offering and all of the representations and warranties by, and the other agreements on the part of, the Company in the underwriting agreement and other agreements to and for the benefit of such underwriters, shall also be made for the benefit of each seller of Registrable

Securities for the limited purpose of its participation in such offering, (B) take all such other actions as such Holders or the underwriter(s) reasonably request in order to expedite or facilitate the disposition of such Registrable Securities and (C) use its reasonable best efforts to cause its counsel to issue opinions of counsel in form, substance and scope as are customary in primary underwritten offerings, addressed and delivered to the underwriter(s) and such sellers;

(vii)   make available for inspection by such Holders, any underwriter participating in any disposition pursuant to such Registration Statement, and any attorney, accountant or other agent retained by such Holders or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and use its reasonable efforts to cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by such Holders, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(viii)   use its reasonable best efforts to cause all such Registrable Securities to be listed on each securities exchange on which Common Shares is then listed or, if it is not listed, on the New York Stock Exchange or the Nasdaq Global Market, as determined by the Company;

(ix)   provide a transfer agent and registrar for all Registrable Securities not later than the effective date of such Registration Statement;

(x)   if requested, use its reasonable best efforts to cause to be delivered, immediately prior to the pricing of any underwritten offering, immediately prior to effectiveness of each Registration Statement (and, in the case of an underwritten offering, at the time of closing of the sale of Registrable Securities pursuant thereto), letters from the Company's independent registered public accountants addressed to the sellers of Registrable Securities and each underwriter, if any, stating that such accountants are independent public accountants within the meaning of the Securities Act or other applicable rule or regulation, and otherwise in customary form and covering such financial and accounting matters as are customarily covered by letters of the independent registered public accountants delivered in connection with primary underwritten public offerings; and

(xi)   promptly notify the sellers of Registrable Securities and Demand Counsel and the underwriter or underwriters, of the following events, if any:

(A) when the Registration Statement, any pre-effective amendment, the prospectus or any prospectus supplement or post-

effective amendment to the Registration Statement has been filed and, with respect to the Registration Statement or any post-effective amendment, when the same has become effective;

(B) of any written request by the Commission for amendments or supplements to the Registration Statement or prospectus;

(C) of the notification to the Company by the Commission of its initiation of any proceeding with respect to, or the issuance by the Commission of any stop order suspending the effectiveness of, the Registration Statement; and

(D) of the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Securities for sale under the applicable securities or blue sky laws of any jurisdiction.

(b)　　The Company shall furnish to Demand Counsel, sellers of Registrable Securities or any underwriter (i) promptly after the same is prepared and publicly distributed, filed with the Commission, or received by the Company, copies of each Registration Statement and any amendment thereto, each preliminary prospectus and prospectus and each amendment or supplement thereto, each letter written by or on behalf of the Company to the Commission, and each item of correspondence from the Commission, in each case relating to such Registration Statement, and (ii) such number of copies of a prospectus, including a preliminary prospectus, and all amendments and supplements thereto and such other documents as Demand Counsel, sellers of Registrable Securities or any underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities. The Company will promptly notify sellers and Demand Counsel of the effectiveness of each Registration Statement or any post-effective amendment. The Company will respond reasonably promptly to any and all comments received from the Commission, with a view towards causing each Registration Statement or any amendment thereto to be declared effective by the Commission as soon as practicable and shall file an acceleration request as soon as practicable following the resolution or clearance of all comments by the Commission, if applicable, following notification by the Commission that any such Registration Statement or any amendment thereto will not be subject to further review.

Section 5.6　　Expenses.

(a)　　All expenses incurred in connection with each registration pursuant to, and incident to the Company's performance of or compliance with, this Article V, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, listing application fees, printing expenses, transfer agent's and registrar's fees, cost of distributing prospectuses in preliminary and final form as well as any supplements thereto, fees and disbursements of counsel for the Company and all accountants and other Persons retained by the Company and the reasonable fees and disbursements of one U.S. counsel for all of the Holders participating in the applicable registration (the "Demand Counsel") (all such expenses being

herein called "Registration Expenses") (but not including any underwriting discounts or commissions or transfer taxes, if any, attributable to the sale of Registrable Securities, which shall be borne by the applicable seller of Registrable Securities), shall be borne by the Company. In addition, the Company shall pay its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which they are to be listed.

(b)     The obligation of the Company to bear the expenses described in Section 5.6(a) shall apply irrespective of whether a registration, once properly demanded, if applicable, becomes effective, is withdrawn or suspended, is converted to another form of registration and irrespective of when any of the foregoing shall occur.

Section 5.7     Indemnification.

(a)     The Company shall indemnify and hold harmless, to the fullest extent permitted by law, each Holder and each of their respective officers, directors, employees and Affiliates and each Person who controls such Holder (within the meaning of the Securities Act) against any losses, claims, damages, liabilities, joint or several, and expenses (each, a "Loss") arising out of or based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application for listing on a national securities exchange, or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus, in light of the circumstances under which they were made) not misleading or (iii) any violation by the Company of the Securities Act, the Exchange Act or applicable "blue sky" laws, except insofar as the same are made in reliance and in conformity with information relating to such Holder, furnished in writing to the Company by such Holder, expressly for use therein.

(b)     In connection with any Registration Statement that includes Registrable Securities owned by any Holder, such Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or prospectus and shall indemnify and hold harmless the Company, its directors and officers, and each other Person who controls the Company (within the meaning of the Securities Act) against any Losses to which the Company or any such director or officer or controlling Person may become subject under the Securities Act or otherwise, insofar as such Losses arise out of or are based upon (i) any untrue or alleged untrue statement of material fact contained in the Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application for listing on a national securities exchange or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is made in such Registration Statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any such application, in reliance upon and in conformity with written information prepared and furnished to the Company by a Holder expressly for use therein, and such Holder will reimburse the Company and each such director, officer and controlling Person for any legal or any other expenses actually and reasonably incurred by them in connection with investigating, defending or settling any such loss, claim, liability,

action or proceeding; <u>provided</u> that the obligation to indemnify and hold harmless will be limited to the net amount of proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement.

(c)     In case any proceeding (including any governmental investigation) will be instituted involving any Person in respect of which indemnity may be sought pursuant to Section 5.7(a) or (b), such Person (hereinafter called the "<u>indemnified party</u>") will promptly notify the Person against whom such indemnity may be sought (hereinafter called the "<u>indemnifying party</u>") in writing and the indemnifying party, upon request of the indemnified party, will retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and will pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party will have the right to retain its own counsel, but the fees and expenses of such counsel will be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party will have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impeded parties) include both the indemnifying party and the indemnified party and the indemnified party will have been advised by counsel that representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party will not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) at any time for all such indemnified parties, and that all such reasonable fees and expenses will be reimbursed as they are incurred. In the case of the retention of any such separate firm for the indemnified parties, such firm will be designated in writing by the indemnified parties. The indemnifying party will not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an indemnified party will have requested an indemnifying party to reimburse the indemnified party for reasonable fees and expenses of counsel as contemplated by the third sentence of this Section 5.7(c), the indemnifying party agrees that it will be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by such indemnifying party of the aforesaid request and (ii) such indemnifying party will not have reimbursed the indemnified party in accordance with such request or reasonably objected in writing, on the basis of the standards set forth herein, to the propriety of such reimbursement prior to the date of such settlement. No indemnifying party will, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such proceeding.

(d)     The provisions of this Section 5.7 shall survive the transfer of securities and any termination of this Agreement.

(e)     If the indemnification provided for in or pursuant to this Section 5.7 is due in accordance with the terms hereof, but is held by a court to be unavailable or unenforceable in respect of any Losses, then each applicable indemnifying party, in lieu of indemnifying such

indemnified party, shall contribute to the amount paid or payable by such indemnified Person as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and of the indemnified party, on the other hand, in connection with the statements or omissions that result in such Losses as well as any other relevant equitable considerations. The relative fault of the indemnifying party, on the one hand, and of the indemnified Person, on the other hand, shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party, and by such party's relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(f)     The parties agree that it would not be just and equitable if contribution pursuant to Section 5.7(e) were determined by *pro rata* allocation or by any other method of allocation that does not take into account the equitable considerations referred to in Section 5.7(e). No Person guilty of "fraudulent misrepresentation" (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(g)     If indemnification is available under this Section 5.7, the indemnifying party will indemnify each indemnified party to the full extent provided in Sections 5.7(a) and (b) without regard to the relative fault of said indemnifying party or indemnified party or any other equitable consideration provided for in Section 5.7(e).

Section 5.8     Participation in Underwritten Registrations.

(a)     No Holder may participate in any registration hereunder that is underwritten unless such Holder (i) agrees to sell its Registrable Securities on the basis provided in any customary underwriting arrangements (including pursuant to the terms of any over-allotment or "green shoe" option requested by the underwriter(s), provided that no Holder will be required to sell more than the number of Registrable Securities that such Holder has requested the Company to include in any registration), (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements, and (iii) cooperates with the Company's reasonable requests in connection with such registration or qualification (it being understood that the Company's failure to perform its obligations hereunder, which failure is caused by such Holder's failure to cooperate, will not constitute a breach by the Company of this Agreement). Notwithstanding the foregoing, no Holder will be required to agree to any indemnification obligations on the part of such Holder that are greater than its obligations pursuant to Section 5.7(b).

(b)     Each Holder that is participating in any registration hereunder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 5.5(a)(v), such Holder will forthwith discontinue the disposition of its Registrable Securities pursuant to the Registration Statement until such Holder receives copies of a supplemented or amended prospectus as contemplated by such Section 5.5(a)(v). In the event the Company gives any such notice, the applicable time period mentioned in Section 5.5(a)(ii) during which a Registration Statement is to remain effective will be extended by the number of days during the period from and including the date of the giving of such notice pursuant to

Section 5.5(a)(v) to and including the date when each seller of a Registrable Security covered by such Registration Statement will have received the copies of the supplemented or amended prospectus contemplated by Section 5.5(a)(v).

Section 5.9    Rule 144.  The Company covenants that, to the extent applicable, it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder, and it will take such further action as any Holder may reasonably request to make available adequate current public information with respect to the Company meeting the information requirements of Rule 144(c) under the Securities Act, to the extent required to enable such Holder to sell Registrable Securities without registration under the Securities Act pursuant to the exemption provided by Rule 144.  Upon the request of any Holders, the Company will deliver to such Holder a written statement as to whether it has complied with such information and requirements.

Section 5.10    Transfer of Registration Rights.

(a)    Subject to the restrictions on Transfers set forth in this Agreement, the Holders may transfer all or any portion of their then remaining registration rights under this Article V to any Transferee of such Person.  In connection with any such transfer, the term "Holder" as used in this Article V shall, where appropriate to assign such rights to such Transferee, be inclusive of the Holder and such Transferee.

(b)    After any such Transfer and assignment, such Holder shall retain its rights under this Article V with respect to all other Registrable Securities owned by such Holder.  Upon the request of such Holder, the Company shall execute a registration rights agreement with such transferee (or a proposed transferee) substantially similar to the applicable subsections of this Article V.

Section 5.11    Holdback.  In consideration for the Company agreeing to its obligations under this Agreement, each Holder agrees in connection with any registration of the Company's securities (whether or not such Holder is participating in such registration) upon the request of the Company and the underwriters managing any underwritten offering of the Company's securities, not to effect, and to cause their respective Controlled Affiliates not to effect (other than pursuant to such registration) any public sale or distribution of Registrable Securities, including any sale pursuant to Rule 144 or Rule 144A, or make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any Registrable Securities, any other equity interests or capital stock of the Company or any securities convertible into or exchangeable or exercisable for any equity interests or capital stock of the Company without the prior written consent of the Company or such underwriters, as the case may be, for a customary period (which shall be the same for all Holders) to be determined after consultation among the managing underwriter or underwriters for such offering and the Company (the "Holdback Period"); provided that nothing herein will prevent any Holder from making a Transfer of Registrable Securities to a Permitted Transferee, so long as any such Permitted Transferee agrees to be so bound.  The Company further agrees not to effect (other than pursuant to such registration) any public sale or distribution, or to file any Registration Statement (other than such registration) covering any of its equity securities or any securities convertible into or exchangeable or exercisable for such securities, during the Holdback Period with respect to an

underwritten offering, if required by the managing underwriter, _provided_ that notwithstanding anything to the contrary herein, the Company's obligations under this Section 5.11 shall not apply during any 12-month period for more than an aggregate of 180 days with respect to any Short-Form Registrations.

## ARTICLE VI.

### NOTICES

All notices or other communications under this Agreement shall be given in writing and shall be deemed duly given and received on the third full business day following the day of the mailing thereof by registered or certified mail or when delivered personally or sent by facsimile transmission as follows:

(i)     if to the Company, at its principal executive offices at the time of the giving of such notice, or at such other address as the Company shall have designated by notice as herein provided the Holders, Attention: The Chairman of the Board of Directors;

(ii)     if to any DDJ Party, to:

DDJ Capital Management, LLC
Attention: James R. Kime
130 Turner Street
Building 3, Suite 600
Waltham, MA 02453
Telephone: (781) 283-8500
Facsimile: (781) 283-8555

with a copy to:

DDJ Capital Management, LLC
Attention: Legal Department
130 Turner Street
Building 3, Suite 600
Waltham, MA 02453
Telephone: (781) 283-8500
Facsimile: (781) 283-8541

or at such other place as each DDJ Party shall have designated by notice as herein provided to the Company and the Holders; and

(iii)     if to any Wayzata Party, to:

Wayzata Investment Partners LLC

701 East Lake Street
Suite 300
Wayzata, Minnesota 55391
Attention: General Counsel
Facsimile No.: 952-345-8901

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention: Howard A. Sobel, Esq. and John Giouroukakis, Esq.
Facsimile No.: 212-751-4864

or at such other place as each Wayzata Party shall have designated by notice as herein provided to the Company and the Holders; and

(iv)     if to any Holder other than a DDJ Party or a Wayzata Party, at the address of such person as set forth in the stock records of the Company or at such other address as such person shall have designated by notice as herein provided to the Company.

## ARTICLE VII.

## SPECIFIC PERFORMANCE

Due to the fact that the securities of the Company cannot be readily purchased or sold in the open market and for other reasons, the parties will be irreparably damaged in the event that this Agreement is not specifically enforced. In the event of a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any of the parties hereto, the other parties shall, in addition to all other remedies, be entitled (without any bond or other security being required) to a temporary and/or permanent injunction, without showing any actual damage or that monetary damages would not provide an adequate remedy, and/or a decree for specific performance, in accordance with the provisions hereof.

## ARTICLE VIII.

## MISCELLANEOUS.

Section 8.1     Entire Agreement; Amendments. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be modified or amended except by a written agreement signed by the Company and approved by a majority (on the basis of the number of Common Shares then held by all Holders) of all Holders; provided, however, that none of the provisions (and related definitions) of Article I, Section 2.2, Section 2.3, Section 2.4, Article III, Article IV, Section 5.2 and Section 5.3 of this Agreement may be modified, amended or eliminated, except by agreement of sixty-six and two-thirds percent (66-2/3%) (on the basis of the number of Common Shares then held by all Holders) of all

Holders, which agreement shall bind each Holder whether or not such Holder has agreed thereto; provided, further, that no modification or amendment which would materially and disproportionately adversely affect the rights of any Holder as compared to other Holders shall be effective as to such Holder if such Holder shall not have consented in writing thereto. At any time hereafter, Persons acquiring Common Shares in accordance with the terms of this Agreement may be made parties hereto by executing a signature page in the form attached as Exhibit A hereto, which signature page shall be countersigned by the Company and shall be attached to this Agreement and become a part hereof without any further action of any other Party hereto. Anything in this Agreement to the contrary notwithstanding, any modification or amendment of this Agreement by a written agreement signed by, or binding upon, any Holder shall be valid and binding upon any and all persons or entities who may, at any time, have or claim any rights under or pursuant to this Agreement in respect of Common Shares acquired from such Holder.

Section 8.2    No Waiver. No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature. Anything in this Agreement to the contrary notwithstanding, any waiver, consent or other instrument under or pursuant to this Agreement signed by, or binding upon, any party shall be valid and binding upon any and all Persons who may, at any time, have or claim any rights under or pursuant to this Agreement in respect of Common Shares acquired from such party.

Section 8.3    Successors and Assigns. Except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Company, the Holders and their respective heirs, personal representatives, successors and assigns; provided, however, that nothing contained herein shall be construed as granting to any Holder the right to Transfer any Common Shares except in accordance with this Agreement.

Section 8.4    Severability. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein.

Section 8.5    Headings; Interpretation. The Article and Section headings contained herein are for the purposes of convenience only and are not intended to define or limit the contents of said sections. Words in the singular shall be read and construed as though in the plural and words in the plural shall be read and construed as though in the singular in all cases where they would so apply.

Section 8.6    Business Day. For purposes of this Agreement, "business day" means any day other than Saturday, Sunday or a day on which banks are authorized by law to be closed in New York, NY. In the event any deadline for the taking of any action or delivery of any notice hereunder falls on a day which is not a business day, then such deadline shall be deemed to be extended until 5:00 p.m., New York City time, on the next business day.

Section 8.7    Further Actions. Each party hereto shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 8.8    Counterparts. This Agreement may be executed in one or more counterparts, all of which taken together shall be deemed one original.

Section 8.9    Consent to Jurisdiction; Waiver of Jury Trial. The Company, the Wayzata Parties, the DDJ Parties and each other Holder hereby irrevocably and unconditionally consents to the jurisdiction of, and agrees, for the benefit of each party, that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement and with respect to the enforcement, modification, vacation or correction of an award rendered in an arbitration proceeding may be brought in, any New York State court or federal court of the United States sitting in the State of New York in any action or proceeding relating to this Agreement and consents to service of process in connection therewith by the delivery of notice to such Person's or Holder's address at the address for notices to such Person pursuant to this Agreement. **TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HERETO WAIVES ANY AND ALL RIGHTS THE PARTY MAY HAVE TO A JURY TRIAL WITH RESPECT TO ANY DISPUTE ARISING UNDER THIS AGREEMENT OR IN CONNECTION THEREWITH.** Each party hereto waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings brought in any such New York Court and hereby further waives and agrees not to plead or claim in any such New York Court that any such action, suit or proceeding brought therein has been brought in an inconvenient forum. Each party agrees that (i) to the fullest extent permitted by law, service of process may be effectuated hereinafter by mailing a copy of the summons and complaint or other pleading by certified mail, return receipt requested, at its address set forth herein and (ii) all notices that are required to be given hereunder may be given by the attorneys for the respective parties. Furthermore, each Holder agrees to vote its Common Shares to cause the Company to at any time make the foregoing consents, agreements and waivers in respect of any legal action, suit or proceeding against the Company by a Holder.

Section 8.10    Governing Law. This Agreement, and the rights and obligations of the parties hereunder, shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to the conflicts of laws principles thereof.

Section 8.11    (a)    Preemptive Rights. Except for Excluded Issuances, if the Company (or any subsidiary of the Company) wishes to issue and sell any equity interests or shares of capital stock or any equity security convertible into or exchangeable for equity interests or capital stock (each, a "New Security" and together with the "New Securities") to any Wayzata Party or any of its Permitted Transferees (collectively, the "Subject Purchasers"), then the Company shall also offer such New Securities to the DDJ Parties and any other Holder that is an "accredited investor" (as defined in Rule 501 of Regulation D promulgated under the Securities Act) (for the purposes of this Section 8.11, each a "Stockholder") by sending written notice (the "New Issuance Notice") to such Persons at least fifteen (15) days prior to the issuance and sale of the New Securities. The New Issuance Notice shall state (i) the number of shares, notes or other securities, as applicable, of New Securities proposed to be issued and sold and the terms of

such New Securities, (ii) the proposed purchase price per share, note or other security, as applicable, of the New Securities that the Company is willing to accept (the "Proposed Price") and the terms and conditions of the purchase of such New Securities, (iii) the proposed date on which the New Securities will be sold (the "New Issuance Closing Date"), and (iv) each Stockholder's Proportionate Percentage. For purposes hereof, each Stockholder's "Proportionate Percentage" means, with respect to any Stockholder, the percentage of the New Securities allocated to such Stockholder to be determined as follows:

(x)      with respect to New Securities which are of the same class as any class of equity interests or capital stock outstanding on the date of the New Issuance Notice ("Shares"), by dividing (a) the total number of Shares of the same class of equity interests or capital stock as the New Securities then owned by the respective Stockholder, by (b) the total outstanding number of Shares of the same class of equity interests or capital stock as such New Securities on such date; or

(y)      with respect to New Securities which are of a new class of equity interests or capital stock different from any class of equity interests or capital stock outstanding on the date of the New Issuance Notice or any New Securities offered pursuant to Section 8.11(a), by dividing (a) the total number of Common Shares held by the respective Stockholder on such date, by (b) the total number of Common Shares outstanding on such date.

(b)      Option. For a period of fifteen (15) days after the giving of the New Issuance Notice pursuant to Section 8.11(a), each Stockholder shall have the right to purchase any or all of its Proportionate Percentage of each or any class of the New Securities at a purchase price equal to the Proposed Price and upon the terms and conditions set forth in the New Issuance Notice.

(c)      Exercise of Options. The right of each Stockholder to purchase the New Securities under Section 8.11(a) shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the 15-day period referred to in Section 8.11(b), to the Company, which notice shall state the amount of each class of New Securities that such Stockholder elects to purchase. The failure to respond within such 15-day period shall be deemed to be a waiver of such Stockholder's rights under Section 8.11(b) with respect to such New Securities (but not future issuances).

(d)      Closing. The closing of the purchase of New Securities subscribed for or purchased by the Stockholders under this Section 8.11 shall be held at the principal office of the Company at 11:00 a.m. local time on the New Issuance Closing Date or at such other time and place as the parties to the transaction may agree. The Company shall make such other representations and warranties, enter into such other agreements and provide such other rights for the benefit of the participating Stockholders, in each case on terms no less favorable than any terms described in the New Securities Notice or on which the Company shall provide any of such representations and warranties, rights or agreements for the benefit of any Subject Purchaser. Each Stockholder purchasing the New Securities shall deliver at the closing payment in full in immediately available funds for the New Securities purchased by him, her or it and shall agree to the same terms and conditions, as agreed to by the Subject Purchasers, including, but not limited to, with respect to representations, warranties and covenants. At such closing, all of the parties

to the transaction shall execute such additional documents as are otherwise necessary or appropriate to consummate such transaction.

(e)    "Excluded Issuances" means any issuance of equity interests or capital stock of the Company (i) pursuant to a stock split, reclassification, subdivision or similar transaction or dividend applicable to all of the Common Shares, or (ii) pursuant to a public offering of securities.

(f)    The provisions of this Section 8.11 shall expire upon the consummation of an IPO.

Section 8.12   Information Rights.  (a) The Company shall provide to each Holder for so long as such Holder owns any of the Common Shares, the following information:

(i)    as soon as available, but no later than forty-five (45) days after the end of each quarterly accounting period in each fiscal year of the Company (other than any quarterly accounting period ending on the last day of a fiscal year of the Company), unaudited consolidated statements of income and cash flows of the Company and its consolidated subsidiaries for such quarterly period (as well as unaudited consolidated statements of income of the Company and its consolidated subsidiaries for the period from the beginning of the fiscal year to the end of such quarter) and unaudited consolidated balance sheets of the Company and its consolidated subsidiaries as of the end of such quarterly period (and such financial statements shall set forth in each case comparisons to the Company's and its consolidated subsidiaries' corresponding period in the preceding fiscal year, with an explanation of any material differences between them).  Such financial statements shall be prepared in accordance with GAAP, subject to the absence of footnote disclosures and to normal year-end adjustments; and

(ii)    as soon as available, but no later than one hundred and twenty (120) days after the end of each fiscal year of the Company, audited consolidated statements of income and cash flows of the Company and its consolidated subsidiaries for such fiscal year, and audited consolidated balance sheets of the Company and its consolidated subsidiaries as of the end of such fiscal year (and such financial statements shall set forth in each case comparisons to the Company's and its consolidated subsidiaries' corresponding period in the preceding fiscal year), and accompanied by the report of the Company's independent certified public accountants.  Such financial statements shall be prepared in accordance with GAAP.

(b)    All information disclosed by the Company to any Holder pursuant to Section 8.12 shall be confidential information of the Company (other than information which is publicly available) and, unless as otherwise provided in this Agreement or consented by the Board of Directors in writing in advance, shall not be used by the recipients thereof for any purpose other than to monitor and manage their investment in the Company, and shall not be disclosed to any third party other than (i) employees, accountants and attorneys of such recipient to the extent that they are bound by similarly restrictive confidentiality obligations with respect to such information or (ii) as otherwise permitted pursuant to any other written agreement by and between the Company and the recipient of such confidential information.  The obligations of the parties hereunder shall not apply to the extent that the disclosure of information otherwise determined to be confidential is required by applicable law, regulations, subpoena, civil investigative demand or other process or compulsion, provided, that: (x) prior to disclosing such

confidential information, a party shall notify the Company thereof, which notice shall include the basis upon which such party believes the information is required to be disclosed; and (y) such party shall, if requested by the Company and at the sole cost and expense of the Company, provide reasonable cooperation with the Company to protect the continued confidentiality thereof.

(c)     The provisions of this Section 8.12 shall expire upon the consummation of an IPO.

Section 8.13   Certain Tax Issues. Each Holder has reviewed with its, his or her own tax and legal advisors the federal, state, local and foreign tax consequences of such Holder's acquisition of Common Shares and the transactions of and contemplated by this Agreement. Each Holder is relying solely on such advisors and not on any statements of the Wayzata Parties, the DDJ Parties, the Company or any of their respective agents with respect to such tax consequences. Each Holder understands that it, he or she (and not the Wayzata Parties, the DDJ Parties or the Company) shall be responsible for their own tax liability that may arise as a result of such Holder's acquisition of Common Shares or the transactions contemplated by this Agreement.

Section 8.14   Other Businesses; Waiver of Certain Duties.

(a)     Each Holder and each general partner thereof, each member, limited or general partner of each such general partner and each of their Affiliates, officers, directors, shareholders, employees and agents may engage in or possess an interest in any other business venture of any nature or description (including any business venture that is a Competitor), on its own account, or in partnership with, or as an employee, officer, director or shareholder of any other Person. Each Holder and each general partner thereof, each member, limited or general partner of each such general partner and each of their Affiliates, officers, directors, shareholders, employees and agents  may (i) engage in, and shall have no duty to refrain from engaging in, separate businesses or activities from the Company or any of its subsidiaries, including business or activities that are the same or similar to, or compete directly or indirectly with, those of the Company or any of its subsidiaries,  (ii) do business with any potential or actual customer or supplier of the Company or any of its subsidiaries and (iii) employ or otherwise engage any officer or employee of the Company or any of its subsidiaries.

(b)     None of the Holders or any of their respective Affiliates shall have any obligation to present any business opportunity to the Company or any of its subsidiaries, even if the opportunity is one that the Company or any of its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and no such Person shall be liable to the Company, its stockholders or any of Company's subsidiaries or any Holder for breach of any fiduciary or other duty, as a shareholder, by reason of the fact that such Person pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity, or information regarding such business opportunity, to the Company or any of its subsidiaries.

Section 8.15   Other Securities. In the event any equity interests or capital stock of the Company or any other Person shall be distributed on, with respect to, or in exchange for

Common Shares as a stock dividend, stock split, spin-off, reclassification or recapitalization, or in connection with any merger or reorganization (including, without limitation, in connection with an IPO), the restrictions, rights and options set forth in this Agreement shall apply with respect to such other equity interests or capital stock to the same extent as they are, or would have been applicable, to the Common Shares on, or with respect to, such other equity interests or capital stock was distributed.

Section 8.16    Treatment of SPV's. Each Holder that is an entity that does not hold any substantial assets other than Common Shares (each, an "SPV") agrees that (a) certificates for shares of its common stock or other instruments reflecting equity interests in such entity (and the certificates for shares of common stock or other equity interests in any similar entities controlling such entity) will note the restrictions contained in this Agreement on the restrictions on transfer of shares as if such common stock or other equity interests were Common Shares, (b) no shares of such common stock or other equity interests may be transferred to any Person other than in accordance with the terms and provisions of this Agreement as if such common stock or other equity interests were Common Shares and (c) any Transfer of such common stock or other equity interests shall be deemed to be a transfer of a *pro rata* number of Common Shares hereunder and subject to the provisions of this Agreement.

\* \* \* \* \*

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the first date written above.

To be completed by Holder:

_____

[INSERT NAME OF HOLDER]

By:_____
      [Signature]

Name:_____
      [Print Name]

Its:_____
      [Title]

EXHIBIT A

<u>SIGNATURE PAGE</u>

<u>KEY PLASTICS CORPORATION</u>
<u>STOCKHOLDERS AGREEMENT</u>

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a party to, and subject to the terms and conditions of, that certain stockholders agreement, dated as of _____, 2009, by and among Key Plastics Corporation, a Delaware corporation (the "<u>Company</u>") and each of the Holders (as defined in the Stockholders Agreement) party thereto (the "<u>Stockholders Agreement</u>"). The undersigned acknowledges and agrees that he, she or it, as the case may be, will have the rights, and be subject to the obligations, of a "<u>Holder</u>" as defined in the Stockholders Agreement.

_____

By: _____
Name:
Title:

Accepted:

KEY PLASTICS CORPORATION

By: _____
Name:
Title:

## SCHEDULE A

GMAM Investment Funds Trust II, for the account of the Promark Alternative High Yield Bond
    Fund (Account No. 7M2E)
GMAM Investment Funds Trust – Promark High Yield Bond Fund
General Motors Welfare Benefit Trust (VEBA)
GMAM Investment Funds Trust II for the account of the Promark Alternative High Yield Bond
    Fund (Account No. 7MWD)
DDJ High Yield Fund
Multi-Style, Multi-Manager Funds PLC The Global Strategic Yield Fund
DDJ Total Return Loan Fund, L.P.
DDJ Capital Management Group Trust
Stichting Pensioenfonds Hoogovens
Caterpillar Inc. Master Retirement Trust
J.C. Penney Corporation, Inc. Pension Plan Trust
The October Fund, Limited Partnership

SCHEDULE B

OTHER INVESTORS

# ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this "Escrow Agreement"), dated as of December _15_, 2008, is entered into by and between Key Plastics L.L.C., a Michigan limited liability company ("Key Plastics"), Key Plastics Finance Corp., a Delaware corporation ("Finance Corp" and, together with Key Plastics, the "Debtors") and Wells Fargo Bank, National Association, as escrow agent (the "Escrow Agent").

**WHEREAS,** the Debtors plan to file a Joint Prepackaged Plan of Reorganization (as may be amended from time to time, the "Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the Disclosure Statement (as may be amended from time to time, the "Disclosure Statement") with respect to the Plan.

**WHEREAS,** pursuant to a Subscription and Contribution Agreement (the "Subscription Agreement") by and among the Debtors and the subscribers thereto (the "Subscribers"), in accordance with the Plan, the Subscribers may participate in a rights offering for certain membership interests of Key Plastics, as a post-confirmation entity reorganized under the Plan (the "New Key Plastics Equity"), for $57.15 per interest (the "Subscription Price") in an aggregate amount of $20,000,000 (the "Rights Offering") and each New Key Plastics Equity interest acquired by the Subscribers will, immediately upon acquisition, be contributed to Finance Corp automatically in exchange for one share of common stock to be issued by Finance Corp, as a post-confirmation entity reorganized under the Plan (the "New Finance Corp Equity").

**WHEREAS,** pursuant to the Backstop Purchase and Contribution Agreement (the "Backstop Agreement") by and among the Debtors and the backstop parties named therein (each, a "Backstop Party" and collectively, the "Backstop Parties"), each Backstop Party has agreed, to purchase, severally and not jointly, at the Subscription Price, any and all New Key Plastics Equity offered in the Rights Offering but not subscribed for by Subscribers (the "Backstop" and, together with the Rights Offering, the "Offering") and each New Key Plastics Equity interest acquired by the Backstop Parties will, immediately upon acquisition, be contributed to Finance Corp automatically in exchange for one share of New Finance Corp Equity.

**WHEREAS,** pursuant to the Subscription Agreement and Backstop Agreement, Key Plastics intends to raise funds from the Subscribers and, if required, the Backstop Parties (together, the "Investors") in the amount of $20,000,000 in the aggregate (the "Escrow Amount") through the sale to the Investors of New Key Plastics Equity (the "Securities").

**WHEREAS,** the funds deposited by the Investors with the Escrow Agent will be held for the benefit of the Investors and the Debtors in accordance with the terms of this Escrow Agreement.

**WHEREAS,** the Escrow Agent is willing to accept the appointment as escrow agent upon the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises set forth above and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

## 1. Escrow of Investor Funds.

(a)     On or before the commencement of the Offering, the Debtors shall establish an escrow account with the Escrow Agent (the "Escrow Account"). During the term of this Escrow Agreement, Investor Funds (as defined herein) will be wired directly to the Escrow Account using wire instructions provided by the Escrow Agent. All funds received by the Escrow Agent from Investors as payment for the Securities ("Investor Funds") shall be retained in the Escrow Account by the Escrow Agent and invested as stated below.

(b)     The Escrow Agent shall have no duty to make any disbursement, investment or other use of Investor Funds until and unless it has good and collected funds.

## 2.     Identity of Investors.

**2.     Identity of Investors.** A copy of the Subscription Agreement is attached as **Exhibit A** and a copy of the Backstop Agreement is attached as **Exhibit B** to this Escrow Agreement. The Debtors shall furnish to the Escrow Agent a copy of each Subscriber's Subscription Form (attached to the Subscription Agreement and incorporated therein by reference) as soon as practicable upon delivery, which form shall contain the names of the Investors who have subscribed for Securities, the Investors' tax identification numbers, the amount of Securities subscribed for by each Investor and the amount to be paid and deposited by each Investor with the Escrow Agent. The Debtors shall also furnish such information for the Backstop Parties. The Escrow Agent shall confirm by way of a statement all deposits of Investor Funds on a monthly basis, or, if practicable, more frequently if requested by the Debtors or the Backstop Parties. All Investor Funds so deposited shall not be subject to any liens or charges by either of the Debtors or the Escrow Agent, or judgments or creditors' claims against the Debtors. While the Investor Funds are held by the Escrow Agent, such funds and any interest thereon shall not be considered property of the Debtors' bankruptcy estates, and shall not be subject to security interests of any kind asserted or assertable by any party. Each of the Debtors understands and agrees that such Debtor shall not be entitled to any Investor Funds on deposit in the Escrow Account and no such funds shall become the property of such Debtor except when released to Key Plastics pursuant to Section 3 of this Escrow Agreement. The Debtors and the Escrow Agent will treat all Investor information as confidential.

## 3.     Disbursement of Funds.

(a)     In the event the Escrow Agent receives written notice from the Solicitation Agent for the Offering, Financial Balloting Group LLC, that an Investor's subscription has been rejected, the Escrow Agent shall pay to the applicable Investor, within five (5) business days after receiving notice of the rejection, by first class United States Mail at the address appearing on the List of Investors, or at such other address or federal wire instructions as are furnished to the Escrow Agent by the Investor in writing, all collected sums paid by the Investor for Securities and received by the Escrow Agent, together with the interest earned on such Investor Funds.

(b)     Once the Escrow Agent is in receipt of good and collected Investor Funds totaling at least the Escrow Amount, the Escrow Agent shall notify the Debtors of the same in writing. If

2

the Escrow Amount has been received into the Escrow Account at the Termination Date (as defined in Section 4), then the Escrow Agent shall pay out the Investor Funds and all earnings thereon to Key Plastics when and as directed in writing by the Backstop Parties.

(c) If the Escrow Amount has not been received by the Escrow Agent before the Termination Date, the Escrow Agent shall, within five (5) business days after the Termination Date, refund to the Investors by first class United States Mail at the address appearing on the List of Investors, or at such other address or fed wire instructions as are furnished to the Escrow Agent by the Investors in writing, all sums paid by the Investor for Securities and received by the Escrow Agent, together with the interest earned on such funds in the Escrow Account, without any further action by the Debtors or the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and shall then notify the Debtors in writing of such refunds.

**4.    Term of Escrow.** The "Termination Date" shall be the earliest of (i) the Effective Date (as defined in the Plan), provided that on such date, all the conditions in Section 4 of the Subscription Agreement and Section 6 and Section 7 of the Backstop Agreement have been satisfied by such date, or (ii) February 28, 2009 (unless extended by written notice to the Escrow Agent from the Debtors and the Backstop Parties, which extension shall conform to the terms of the Offering). After the Termination Date, the Escrow Agent shall not accept, any additional amounts representing payments by prospective Investors.

**5.    Duty and Limitation on Liability of the Escrow Agent.**

(a) The Escrow Agent's rights and responsibilities shall be governed solely by this Escrow Agreement. Neither the Subscription Agreement, the Backstop Agreement nor any other agreement or document shall govern the Escrow Agent even if such other agreement or document is referred to herein, is deposited with, or is otherwise known to, the Escrow Agent.

(b) The Escrow Agent shall be under no duty to determine whether the Debtors are complying with the requirements of the Offering or applicable securities or other laws. The Escrow Agent shall not be responsible for, or be required to enforce, any of the terms or conditions of any other agreement between the Debtors and any other party.

(c) The Escrow Agent may conclusively rely upon and shall be fully protected in acting upon any statement, certificate, notice, request, consent, order or other document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall have no duty or liability to verify any such statement, certificate, notice, request, consent, order or other document. Upon or before the execution of this Escrow Agreement, the Debtors shall deliver to the Escrow Agent an authorized signers list in the form of **Exhibit C** to this Escrow Agreement.

(d) The Escrow Agent shall be under no obligation to institute and/or defend any action, suit or proceeding in connection with this Escrow Agreement unless first indemnified to its reasonable satisfaction.

(e)     The Escrow Agent may consult one counsel of its own choice at Debtors' expense, with respect to any question arising under this Escrow Agreement and the Escrow Agent shall not be liable for any action taken or omitted in good faith upon the advice of such counsel, except to the extent that a court of competent jurisdiction determines that the Escrow Agent was grossly negligent or engaged in willful misconduct.

(f)     The Escrow Agent shall not be liable for any action taken or omitted by it, except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of loss.

(g)     The Escrow Agent is acting solely as escrow agent hereunder and owes no duties, covenants or obligations, fiduciary or otherwise, to any person by reason of this Escrow Agreement, except as otherwise explicitly set forth in this Escrow Agreement, and no implied duties, covenants or obligations, fiduciary or otherwise, shall be read into this Escrow Agreement against the Escrow Agent.

(h)     In the event of any disagreement between any of the parties to this Escrow Agreement, or between any of them and any other person, including any Investor, resulting in adverse or conflicting claims or demands being made in connection with the matters covered by this Escrow Agreement, or in the event that the Escrow Agent is in doubt, in its reasonable judgment, as to what action it should take hereunder, the Escrow Agent may, in its reasonable judgment, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue so to refrain from acting until (i) the rights of all interested parties shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjudged and all doubt resolved by agreement among all of the interested persons, and the Escrow Agent shall have been notified thereof in writing signed by all such persons. Notwithstanding the foregoing, the Escrow Agent may in its discretion obey the order, judgment, decree or levy of any court of competent jurisdiction and the Escrow Agent is hereby authorized in its sole discretion to comply with and obey any such orders, judgments, decrees or levies.

(i)     In the event that any controversy should arise with respect to this Escrow Agreement, the Escrow Agent shall have the right, in its reasonable judgment, to institute an interpleader action in any court of competent jurisdiction to determine the rights of the parties.

(j)     IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

(k)     The parties agree that the Escrow Agent had no role in the preparation of the Subscription Agreement and Backstop Agreement, has not reviewed any such documents, and

makes no representations or warranties with respect to the information contained therein or omitted therefrom.

(l)     The Escrow Agent shall have no obligation, duty or liability with respect to compliance with any federal or state securities, disclosure or tax laws concerning the Subscription Agreement and Backstop Agreement or the issuance, offering or sale of the Securities.

(m)     The Escrow Agent shall have no duty or obligation to monitor the application and use of the Investor Funds once transferred to Key Plastics, that being the sole obligation and responsibility of the Debtors.

(n)     The Escrow Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; acts of terrorism; civil or military disturbances; sabotage; epidemic; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

**6.     Escrow Agent's Fee.** The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as **Exhibit D**, which compensation shall be paid by the Debtors on the date hereof. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any material service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation relating to this Escrow Agreement, or the subject matter hereof, then the Escrow Agent shall be entitled to reasonable compensation for such extraordinary services and reimbursement for all reasonable and documented costs and expenses, including reasonable and documented attorney's fees and expenses, occasioned by any delay, controversy, litigation or event, and the same shall be paid by the Debtors. The Debtors' obligations under this Section 6 shall survive the resignation or removal of the Escrow Agent and the assignment or termination of this Escrow Agreement.

**7.     Investment of Investor Funds; Income Allocation and Reporting.**

(a)     The Escrow Agent shall invest the Investor Funds, including any and all interest and investment income in the Institutional Money Market Account (IMMA), which is further described herein on **Exhibit E**. Any interest received by the Escrow Agent with respect to the Investor Funds, including reinvested interest shall become part of the Investor Funds, and shall be disbursed pursuant to Section 3 of this Escrow Agreement. Each Debtor agrees that, for tax

reporting purposes, all interest or other taxable income earned on the Investor Funds in any tax year shall be taxable to Key Plastics.

(b)     The Escrow Agent shall be entitled, after notice to the Debtors, to sell or redeem any such investments as the Escrow Agent deems necessary to make any payments or distributions required under this Escrow Agreement. The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement. The parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

(c)     Upon request by the Escrow Agent, the Debtors shall provide the Escrow Agent with certified tax identification numbers for the Debtors by furnishing appropriate IRS Forms W-9. The Debtors understand that if such tax reporting documentation is not so certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, to withhold a portion of any interest or other income earned on the Investor Funds pursuant to this Escrow Agreement.

**8.     Notices.** All notices, requests, demands, and other communications under this Escrow Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given, (b) on the day of transmission if sent by facsimile to the facsimile number given below, with written confirmation of receipt, (c) on the day after delivery via Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service, or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, and properly addressed, return receipt requested, to the party as follows:

If to the Debtors:

>       Key Plastics L.L.C. or Key Plastics Finance Corp.
>       21700 Haggerty Road, Suite 100N
>       Northville, Michigan 48167
>       Attention: Chief Executive Officer

with a copy to:

>       Weil, Gotshal & Manges LLP
>       200 Crescent Court, Suite 300
>       Dallas, TX  75201
>       214-746-7700
>       Attn: Stephen A. Youngman (email: stephen.youngman@weil.com)
>       Facsimile: 214-746-7777

If to Escrow Agent:

>       Wells Fargo Bank, National Association

45 Broadway, MAC N2666-140
New York, NY 10006-3007
Attn: Matt Sherman
Tel: (212) 515-1573
Fax: (212) 509-1716

Any party may change its address for purposes of this section by giving the other party written notice of the new address in the manner set forth above.

**9.     Indemnification of Escrow Agent.** The Debtors hereby jointly and severally indemnify, defend and hold harmless the Escrow Agent from and against, any and all loss, liability, cost, damage and expense, including, without limitation, reasonable and documented counsel fees and expenses, which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent arising out of this Escrow Agreement or any transaction to which this Escrow Agreement relates unless such loss, liability, cost, damage or expense is finally determined by a court of competent jurisdiction to have been primarily caused by the gross negligence or willful misconduct of the Escrow Agent. The terms of this Section 9 shall survive the assignment or termination of this Escrow Agreement and the resignation or removal of the Escrow Agent.

**10.     Resignation.** The Escrow Agent may resign upon thirty (30) days' advance written notice to the Debtors. If the Debtors do not appoint a successor escrow agent within the thirty (30) day period following such notice, the Escrow Agent, at the Debtor's expense, may petition any court of competent jurisdiction to name a successor escrow agent or interplead the Investor Funds with such court, whereupon the Escrow Agent's duties hereunder shall terminate.

**11.     Successors and Assigns.** Except as otherwise provided in this Escrow Agreement, no party hereto shall assign this Escrow Agreement or any rights or obligations hereunder without the prior written consent of the other parties hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect. This Escrow Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto. Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets in whole or in part, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance any further act. Any corporation or association into which either of the Debtors may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its business and assets in whole or in part, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which such Debtor is a party, shall be and become a successor party under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor. The Debtors shall send the Escrow Agent written notice of any such conversion, merger or consolidation.

12. **Governing Law; Jurisdiction.**

    (a)    This Escrow Agreement shall be construed, performed, and enforced in accordance with, and governed by, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.

    (b)    Each of the parties hereto irrevocably and unconditionally (i) consents to submit itself to the personal jurisdiction of the Bankruptcy Court, in connection with any dispute that arises out of this Escrow Agreement or any of the transactions contemplated by this Escrow Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court on the basis that litigation brought therein has been brought in an inconvenient forum and (iii) agrees that it will not bring any action relating to this Escrow Agreement or any of the transactions contemplated by this Escrow Agreement in any court other than the Bankruptcy Court, and waives any objection to the laying of venue in any such court. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

13. **Severability.** In the event that any part of this Escrow Agreement is declared by any court or other judicial or administrative body to be null, void, or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Escrow Agreement shall remain in full force and effect.

14. **Amendments; Waivers.** This Escrow Agreement may be amended or modified, and any of the terms, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation, or warranty of this Escrow Agreement. The Debtors agree that any requested waiver, modification or amendment of this Escrow Agreement shall be consistent with the terms of the Offering.

15. **Entire Agreement.** This Escrow Agreement contains the entire understanding among the parties hereto with respect to the escrow contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such escrow.

16. **References to Escrow Agent.** No printed or other matter in any language (including, without limitation, the Offering document, any supplement or amendment relating thereto, notices, reports and promotional material) which mentions the Escrow Agent's name or the rights, powers, or duties of the Escrow Agent shall be issued by the Debtors or on the Debtors' behalf unless the Escrow Agent shall first have given its specific written consent thereto.

17. **Section Headings.** The section headings in this Escrow Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Escrow Agreement.

8

**18.** **Counterparts.** This Escrow Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

NY\1472722.7

**IN WITNESS WHEREOF**, the parties hereto have caused this Escrow Agreement to be executed the day and year first set forth above.

KEY PLASTICS L.L.C.

By: _____
Name: John Wilson
Title: CFO

KEY PLASTICS FINANCE CORP.

By: _____
Name: John Wilson
Title: CFO

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By: _____
Name:
Title:  Matthew Sherman
       Vice President

EXHIBIT A

COPY OF SUBSCRIPTION AGREEMENT

EXHIBIT B

COPY OF BACKSTOP AGREEMENT

# EXHIBIT D
## CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Key Plastics L.L.C. and Key Plastics Finance Corp. and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit D is attached, on behalf of Key Plastics L.L.C. or Key Plastics Finance Corp.

**Name / Title**                    *Specimen Signature*

### *Key Plastics L. L. C.*

Douglas Nyhoff
_____
Name

President and CEO
_____
Title

John Wilson
_____
Name

Sr Vice President and CFO
_____
Title

### *Key Plastics Finance Corp.*

John Wilson
_____
Name

Sr Vice President and CFO
_____
Title

# EXHIBIT D

## ESCROW AGENT FEES

CORPORATE, MUNICIPAL AND ESCROW SOLUTIONS
CORPORATE TRUST SERVICES



## SCHEDULE OF FEES
## to act as ESCROW AGENT for
## KEY PLASTICS INC.

**I. Acceptance Fee**          **WAIVED**

Initial Fees as they relate to Wells Fargo Bank acting in the capacity of Escrow Agent – includes final review of the Escrow Agreement; acceptance of the Escrow appointment; setting up of Escrow Account(s) and accounting records; and coordination of receipt of funds for deposit to the Escrow Account(s).

**II. Escrow Agent Administration Fee**          **$3,500**

For ordinary administrative services by Escrow Agent – includes daily routine account management; investment transactions; cash transaction processing (including wire and check processing) and disbursement of funds in accordance with the agreement. Generation of 1099's (if applicable) for up to 15 investors is included in the Escrow Administration fee.

This fee is payable in advance, with payment due at the time of Escrow Agreement execution.

*Wells Fargo's fee quote is based on the following assumptions:*

- **MAXIMUM NUMBER OF INVESTORS:**      15
- **DURATION OF THE ESCROW IS 6 MONTHS OR LESS**
- **APPOINTMENT SUBJECT TO RECEIPT OF REQUESTED DUE DILIGENCE INFORMATION AS PER THE USA PATRIOT ACT**
- **THIS PROPOSAL ASSUMES THAT BALANCES IN ESCROW ACCOUNT WILL BE INVESTED IN MONEY MARKET FUNDS**
- **ALL FUNDS WILL BE RECEIVED FROM OR DISTRIBUTED TO A DOMESTIC OR AN APPROVED FOREIGN ENTITY**
- **IF THE ACCOUNT(S) DOES NOT OPEN WITHIN THREE (3) MONTHS OF THE DATE SHOWN BELOW, THIS PROPOSAL WILL BE DEEMED TO BE NULL AND VOID**

**III. Out-of-Pocket Expenses**          **At Cost**

We will charge for out-of-pocket expenses in response to specific tasks assigned by the client or provided for in the Escrow Agreement. Possible expenses would be, but are not limited to, express mail and messenger charges, travel expenses to attend closing or other meetings, fees and expenses of our counsel should substantial comments be made to our Escrow Agreement.



*This fee schedule is based upon the assumptions listed above which pertain to the responsibilities and risks involved in Wells Fargo undertaking the role of Escrow Agent. These assumptions are based on information provided to us as of the date of this fee schedule. Our fee schedule is subject to review and acceptance of the final documents. Should any of the assumptions, duties or responsibilities change, we reserve the right to affirm, modify or rescind our fee schedule. Extraordinary services (services other than the ordinary administration services of Escrow Agent described above) are not included in the administration fee and will be billed as incurred at the rates in effect from time to time.*

**Submitted: November 13, 2008**

**ACCEPTED BY:**

**KEY PLASTICS INC.**

By: _____
Print Name: ___John Wilson___
Title: ___CFO___
Date: ___Dec 12, 2008___

EXHIBIT E

**Agency and Custody Account Direction**
**For Cash Balances**
**Institutional Money Market Account**

Direction to use the following Wells Fargo Institutional Money Market Account for Cash
Balances for the escrow account or accounts (the "Account") established under the Escrow
Agreement to which this Exhibit E is attached.

You are hereby directed to deposit, as indicated below, or as I shall direct further in writing from
time to time, all cash in the Account(s) in the following money market deposit account of Wells
Fargo Bank, National Association (Bank):

Wells Fargo Institutional Money Market Account (IMMA)

I understand that amounts on deposit in the IMMA are insured, subject to the applicable rules
and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC
insurance amount of $100,000 per depositor, per insured bank, except that FDIC deposit
insurance temporarily increased from $100,000 to $250,000 per depositor through December 31,
2009. This includes principal and accrued interest up to a total of $250,000.

I acknowledge that I have full power to direct investments of the Account(s).

I understand that I may change this direction at any time and that it shall continue in effect until
revoked or modified by me by written notice to you.

_____
Authorized Representative
Key Plastics L.L.C.

_____
Authorized Representative
Key Plastics Finance Corp.

Dec 12, 2008
_____
Date

## Direction for Investment of Cash Balances

## Wells Fargo Money Market Deposit Accounts

Direction to use the following Wells Fargo Money Market Deposit Accounts for Cash Balances for the following account(s):

Account Name:

Account Number(s): 2332\600

You are hereby directed to deposit, as indicated below, or as I shall direct further in writing from time to time, all cash in the Account(s) in the following money market deposit account of Wells Fargo Bank, National Association (Bank):

_____    **Wells Fargo Institutional Money Market Deposit Account (IMMDA)**

I understand that amounts on deposit in the IMMDA are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $100,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $100,000.

*[Wells Fargo Bank, National Association has short term debt ratings of "P-1" from Moody's Investors Service and "A-1+" from Standard & Poor's Ratings Services.]*

I acknowledge that I have full power to direct investments of the Account(s).

I understand that I may change this direction at any time and that it shall continue in effect until revoked or modified by me by written notice to you.

_____
Signature

_____
Date          Dec 12 2008