# Exhibit E

# BACKSTOP PURCHASE AND CONTRIBUTION AGREEMENT

THIS BACKSTOP PURCHASE AND CONTRIBUTION AGREEMENT (this "Agreement") is made this 15th day of December, 2008 by and among Key Plastics L.L.C., a Michigan limited liability company ("Key Plastics"), Key Plastics Finance Corp., a Delaware corporation ("Finance Corp" and, together with Key Plastics, the "Debtors"), Wayzata Opportunities Fund II, L.P., a Delaware limited partnership ("Wayzata Opportunities"), and Wayzata Opportunities Fund Offshore II, L.P., a Delaware limited partnership ("Wayzata Offshore", and together with Wayzata Opportunities, each, a "Backstop Party" and collectively, the "Backstop Parties"). Capitalized terms not otherwise defined shall have the meaning set forth in the Plan (as defined below).

## WITNESSETH:

WHEREAS, the Debtors, as debtors and debtors-in-possession, will file a Joint Prepackaged Plan of Reorganization (as may be amended from time to time, the "Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the Disclosure Statement (as may be amended from time to time, the "Disclosure Statement") with respect to the Plan.

WHEREAS, pursuant to the Rights Offering (as defined in the Plan) and the Subscription and Contribution Agreement (the "Subscription Agreement") by and among the Debtors and the subscribers thereto (the "Subscribers"), in respect of the Subscribers' secured claims against the Debtors as senior noteholders pursuant to the 11 ¾% Senior Secured Notes Indenture dated March 12, 2007 (the "Senior Notes Indenture"), the Subscribers may participate in a Rights Offering for certain equity in Key Plastics in an amount proportionate to such Subscriber's aggregate principal amount of indebtedness under the Senior Notes Indenture held by such Subscriber as of the Voting Record Date (the "Maximum Senior Note Claim Amount"), which is set forth in Item 1 of the Subscription Form attached to the Subscription Agreement (the "Subscription Form");

WHEREAS, pursuant to the Rights Offering, each Subscriber has the right to subscribe for up to the number of membership interests of Key Plastics, as a post-confirmation entity reorganized under the Plan (the "New Key Plastics Equity"), equal to the quotient obtained by dividing (A) the product of (i) the quotient determined by dividing (x) the Maximum Senior Note Claim Amount by (y) $115 million, the aggregate principal amount of indebtedness under the Senior Notes Indenture held as of the Voting Record Date, and (ii) $20 million, the aggregate amount of New Key Plastics Equity offered in the Rights Offering, by (B) $57.15 per membership interest (the "Subscription Price").

WHEREAS, each New Key Plastics Equity interest acquired by the Subscribers pursuant to the Subscription Agreement will, immediately upon acquisition, be contributed to Finance Corp automatically, and without further action by such Subscriber, Key Plastics or Finance Corp, in exchange for one share of common stock to be issued by Finance Corp, as a post-confirmation entity reorganized under the Plan (the "New Finance Corp Equity").

WHEREAS, pursuant to this Agreement, each Backstop Party agrees, severally and not jointly, subject to the terms and conditions set forth herein, to purchase, at the Subscription Price, any and all New Key Plastics Equity offered in the Rights Offering but not subscribed for by Subscribers (the "Backstop Purchase") in the proportion of Rights Offering Interests (as defined herein) to be purchased by such Backstop Party as set forth opposite such Backstop Party's name in Schedule A attached hereto and incorporated herein by reference, of which each interest will also be contributed to Finance Corp automatically, and without further action by any Backstop Party, Key Plastics or Finance Corp, in exchange for one share of New Finance Corp Equity (the "Contribution", and together with the Backstop Purchase, the "Transactions").

WHEREAS, as of the Effective Date, in accordance with the Plan and upon consummation of the Transactions, Finance Corp will own 100% of the issued and outstanding New Key Plastics Equity and the Subscribers and Backstop Parties will own shares of New Finance Corp Equity.

WHEREAS, the parties intend that the Contribution shall qualify as a transaction described in Section 351 of the Internal Revenue Code of 1986, as amended (the "Code").

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements contained in this Agreement, the parties hereto hereby agree as follows:

**Section 1. Definitions.**

(a) For purposes of this Agreement, the following terms will have the meaning set forth below:

"Affiliate" of any Person means any Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"Board of Directors" means the board of directors of Finance Corp or any duly authorized committee thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"Confirmation Date" shall have the meaning assigned to it in the Plan.

"Latham" means Latham & Watkins LLP, legal counsel to the Backstop Parties.

"Managing Member" means the managing member of Key Plastics or any duly authorized committee thereof.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, affairs, condition (financial or otherwise), assets, properties or prospects of the Debtors and their respective subsidiaries taken as a whole, whether or not arising from transactions in the ordinary course of business, (b) the ability of the Debtors, subject to the approvals, and other authorizations as may be required under applicable requirements of the Bankruptcy Code, in connection with the Plan (the "Approvals"), to perform their obligations under this Agreement or the Restructuring and Plan Support Agreement or Finance Corp's obligations under the Stockholders Agreement, (c) subject to the Approvals, the validity or enforceability of this Agreement or the Restructuring and Plan Support Agreement against the Debtors or of the Stockholders Agreement against Finance Corp , or (d) the commencement of proceedings under the Bankruptcy Code by (i) any of Ford Motor Company, Chrysler LLC or General Motors Corporation, or (ii) any other customer or customers of the Debtors comprising more than 10% of the Debtors' annual revenues; provided that in the case of each of clauses (a)-(c), the following shall not constitute a Material Adverse Effect: (i) the circumstances giving rise to the filing of the Plan under chapter 11 of title 11 of the Bankruptcy Code, or (ii) the sale of the New Key Plastics Equity and New Finance Corp Equity in connection with the Transactions, as contemplated by this Agreement and the Subscription Agreement.

2

"Party" means Key Plastics, Finance Corp or a Backstop Party individually, and the "Parties" means Key Plastics, Finance Corp and the Backstop Parties, collectively.

"Person" includes all natural persons, corporations, business trusts, limited liability companies, associations, companies, partnerships, joint ventures and other entities, as well as governments and their respective agencies and political subdivisions.

"Petition Date" means the date on which the Debtors file voluntary petitions for relief under chapter 11 of the Bankruptcy Code, as contemplated in the recitals hereto.

"Professionals Fees" shall mean the fees and disbursements incurred by the Backstop Parties for FTI Consulting, Inc., as financial advisor, and Latham, as legal advisor.

"Purchase Date" means the Rights Offering Purchase Date and the Closing.

"Rights Offering Expiration Date" has the meaning assigned to it in the Subscription Agreement.

"Rights Offering Purchase Date" means the date of the sale and purchase of New Key Plastics Equity in the Rights Offering.

## Section 2. The Backstop Issuance.

### 2.1 Backstop.

(a) _Purchase and Sale._ Each Backstop Party agrees, severally and not jointly, to purchase from Key Plastics, pursuant to the terms and conditions set forth in this Agreement and in the Plan, an amount of New Key Plastics Equity equal to the product of (x) any and all membership interests of New Key Plastics Equity which are not subscribed for pursuant to the Rights Offering and (y) the percentage of such interests such Backstop Party commits to purchase, as set forth opposite such Backstop Party's name in Schedule A attached hereto and incorporated herein by reference (the "Rights Offering Interests"). Each Backstop Party agrees, severally and not jointly, to deposit in escrow with Wells Fargo, National Association (the "Escrow Agent") an amount equal to such Backstop Party's Rights Offering Interests multiplied by the Subscription Price within two (2) Business Days after receipt of a notice from the Debtors specifying whether any Subscribers have declined to purchase New Key Plastics Equity and the amount of New Key Plastics Equity such Subscribers have declined to purchase in the Rights Offering (the "Notice of Payment Amount"). The Notice of Payment Amount shall be sent to the Backstop Parties substantially concurrently with the distribution by the Debtors of the Notice to Provide Payment (as defined in the Subscription Form ) to Subscribers. On the terms and subject to the conditions set forth in this Agreement and in the Plan, at Closing, Key Plastics will sell to each Backstop Party its respective Rights Offering Interests at the Subscription Price, and each Backstop Party will purchase its respective Rights Offering Interests at the Subscription Price from Key Plastics in the same manner and at the same time as the New Key Plastics Equity to be purchased by such Backstop Party in the Rights Offering and as provided for in this Agreement, in the Subscription Agreement and the Subscription Form attached thereto (the "Backstop Issuance").

(b) _Contribution._ Each Backstop Party hereby agrees and covenants, severally and not jointly, subject to the terms and conditions set forth in this Agreement and in the Plan, that immediately upon the consummation of the Backstop Issuance at Closing, (i) 100% of such Backstop Party's Rights Offering Interests will be contributed to Finance Corp automatically, and such Backstop Party is hereby deemed to automatically contribute to Finance Corp such Backstop Party's Rights Offering Interests, without further action by such Backstop Party, Key Plastics or Finance Corp, and (ii) good and marketable title in such

3

Backstop Party's Rights Offering Interests shall vest in Finance Corp upon such Contribution. For the avoidance of doubt, following the consummation of the sale of Key Plastics of the Rights Offering Interests at Closing, no further action by Key Plastics, Finance Corp or any Backstop Party shall be required to effect the Contribution of the Backstop Parties' Rights Offering Interests to Finance Corp. At Closing, and subject to the terms and conditions set forth in this Agreement and in the Plan, as consideration for the Contribution of such Backstop Party's Rights Offering Interests, Finance Corp will deliver to such Backstop Party a certificate or certificates evidencing the number of shares of New Finance Corp Equity equal to such Backstop Party's contributed Rights Offering Interests (the "Rights Offering Stock" and, together with the Rights Offering Interests, the "Rights Offering Shares").

(c) <u>Closing.</u> The closing of the Transactions shall take place on the Effective Date or on such other date as may be mutually agreed by the Debtors and the Backstop Parties (the "Closing").

(d) <u>Backstop Commitment Fees.</u> In further consideration for the Backstop Parties having agreed to purchase any Rights Offering Interests that are not subscribed for when the Rights Offering terminates, the Debtors shall pay to the Backstop Parties a fee equal to $400,000, which fees shall be allocated to the Backstop Parties in proportion to their respective commitments to purchase Rights Offering Interests, as set forth on <u>Schedule A</u> (the "Backstop Commitment Fees"). The Backstop Commitment Fees shall be due and payable, in cash, on the Business Day after the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") enters an order granting the Debtors' motion for authority to enter into this Agreement (the "Backstop Agreement Order").

**2.2 Breakup Fees.** In the event that the Debtors pursue a transaction, or series of transactions, or take other action that causes either the Backstop Purchase to terminate or renders the Rights Offering no longer practicable, the Debtors may terminate this Agreement and, in connection therewith, shall pay to the Backstop Parties a fee equal to the remainder of (A) $1.5 million, less (B) the amount of any Commitment Fees paid to the Backstop Parties prior to the Effective Date by the Debtors, which fees shall be allocated to the Backstop Parties in proportion to their respective commitments to purchase Rights Offering Interests, as set forth on <u>Schedule A</u> (the "Breakup Fees"). The Breakup Fees shall be due and payable, in cash, prior to the date the Agreement is terminated by the Debtors in accordance with this Section 2.2.

**Section 3. Representations and Warranties of the Debtors.** The Debtors hereby, jointly and severally, represent and warrant to each Backstop Party, in their respective capacities as a Backstop Party and as a Subscriber under the Rights Offering, as of the date hereof, as follows:

**3.1 Organization.** Except as set forth on Schedule 3.1, each of the Debtors and each of their subsidiaries (a) is duly organized and validly existing and (only with respect to Significant Subsidiaries (as such term is defined in Rule 1-02(w) of Regulation S-X)) is in good standing under the laws of the jurisdiction of its organization, (b) is duly qualified or licensed to do business as a foreign corporation and is in good standing under the laws of each jurisdiction where the nature of the property owned or leased by it or the nature of the business conducted by it makes such qualification or license necessary, except where any such failure to be so qualified or licensed, individually in the aggregate, would not result in, and would not reasonably be expected to result in, a Material Adverse Effect, and (c) has all power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business as now or currently proposed to be conducted, except where any such failure to own and operate, individually in the aggregate, would not result in, and would not reasonably be expected to result in, a Material Adverse Effect. Each of the Debtors and each of their subsidiaries is in compliance with its certificate of formation and operating agreement or certificate of incorporation and bylaws, as the case may be, except where any such failure to comply, individually in the aggregate, would not result in, and would not reasonably be expected to result in, a Material Adverse Effect.

4

**3.2 Due Authorization, Execution and Delivery; Enforceability.** Subject to the entry of the final non-appealable order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") confirming the Plan and the Approvals, each of the Debtors has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its respective obligations hereunder, including, for Key Plastics, the issuance of the New Key Plastics Equity and for Finance Corp, the issuance of the New Finance Corp Equity, and has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement and the Transactions, including, for Key Plastics, the issuance of the New Key Plastics Equity and for Finance Corp, the issuance of the New Finance Corp Equity. Key Plastics has the full power and authority to execute, deliver and perform this Agreement and to issue and sell the Rights Offering Interests to the Backstop Parties hereunder, in exchange for a purchase price per interest equal to the Subscription Price. Finance Corp has the full power and authority to execute, deliver and perform this Agreement and the Stockholders Agreement (as defined below) and to issue to the Backstop Parties an equivalent amount of New Finance Corp Equity in exchange for the Contributions by each Backstop Party of all of its New Key Plastics Equity. Key Plastics and Finance Corp each further represents and warrants that the sale and exchange of the Rights Offering Shares and its execution, delivery and performance of this Agreement and the Stockholders Agreement have been authorized by all necessary action on its behalf, and this Agreement is its legal, valid and binding obligation, enforceable against each of them in accordance with its terms.

**3.3 Due Issuance and Authorization of Ownership Interest.** At the Effective Date and at the Purchase Date, no capital stock or membership interests, as the case may be, of the Debtors will be subject to preemptive rights or any other similar rights granted by the Debtors (other than preemptive rights set forth in the Stockholders Agreement). The Rights Offering Interests issued and delivered by Key Plastics and the Rights Offering Stock issued and delivered by Finance Corp to each Backstop Party pursuant to the terms hereof will be, upon issuance, duly authorized, validly issued, fully paid and non-assessable, and will be free from all taxes, liens, preemptive rights (other than preemptive rights set forth in the Stockholders Agreement) and charges with respect to the issue thereof.

**3.4 Capitalization of Finance Corp.** At the Effective Date, the authorized capital stock of Finance Corp will consist solely of 1,500,000 shares of New Finance Corp Equity, par value $0.01 per share, of which 1,000,000 will be outstanding as of the Effective Date and 100,000 shares of preferred stock, par value $0.01 per share (the "Preferred Stock"), none of which will be outstanding as of the Effective Date. At the Effective Date, all of the issued and outstanding New Finance Corp Equity and Preferred Stock will have been duly authorized and validly issued, will be fully paid and non-assessable, will not be subject to any preemptive rights (other than preemptive rights set forth in the Stockholders Agreement) and assuming the accuracy of the representations and warranties and compliance with the covenants of each Backstop Party set forth in this Agreement, will not be issued in violation of the Securities Act of 1933, as amended (the "Securities Act"), or any other applicable laws (including state "Blue Sky" laws). At the Effective Date, Finance Corp will not have issued or granted any outstanding options, warrants, rights or other securities convertible into or exchangeable or exercisable for its New Finance Corp Equity.

**3.5 Capitalization of Key Plastics.** As of the date hereof, the authorized membership interests of Key Plastics will be as set forth in the Plan. At the Effective Date, Finance Corp will own 100% of the issued and outstanding equity interests of Key Plastics. At the Effective Date, all of the issued and outstanding equity interests of Key Plastics will have been duly authorized and validly issued, will be fully paid and non-assessable, will not be subject to any preemptive rights and will not have been issued in violation of the Securities Act, or any other applicable laws (including state "Blue Sky" laws). At the Effective Date, Key Plastics will not have issued or granted any outstanding options, warrants, rights or other securities convertible into or exchangeable or exercisable for New Key Plastics Equity.

5

**3.6 Capitalization of Subsidiaries.** At the Effective Date and at the Purchase Date, all of the issued and outstanding shares of the Debtors' subsidiaries will have been duly authorized and validly issued and will be fully paid and non-assessable. At the Effective Date and at the Purchase Date, each Debtor will own of record and beneficially all of the issued and outstanding shares of capital stock or other equity securities of or other equity ownership interests in each of its respective subsidiaries free and clear of any liens, except as described on Schedule 3.6 attached hereto. At the Effective Date and at the Purchase Date, there will be no agreements which may obligate the Debtors or any of the Debtors' subsidiaries, as the case may be, to issue, purchase, register for sale, redeem or otherwise acquire any of such subsidiaries' shares of capital stock or other equity securities or equity ownership interests.

**3.7 Consents.** Subject to the Approvals, such filings and approvals as may be required under federal securities laws and applicable state securities or Blue Sky laws and except as listed on Schedule 3.7 attached hereto, none of the execution, delivery or performance of this Agreement or the Restructuring and Plan Support Agreement by the Debtors or the Stockholders Agreement by Finance Corp, including the consummation of transactions hereunder or thereunder, will require any consent of, authorization by, exemption from, filing with, or notice to any governmental entity or any other Person, except where the failure to obtain such consent, authorization or exemption, individually or in the aggregate, would not result in, or reasonably be expected to result in, a material adverse effect on Key Plastics's or Finance Corp's ability to operate in the ordinary course of business consistent with past practice.

**3.8 No Conflicts.** Except for the Approvals and/or except as listed on Schedule 3.8, the execution, delivery and performance of (i) this Agreement, (ii) the Restructuring and Plan Support Agreement by the Debtors and (iii) the Stockholders Agreement by Finance Corp, including the issuance of New Key Plastics Equity and New Finance Corp Equity and the consummation of the Transactions and the other transactions contemplated hereunder and thereunder, will not (a) conflict with or result in any breach of any provision of the Debtors' certificate of formation and operating agreement or certificate of incorporation and bylaws, as the case may be, as in effect on the Effective Date and at the Purchase Date, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material agreement, lease, mortgage, license, indenture, instrument or other contract to which either of the Debtors or any of their respective subsidiaries is a party or by which any of the Debtors or any of the Debtors' subsidiaries' properties or assets are bound as in effect on the Effective Date and at the Purchase Date, or (c) result in a violation of any law, rule, regulation, order, judgment or decree (including, without limitation, federal and state securities laws and regulations) applicable to the Debtors or any of their respective subsidiaries or by which any of the Debtors or their respective subsidiaries' properties or assets are bound or affected as in effect on the Effective Date and at the Purchase Date, except in the case of clauses (b) and (c), as would not, individually or in the aggregate, result in or reasonably be expected to result in a Material Adverse Effect.

**3.9 No Registration.** Assuming the accuracy of the representations and warranties and compliance with the covenants of each Backstop Party set forth in this Agreement, no registration of the Rights Offering Shares under the Securities Act is required by any Backstop Party for the Transactions contemplated by this Agreement.

**3.10 Compliance with Laws and Regulations.** Neither the Debtors nor any of their respective subsidiaries is in violation of any applicable law, ordinance, statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, applicable to the Debtors or any of their subsidiaries, which violation would, individually or in the aggregate, have or reasonably be expected to have a Material Adverse Effect.

6

**3.11 Internal Controls.** Each of the Debtors and their respective subsidiaries maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**Section 4. Representations and Warranties of the Backstop Parties.** Each Backstop Party, severally and not jointly, represents and warrants to the Debtors as of the date hereof as follows:

**4.1 Organization.** The Backstop Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

**4.2 Due Authorization.** The Backstop Party has the requisite power and authority to enter into, execute and deliver this Agreement, to consummate the Transactions and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

**4.3 Due Execution; Enforceability.** This Agreement has been duly and validly executed and delivered by the Backstop Party and constitutes its valid and binding obligation of the Backstop Party, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**4.4 No Registration under the Securities Act.** The Backstop Party understands that the Rights Offering Shares have not been registered under the Securities Act, and that except as provided in the Stockholders Agreement, the Debtors shall not be required to effect any registration, under the Securities Act, or any state securities law and, the Rights Offering Shares will be issued in reliance upon exemptions contained in the Securities Act or interpretations thereof and in the applicable state securities laws.

7

**4.5 Acquisition for Investment.** The Rights Offering Shares are being acquired under this Agreement by the Backstop Party in good faith solely for its own account, for investment and not with a view toward resale or other distribution within the meaning of the Securities Act; provided, however, that the disposition of the Backstop Party's property shall at all times be under its control. The Backstop Party will not, directly or indirectly, offer, transfer, sell, pledge, hypothecate or otherwise dispose of any of the Subscribed Shares (or solicit any offers to buy, purchase, or otherwise acquire or take a pledge of any of the Subscribed Shares), except in compliance with the Stockholders Agreement and pursuant to a registration statement or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

**4.6 Accredited Backstop Party.** The Backstop Party is an "accredited investor" within the meaning of Rule 501(a) under the Securities Act, with such knowledge and experience in financial and business matters as are necessary in order to evaluate the merits and risks of an investment in the Subscribed Shares.

**4.7 Additional Information.** The Backstop Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Debtors, to obtain additional information that it has requested to verify the accuracy of the information contained herein and to have its independent counsel review such additional information and this Agreement. Notwithstanding the foregoing, nothing contained herein shall operate to modify or limit in any respect the representations and warranties of the Debtors or to relieve it from any obligations to the Backstop Party for breach thereof or the making of misleading statements or the omission of material facts in connection with the transactions contemplated herein.

**4.8 Contribution.** The Backstop Party acknowledges and agrees that it has relied upon the advice of its own tax advisors and no party to this Agreement has any liability to any other party for the tax consequences of the Contribution, including, without limitation, the qualification of the Contribution under Section 351 of the Code.

**4.10    Compliance with Laws and Other Instruments.** The execution and delivery of this Agreement, the consummation of the Transactions and the performance of each obligation hereunder will not conflict with, or result in any violation of or default under, any provision of any governing instrument applicable to the Backstop Party, or any agreement or other instrument to which the Backstop Party is a party or by which the Backstop Party or any of its properties are bound, or any permit, franchise, judgment, decree, statute, order, rule or regulation applicable to the Backstop Party or its business.

**Section 5. Additional Covenants.** Each of the Debtors and each Backstop Party, severally and not jointly, hereby agree to do the following:

**5.1 Stockholders Agreement.** Finance Corp will enter into a stockholders agreement with all holders of shares of New Finance Corp Equity, substantially in the form of the agreement attached hereto as Exhibit 1 (the "Stockholders Agreement").

**5.2 Legends.** The Backstop Party agrees with Finance Corp that the certificates evidencing the shares of New Finance Corp Equity to be acquired hereunder will bear the legends specified in Section 2.5(b) of the Stockholders Agreement attached hereto as Exhibit 1.

**5.3 Further Assurances.** From time to time after the date of this Agreement, the parties hereto shall execute, acknowledge and deliver to the other parties such other instruments, documents, and certificates and will take such other actions as the other parties may reasonably request in order to consummate the transactions contemplated by this Agreement.

8

**5.4 Cooperation.**

(a) Each of the Debtors shall use commercially reasonable efforts to cause the conditions set forth in Section 6 to be satisfied and to consummate the transactions contemplated herein.

(b) The Backstop Party shall use commercially reasonable efforts to cause the conditions set forth in Section 7 to be satisfied and to consummate the Transactions contemplated herein.

**Section 6. Conditions to Backstop Parties' Backstop Obligations.** The obligation of each Backstop Party to consummate the Transactions shall be subject to the satisfaction (as determined by the Backstop Parties, in their sole discretion) of each of the following conditions on the Purchase Date:

(a) Material Adverse Effect. As of the Effective Date, in the judgment of the Backstop Parties, there shall not have been any Material Adverse Effect with respect to the Debtors (other than as set forth in the Plan) since the Petition Date;

(b) Restructuring and Plan Support Agreement. The Restructuring and Plan Support Agreement, dated November 10, 2008, among the Debtors and the consenting senior noteholders signatory thereto (the "Restructuring and Plan Support Agreement") shall be in full force and effect and shall not have terminated;

(c) Stockholders Agreement. Finance Corp shall have executed and delivered the Stockholders Agreement substantially in the form of the agreement attached hereto as Exhibit 1;

(d) Required Consents. All of the Approvals and all of the approvals necessary for the consummation of the Transactions contemplated by this Agreement set forth on Schedule 6(d) attached hereto shall have been obtained;

(e) Backstop Commitment Fees. The Debtors shall have paid to each Backstop Party its Backstop Commitment Fee as set forth in Section 2.1(d);

(f) Professionals Fees. The Debtors shall have paid current all Professionals Fees;

(g) Rights Offering. Finance Corp shall have consummated the Rights Offering pursuant to and in accordance with the Plan;

(h) Plan Confirmation. On the Confirmation Date, the Bankruptcy Court shall have entered a final non-appealable order confirming the Plan on terms acceptable to the Backstop Parties in their sole discretion (including, without limitation, approval of the Backstop Commitment Fees and Professionals Fees);

(i) Other Conditions. (i) The Debtors shall have performed each of their obligations hereunder required to be performed by them at or prior to the Purchase Date and (ii) the representations and warranties of the Debtors contained in this Agreement shall be true and correct at and as of the Purchase Date as if made at and as of the Purchase Date (other than those representations and warranties that address matters only as of a particular earlier date, which need only be true and correct as of such earlier date);

9

(j)  Chief Financial Officer Certificate.  The Debtors shall have delivered to the Backstop Parties a certificate executed by the chief financial officer of the Debtors dated as of the Purchase Date certifying that the Debtors' financial projections included in the Disclosure Statement, as supplemented by the financial projections delivered by the Debtors to the Backstop Parties on the date hereof, are materially accurate as of the Purchase Date, it being understood and agreed that financial projections are not a guarantee of financial performance and actual results may differ from financial projections; and

(k)  Officer's Certificate.  Key Plastics and Finance Corp shall each have delivered to the Backstop Parties an officer's certificate dated as of the Purchase Date certifying that (i) the resolutions duly adopted by the Managing Member or the Board of Directors, as the case may be, authorizing and approving its performance of the Transactions and the execution and delivery of this Agreement and, in the case of Finance Corp, the Stockholders Agreement, remain in full force and effect, (ii) that there has been no Material Adverse Effect with respect to Key Plastics or Finance Corp, as the case may be (other than as set forth in the Plan) since the Petition Date and (iii) the conditions set forth in <u>Section 6(i)</u> have been satisfied.

**Section 7. Conditions to the Debtors' Obligations.**  The obligations of Key Plastics and Finance Corp hereunder to consummate the Transactions are subject to the satisfaction (or the waiver by Key Plastics and Finance Corp) of the following conditions as of Closing:

(a)  Restructuring and Plan Support Agreement.  The Restructuring and Plan Support Agreement shall be in full force and effect and shall not have terminated;

(b)  Required Consents.  All of the Approvals shall have been obtained;

(c)  Rights Offering.  The Rights Offering shall have been consummated pursuant to the Plan;

(d)  Plan Confirmation.  On the Confirmation Date, the Bankruptcy Court shall have entered a final non-appealable order confirming the Plan; and

(e)  Other Conditions.  (i) Each Backstop Party shall have performed its obligations hereunder required to be performed by it at or prior to Closing, and (ii) the representations and warranties of each Backstop Party contained in this Agreement shall be true and correct at and as of Closing as if made at and as of such Closing (other than those representations and warranties that address matters only as of a particular earlier date, which need only be true and correct as of such earlier date).

**Section 8. Miscellaneous**

**8.1  Notices.**  Any notice or other communication required or which may be given pursuant to this Agreement will be in writing and either delivered personally to the addressee, telecopied to the addressee, sent via electronic mail or mailed, certified or registered mail, postage prepaid, and will be deemed given when so delivered personally, telecopied, or sent via electronic mail or, if mailed, five (5) days after the date of mailing, as follows:

(i) if to a Backstop Party, to the address, facsimile number or email address set forth below:

Wayzata Investment Partners, LLC
701 East Lake Street, Suite 300
Wayzata, MN 55391
Attn: Chief Financial Officer

*with copies to:*

Wayzata Investment Partners, LLC
701 East Lake Street, Suite 300
Wayzata, MN 55391
Attn: General Counsel

Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022
Attn: Mitchell Seider, Esq. (email: Mitchell.Seider@lw.com)
Facsimile: 212-751-4864

(ii) if to Key Plastics or Finance Corp, to:

Key Plastics L.L.C. or Key Plastics Finance Corp.
21700 Haggerty Road, Suite 100N
Northville, Michigan 48167
Attention: Chief Executive Officer

*with a copy to:*

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
214-746-7700
Attn: Stephen A. Youngman (email: stephen.youngman@weil.com)
Facsimile: 214-746-7777

**8.2 Indemnification & Exculpation.**

(a) Indemnification. The Debtors will, jointly and severally, indemnify, save and hold harmless each Backstop Party, its directors, officers, stockholders, employees, partners, members, managers, representatives, Affiliates, attorneys, other professional advisors and agents and all of their respective heirs, successors, legal administrators, permitted assigns, and each Person who (within the meaning of Section 15 of the Securities Act or Section 20 of the Securities Exchange Act of 1934, as amended) controls any Backstop Party and the officers, directors, agents and employees of any such controlling Person (collectively, the "Indemnitees") from and against all losses, claims, damages, liabilities, costs (including, without limitation, the costs of investigation and reasonable attorneys' fees) and expenses, as incurred by any or all of the Indemnitees in connection with any claim against them by a third party in connection with or arising from the execution, delivery and performance by the Debtors of this Agreement, the Rights Offering and any other related transactions contemplated hereby or thereby, as the case may be (collectively, the "Losses"); *provided, however,* that the foregoing indemnity will not apply to Losses to the extent that they are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from any act by an Indemnitee of willful misconduct or gross negligence. This indemnification provision is in addition to the rights of each and all of the Indemnitees to bring an action against the Debtors for material breach of any term of this Agreement. Each of the Debtors acknowledges and agrees that each and all of the Indemnitees shall be treated as third-party beneficiaries with rights to bring an action against the Debtors under this Section 8.2.

11

(b) <u>Exculpation</u>. To the extent permitted by applicable law, no Debtor shall assert, and each Debtor hereby waives, any claim against any Backstop Party and its Affiliates, directors, employees, attorneys, other professional advisors, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) to the extent any such claim arises out of, is in connection with, is a result of, or is in any way related to, this Agreement or any agreement or instrument contemplated hereby or referred to herein, the transactions contemplated hereby, or any act or omission or event occurring in connection therewith, and each Debtor hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in their favor (collectively, the "<u>Exculpated Claims</u>"); <u>provided</u>, <u>however</u>, that the foregoing indemnity will not apply to Losses to the extent that they are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from any act by an Indemnitee of willful misconduct or gross negligence.

**8.3 Survival of Representations and Warranties, etc.** All representations and warranties made in this Agreement, the Schedules attached hereto and/or the certificate delivered pursuant to <u>Section 6(i)</u> hereof will survive the execution and delivery of this Agreement until expiration of the applicable statute of limitations, notwithstanding any investigation at any time made by or on behalf of any party hereto.

**8.4 Assignment.** This Agreement will be binding upon and inure to the benefit of each and all of the parties to this Agreement, and, except as set forth below, neither this Agreement nor any of the rights, interests or obligations hereunder will be assigned by any of the parties to this Agreement without the prior written consent of the other parties. This Agreement, or the obligations of each Backstop Party hereunder, may be assigned, delegated or transferred, in whole or in part, by such Backstop Party to (i) any Affiliate of such Backstop Party, (ii) any funds or accounts under common management with, or operated by, such Backstop Party, and (iii) any other Person controlled, directly or indirectly, by Wayzata Investment Partners LLC, a Delaware limited liability company; <u>provided</u>, that any such assignee assumes the obligations of such Backstop Party hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as the Backstop Party. Without complying with the provisions of this <u>Section 8.4</u>, each Backstop Party may satisfy its obligations under <u>Section 2.1</u> hereof by causing an Affiliate of such Backstop Party to satisfy its obligations under such Section so long as such Affiliate otherwise assumes the obligations of such Backstop Party hereunder with respect thereto (including, without limitation, by making the representations and warranties set forth in <u>Section 4</u> hereof).

**8.5 Entire Agreement.** This Agreement, including the terms of the Subscription Agreement, the Subscription Form, the Restructuring and Plan Support Agreement and the Plan contain the entire agreement by and between the Debtors and the Backstop Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements and representations, written or oral, with respect thereto. To the extent there is an inconsistency between the provisions in this Agreement and the Plan, the Plan shall control.

**8.6 Waivers and Amendments.** This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Debtors and the Backstop Parties or, in the case of a waiver, by the Backstop Parties in the case of a waiver by the Backstop Parties, or the Debtors, in the case of a waiver by the Debtors. No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided

12

pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

**8.7 Governing Law; Jurisdiction; Venue; Process.** THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE. Each Party hereby irrevocably submits, for itself and its property, to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware, for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party hereto irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

**8.8 Counterparts.** This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. All such counterparts will be deemed an original, will be construed together and will constitute one and the same instrument.

**8.9 Headings.** The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

**8.10 Severability.** In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto will be enforceable to the fullest extent permitted by law.

**8.11 Termination.** This Agreement may be terminated (i) by the Debtors in the event of a material breach of this Agreement by the Backstop Parties which has prevented the satisfaction of any condition to the obligations of the Debtors on the Effective Date and such violation or breach has not been waived by the Debtors or cured by the Backstop Parties within five Business Days after written notice thereof from the Debtors (provided, however, that the Debtors may not seek to terminate this Agreement based upon a material breach arising out of the actions or omissions of the Debtors in breach hereof), (ii) by the Backstop Parties in the event of a material breach of this Agreement by such Debtor which has prevented the satisfaction of any condition to the obligations of the Backstop Parties on the Effective Date and such violation or breach has not been waived by the Backstop Parties or cured by the Debtors within five Business Days after written notice thereof from the Backstop Parties, (iii) if the Debtors and the Backstop Parties agree in writing to terminate the Agreement; (iv) pursuant to Section 2.2 hereof; and/or (v) by the Backstop Parties in the event that the Closing shall not have occurred by March 31, 2009 (provided, however, that the Backstop Parties may not seek to terminate this Agreement pursuant to this clause (v) if the Closing has not occurred by March 31, 2009 due solely to a material breach of this Agreement by the Backstop Parties). In the event of termination of this Agreement by the Debtors as provided above, the provisions of this Agreement shall immediately become void and of no further force and effect (other than this Section 8.11, Section 2.2 (if applicable), Section 8.1, Section 8.3 through 8.10 and Section 8.12), and there shall be no liability on the part of the Debtors to any other party hereto, except for willful breaches of this Agreement prior to the time of such termination.

**8.12 Specific Performance.** The Debtors agree that the Backstop Parties shall have the right, in addition to any other rights and remedies existing in its favor, to enforce their rights and the obligations

13

of the Debtors hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief; subject, however, to the Bankruptcy Code in the event that the Debtors have filed a petition under chapter 7 or chapter 11 of the Bankruptcy Code. Furthermore, the Backstop Parties agree that the Debtors shall have the right, in addition to any other rights and remedies existing in its favor, to enforce its rights and the obligations of the Backstop Parties hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief.

**8.13 Limited Liability of Members, Partners and Managers.** Notwithstanding any other provision of this Agreement, (a) the obligations of the Backstop Parties under this Agreement shall be without recourse to their members, partners or managers and shall be limited in all events to the assets of the Backstop Parties and (b) the members, partners or managers of the Backstop Parties shall have no personal liability for the performance of any obligation of the Backstop Parties under this Agreement.

*[Signature Page Follows]*

14

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

Key Plastics L.L.C.

By:

Name: John Wilson

Title: CFO

Key Plastics Finance Corp.

By:

Name: John Wilson

Title: CFO

*[Signatures Continued]*

**BACKSTOP AGREEMENT**

Wayzata Opportunities Fund II, L.P.

By: WOF II GP, L.P., its General Partner

By: WOF II GP, LLC, its General Partner

Name: Patrick Halloran
Title: Authorized Signatory

Wayzata Opportunities Fund Offshore II, L.P.

By: Wayzata Offshore GP II, LLC, its General Partner

Name: Patrick Halloran
Title: Authorized Signatory

**BACKSTOP AGREEMENT**

NY\1470732.10

## SCHEDULE A

### <u>BACKSTOP PARTY COMMITMENTS</u>

| Backstop Party | Commitment |
|---|---|
| Wayzata Opportunities Fund II, L.P. | 89.67764% |
| Wayzata Opportunities Fund Offshore II, L.P. | 10.32236% |
| **TOTAL** | 100.00% |

## Schedule of Exceptions

The disclosures set forth in these disclosure schedules ("Schedules") have been organized to correspond to section references in the Backstop Purchase and Contribution Agreement, (the "Agreement"), dated as of December 15, 2008, by and among Key Plastics, L.L.C., a Michigan limited liability company ("Key Plastics"), Key Plastics Finance Corp., a Delaware corporation ("Finance Corp" and, together with Key Plastics, the "Debtors"), Wayzata Opportunities Fund II, L.P., a Delaware limited partnership ("Wayzata Opportunities"), and Wayzata Opportunities Fund Offshore II, L.P., a Delaware limited partnership ("Wayzata Offshore" together with Wayzata Opportunities, each, a "Backstop Party" and collectively, the "Backstop Parties") to which such disclosure relates. The section numbers in this Schedule of Exceptions correspond to the section numbers in the Agreement. Capitalized terms used but not otherwise defined herein have the same meanings given to such terms in the Agreement. The section numbers of this Schedule of Exceptions correspond to the first, or principal, section of the Agreement to which the disclosures relate; however, all information disclosed herein shall be deemed disclosed under and incorporated into any other section of the Agreement where the applicability of such disclosure would be readily apparent.

Disclosure of any matter or item on any Schedule shall not constitute or be deemed to constitute an acknowledgement, admission or indication that any such matter or item is material, would have a Material Adverse Effect or is required to be disclosed. No disclosure on a Schedule relating to a possible breach or violation of any contract, law or order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

## Schedule 3.1

## Organization

*(a) Good Standing in Jurisdiction of Organization*

The following entities are subject to restrictions imposed by or other actions taken under the direction or supervision of French judicial courts or other authorities, including any restructuring or other activities pursuant to *redressement judiciaire* proceedings:

    A. Key Plastics Europe Holdings, S.A.S (France)

    B. Key Plastics Franche-Comte S.A.S. (France)

    C. Key Plastics International S.A.S. (France)

    D. Key Plastics Interiors, S.A.S. (France)

    E. Key Plastics Slovakia, S.r.o. (Slovakia)

*(c) Corporate Power and Authority*

See items referenced in subsection (a) of this Schedule 3A.

*Compliance with Organizational Documents*

See items referenced in subsection (a) of this Schedule 3A.

## Schedule 3.6

### Capitalization of Subsidiaries

1. Key Plastics Slovakia, S.r.o. – In December 2004, Key Plastics (through a wholly-owned indirect subsidiary) entered into a Joint Venture Agreement and contributed $6,000 for 75% ownership interest in Key Plastics Slovakia, S.r.o., a start-up operation in the Slovak Republic. In December 2007 and 2006, Key Plastics (through a wholly-owned indirect subsidiary) and its 25% joint venture partner contributed additional capital of $3,476,000 and $3,908,000 respectively, in proportion to their respective ownership interests.

2. Shanghai Key Automotive Plastic Component Co., Ltd. – In May 2005, Key Plastics (through a wholly-owned indirect subsidiary) entered into a Joint Venture Agreement and contributed $2,505,000 for 50.1% interest in Shanghai Key Automotive Plastic Component Co., Ltd., which purchased the assets of an existing business in China.

3. All liens granted pursuant to that certain Collateral Agreement of March 12, 2007 among Key Plastics L.L.C. and Key Plastics Finance Corp. and certain of its Subsidiaries, as Grantors, in favor of Well Fargo Bank, National Association as Collateral Agent and all ancillary documents thereto.

4. All liens granted pursuant to that certain Collateral Agreement, dated as of November 12, 2008, by and among Key Plastics, L.L.C. and certain of its Subsidiaries, as Grantors, in favor of Wayzata Investment Partners, LLC, as Administrative Agent and all ancillary documents thereto.

5. To the extent not released at the Effective Date (as defined in the Plan), all liens granted pursuant to that certain Collateral Agreement expected to be entered into prior to the Effective Date by and among Key Plastics L.L.C. and certain of its Subsidiaries, as Grantors, in favor of Wayzata Investment Partners, LLC, as Administrative Agent and all ancillary documents thereto.

## Schedule 3.7

## Consents

1. Lease Agreement, dated July 3, 2006, by and among Key Plastics, L.L.C., Agilis Capital, LLC, and RBS Asset Finance, Inc. **[Notice required.]**

2. The Senior Notes Indenture and all ancillary documents thereto. **[Notice required.]**

3. That certain Credit Agreement, dated as of November 12, 2008, by and among Key Plastics L.L.C., as Borrower, the various financial institutions and other persons from time to time parties thereto, as lenders, and Wayzata Investment Partners, LLC, as Administrative Agent and all ancillary documents thereto. **[Notice required.]**

4. Contracts between Ford Motor Company, Ashton Martin Lagonda Limited, Jaguar Cars Limited, Land Rover, Volvo Car Corporation and their Subsidiaries and Key Plastics L.L.C. governed by the Production Purchasing Global Terms and Conditions PPGTC Jan. 1, 2004. **[Notice required.]**

## Schedule 3.8

## No Conflicts

*(b) Conflict with, breach of, or right of acceleration under material agreements*

1. Lease, dated April 10, 2002, by and between Eight Mile/Haggerty Office, L.L.C. and Key Plastics, L.L.C. (as amended).

2. Lease Agreement, dated July 3, 2006, by and among Key Plastics, L.L.C., Agilis Capital, LLC, and RBS Asset Finance, Inc.

3. The Senior Notes Indenture and all ancillary documents thereto.

4. That certain Credit Agreement, dated as of November 12, 2008, by and among Key Plastics L.L.C., as Borrower, the various financial institutions and other persons from time to time parties thereto, as lenders, and Wayzata Investment Partners, LLC, as Administrative Agent and all ancillary documents thereto.

5. That certain insurance Premium Finance Agreement between Key Plastics L.L.C. and Wachovia Premium Finance, Inc. dated December 12, 2008 and any renewal thereof and insurance contracts entered thereunder.

6. Contracts between General Motors Corporation and Key Plastics L.L.C. governed by the Standard Blanket Contract.

7. Contracts between Visteon Corporation and Key Plastics L.L.C. governed by the Global Terms for Production Parts and Non-Productions Goods and Services.

8. Contracts between Ford Motor Company, Ashton Martin Lagonda Limited, Jaguar Cars Limited, Land Rover, Volvo Car Corporation and their Subsidiaries and Key Plastics L.L.C. governed by the Production Purchasing Global Terms and Conditions PPGTC Jan. 1, 2004.

9. Contracts between Brose Fahrzeugteile GmbH & Co. and its subsidiaries and Key Plastics L.L.C. governed by the Global Terms and Conditions of Purchase.

10. Contracts between Autoliv ASP, Inc. and Key Plastics L.L.C. governed by the Purchase Order Terms and Conditions.

11. Contracts between Chrysler Corporation and Key Plastics L.L.C. governed by the Production Purchasing General Terms and Conditions.

12. Contracts between Nissan North America, Inc. and Key Plastics L.L.C. governed by the Global Terms and Conditions of Purchase.

## Schedule 6(d)

## Required Consents

1. Backstop Order to be granted by Bankruptcy Court in accordance with the Plan.

2. Such filings and approvals as may be required under applicable state securities or Blue Sky laws.

3. That certain insurance Premium Finance Agreement between Key Plastics L.L.C. and Wachovia Premium Finance, Inc. dated December 12, 2008 and any renewal thereof and insurance contracts entered thereunder.

4. Contracts between General Motors Corporation and Key Plastics L.L.C. governed by the Standard Blanket Contract.

5. Contracts between Visteon Corporation and Key Plastics L.L.C. governed by the Global Terms for Production Parts and Non-Productions Goods and Services.

6. Contracts between Ford Motor Company, Ashton Martin Lagonda Limited, Jaguar Cars Limited, Land Rover, Volvo Car Corporation and their Subsidiaries and Key Plastics L.L.C. governed by the Production Purchasing Global Terms and Conditions PPGTC Jan. 1, 2004.

7. Contracts between Brose Fahrzeugteile GmbH & Co. and its subsidiaries and Key Plastics L.L.C. governed by the Global Terms and Conditions of Purchase.

8. Contracts between Autoliv ASP, Inc. and Key Plastics L.L.C. governed by the Purchase Order Terms and Conditions.

9. Contracts between Chrysler Corporation and Key Plastics L.L.C. governed by the Production Purchasing General Terms and Conditions.

10. Contracts between Nissan North America, Inc. and Key Plastics L.L.C. governed by the Global Terms and Conditions of Purchase.

# EXHIBIT 1

## STOCKHOLDERS AGREEMENT

**Exhibit 1**

## STOCKHOLDERS AGREEMENT

Stockholders Agreement (this "Agreement"), dated as of [_____,] 2009, by and among Key Plastics Corporation, a Delaware corporation (the "Company"), Wayzata Recovery Fund LLC, a Delaware limited liability company ("Wayzata Recovery"), Wayzata Opportunities Fund II, L.P., a Delaware limited partnership ("Wayzata Opportunities"), Wayzata Opportunities Fund Offshore II, L.P., a Delaware limited partnership ("Wayzata Offshore", and together with Wayzata Recovery and Wayzata Opportunities, each, a "Wayzata Party" and collectively, the "Wayzata Parties"), the persons set forth on Schedule A attached hereto (each, a "DDJ Party" and collectively, the "DDJ Parties"), and the persons set forth on Schedule B attached hereto (the "Other Investors") who have acquired on the date hereof shares of common stock of the Company, par value $0.01 per share ("Common Shares") (the Wayzata Parties, the DDJ Parties and the Other Investors being the "Holders").

The Company and each of the Holders desire, for their mutual benefit and protection, to enter into this Agreement to set forth their respective rights and obligations with respect to their Common Shares (whether issued or acquired hereafter).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.

## BOARD OF DIRECTORS AND GOVERNANCE RIGHTS

Section 1.1    Nomination Rights; Voting.

(a)    At any annual or special meeting of stockholders or by written consent, each Holder will vote its Common Shares to fix the number of members of the board of directors of the Company (the "Board of Directors") at five (5) or such other number as may be required by this Section 1.1.

(b)    So long as the Wayzata Parties and their Permitted Transferees own, collectively, (i) at least fifty percent (50%) of the issued and outstanding Common Shares, the Wayzata Parties will be entitled to nominate three (3) persons to serve as directors of the Company, (ii) at least thirty percent (30%), but less than fifty percent (50%), of the issued and outstanding Common Shares, the Wayzata Parties will be entitled to nominate two (2) persons to serve as directors of the Company, and (iii) at least fifteen percent (15%), but less than thirty percent (30%), of the issued and outstanding Common Shares, the Wayzata Parties will be entitled to nominate one (1) person to serve as a director of the Company. Any person nominated by the Wayzata Parties to serve as a director of the Company shall hereinafter be referred to as a "Wayzata Nominee" and all such persons nominated by the Wayzata Parties to serve as directors of the Company shall collectively be referred to as the "Wayzata Nominees".

(c)    So long as the DDJ Parties and their Permitted Transferees own, collectively, at least fifteen percent (15%) of the issued and outstanding Common Shares, the DDJ

Parties will be entitled to nominate one (1) person to serve as a director of the Company (the "DDJ Nominee").

(d)     The chief executive officer of the Company shall be nominated by the DDJ Parties and the Wayzata Parties to serve as a director of the Company (such nominee, the "CEO Nominee").  For the avoidance of doubt, it is understood that no party shall have the right to select the chief executive officer of the Company pursuant to this Section 1.1(d).

(e)     The Board of Directors as of the date of this Agreement consists of the following members:

| Name of Director | Type of Nominee |
| --- | --- |
|  | Wayzata Nominee |
|  | Wayzata Nominee |
|  | Wayzata Nominee |
|  | DDJ Nominee |
|  | CEO Nominee |

(f)     Notwithstanding anything to the contrary in this Article I, each Holder shall have the right to nominate candidates to the Board of Directors in accordance with the procedures set forth in the Company's bylaws.

Section 1.2     Assignment of Nomination Right.

(a)     The DDJ Parties may assign its right to nominate a director of the Company (in accordance with Section 1.1(c) above) to any Transferee of its Common Shares so long as: (i) the Transferee is acquiring at least 15% of the issued and outstanding Common Shares; (ii) the Transfer of Common Shares by the DDJ Parties is made in compliance with the terms of this Agreement (including, without limitation, Section 2.2); and (iii) the Transferee shall be reasonably acceptable to the Wayzata Parties.

(b)     The Wayzata Parties may assign their right, in whole or in part, to nominate one or more directors of the Company (in accordance with Section 1.1(b) above) to any Transferee of all or part of the Wayzata Parties' Common Shares made in compliance with the terms of this Agreement.

Section 1.3     Election of Nominees.  Each party hereto will use its respective reasonable best efforts to cause the Wayzata Nominees, the DDJ Nominee and the CEO Nominee to be elected in any and all elections of the Board of Directors held during the term of this Agreement. Without limiting the generality of the foregoing, each party hereto will vote, consent or cause to be voted for the election of the Wayzata Nominees, the DDJ Nominee and

the CEO Nominee in all elections of the Board of Directors or written consents in lieu thereof held during the term of this Agreement, all securities that such party has the power to vote or consent (or in respect of which such party has the power to direct the vote or consent).

Section 1.4    Vacancies.

(a)    Each of the Wayzata Nominees will hold office as directors of the Company for such term as is provided in the Company's organizational documents and applicable law or until his or her death, resignation, incapacity or removal from the Board of Directors or until their successor has been duly elected and qualified in accordance with the provisions of this Agreement. If any of the Wayzata Nominees ceases to serve as a director of the Company for any reason during his or her term (other than as a result of a decrease in the collective ownership of Common Shares by the Wayzata Parties pursuant to Section 1.1(b)), a nominee for the vacancy/vacancies resulting therefrom will be designated by the Wayzata Parties. In the event any Wayzata Nominee ceases to serve as a director of the Company as a result of a decrease in the collective ownership of Common Shares pursuant to Section 1.1(b), such replacement director shall be determined by the Holders holding a majority of then outstanding Common Shares; provided, however, that such replacement director shall not be an Affiliate of the Wayzata Parties.

(b)    The DDJ Nominee will hold office as a director of the Company for such term as is provided in the Company's organizational documents and applicable law or until his or her death, resignation, incapacity or removal from the Board of Directors or until his or her successor has been duly elected and qualified in accordance with the provisions of this Agreement. If the DDJ Nominee ceases to serve as a director of the Company for any reason during his or her term (other than as a result of a decrease in the collective ownership of Common Shares by the DDJ Parties pursuant to Section 1.1(c)), a nominee for the vacancy resulting therefrom will be designated by the DDJ Parties. In the event the DDJ Nominee ceases to serve as a director of the Company as a result of a decrease in the collective ownership of Common Shares pursuant to Section 1.1(c), such replacement director shall be determined by the Holders holding a majority of then outstanding Common Shares; provided, however, that such replacement director shall not be an Affiliate of the DDJ Parties.

(c)    The CEO Nominee will hold office as a director of the Company for so long as such Person remains as chief executive officer of the Company. If the CEO Nominee ceases to serve as a director of the Company for any reason during his or her term, upon the hiring of a new chief executive officer of the Company, such replacement chief executive officer shall be nominated by the DDJ Parties and the Wayzata Parties to fill the vacancy resulting therefrom. For the avoidance of doubt, it is understood that no party shall have the right to nominate or otherwise select the replacement chief executive officer of the Company pursuant to this Section 1.4(c).

Section 1.5    Removal of Directors. Each Holder agrees to vote, or consent with respect to, its Common Shares to remove any director(s) subject to removal pursuant to Section 1.1(b), Section 1.1(c) and Section 1.1(d). Notwithstanding the foregoing, if the number of directors permitted to be nominated by a Holder is reduced and such Holder so designates a specific individual or individuals of its designees to be removed, then the other Holders agree to vote for the removal of the individual so designated.

Section 1.6 <u>Compensation and Indemnification</u>. The board members shall be entitled to receive compensation for their services and be reimbursed for reasonable out-of-pocket expenses incurred in connection therewith; <u>provided</u>, that no member of the Board of Directors that is also an employee of a Wayzata Party, a DDJ Party or any of their respective Affiliates shall be entitled to receive compensation for his or her services. The certificate of incorporation or bylaws of the Company shall at all times provide for indemnification and limitation on the liability of directors of the Company to the fullest extent permitted by law. The Company shall obtain and at all times maintain directors' and officers' liability insurance coverage on commercially reasonable terms.

Section 1.7 <u>Committees</u>. At the request of any of the Wayzata Parties, each Holder shall use its respective reasonable best efforts to cause two (2) Wayzata Nominees to be placed on the compensation committee of the Board of Directors or any committee of the Board of Directors. At the request of any of the DDJ Parties, each Holder shall use its respective reasonable best efforts to cause the DDJ Nominee to be placed on the compensation committee of the Board of Directors or any committee of the Board of Directors.

Section 1.8 <u>Initial Public Offering</u>. The Company may not initiate an initial public offering of the Company's Common Shares pursuant to an effective registration statement under the Securities Act (an "<u>IPO</u>") without the approval of such number of directors of the Board of Directors equal to at least a majority of the entire Board of Directors of the Company plus one (1).

Section 1.9 <u>Member Approval</u>. Unless the Board of Directors unanimously agrees otherwise, the following actions may only be taken by the Company with the approval of the Holders holding at least sixty-six and two-thirds percent (66-2/3%) of the issued and outstanding Common Shares of the Company calculated as of the close of business on the day immediately prior to any vote or action by written consent of the Holders:

> (a) the purchase, exchange or other acquisition, whether in a single transaction or series of related transactions or by any other manner (including by way of merger, consolidation, business combination or similar transaction involving the Company or any of its subsidiaries), of any equity securities or assets of any Person (other than a wholly-owned subsidiary of the Company) with a fair market value in excess of $25.0 million;

> (b) the sale, transfer, lease, license or other disposition of assets or properties with an aggregate fair market value in excess of $25.0

4

million;

(c) the incurrence of indebtedness for borrowed money, or the assumption, guaranteeing, endorsement or otherwise becoming responsible for any obligations of another Person, in each case, in excess of $20.0 million, except in connection with any of transactions described in Section 1.9(a) and Section 1.9(b) above, in which Section 1.9(a) or Section 1.9(b), as applicable, shall apply;

(d) enter into any transaction or agreement with any Holder or any of its Affiliates, for aggregate payments or with an aggregate value, in any 12-month period, in excess of $1.0 million in any one transaction or series of related transactions;

(e) any voluntary recapitalization pursuant to which any principal amount of indebtedness of the Company or any of its subsidiaries is converted into not less than fifty percent (50%) of the issued and outstanding Common Shares; and

(f) any reorganization, liquidation or dissolution (other than in connection with any transaction described in Section 1.9(a) or Section 1.9(b) above (in which Section 1.9(a) or Section 1.9(b), as applicable, shall apply) or in the course of a proceeding under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code")).

Section 1.10    Expiration or Termination. The provisions of this Article I shall expire upon consummation of an IPO.

## ARTICLE II.

## RESTRICTIONS ON TRANSFER

Section 2.1    General Restrictions on Transfer.  Each Holder agrees that, until the consummation of an IPO, it will not, directly or indirectly, sell, hypothecate, give, convey, bequeath, transfer, assign, pledge or in any other way whatsoever encumber or dispose (any such event, a "Transfer") of any Common Shares now owned or hereafter acquired by such party (or any interest therein) to any other Person, except in compliance with the terms of this Agreement; provided, that as a condition to any Transfer, the intended Transferee expressly and in writing agrees to be bound by the terms of this Agreement as a Holder by signing a signature page to this Agreement in the form attached as Exhibit A hereto.  Any transferee of Common Shares made in compliance with the terms of this Agreement is called a "Transferee".

Section 2.2    Transfers to Competitors.  Each Holder agrees that, until the consummation of an IPO, it will not Transfer any Common Shares now owned or hereafter acquired by such party (or any interest therein) to any Competitor (other than any Transfer pursuant to Article IV).

Section 2.3    Right of First Refusal.

(a)    If any Holder or any of its Permitted Transferees (each, solely for purposes of this Section 2.3, a "Right of First Refusal Stockholder") receives a bona fide offer (a "Transfer Offer") to acquire any or all of its Common Shares (solely for purposes of this Section 2.3, the "Transfer Stock") from any Person that is not a party to this Agreement (other than a Permitted Transferee of such Holder), such Right of First Refusal Stockholder shall cause such Transfer Offer to be reduced to writing and shall notify each of the Wayzata Parties and the Company of its wish to accept such Transfer Offer (the "Transfer Notice").  Such Transfer Notice shall set forth (i) the name of the third party or parties, (ii) the prospective purchase price for the Transfer Stock, and (iii) all other material terms and conditions contained in the Transfer Offer.  The Transfer Notice shall constitute an irrevocable offer by the Right of First Refusal Stockholder ("First Refusal Offer") to sell all, but not less than all, of the Transfer Stock to any of Wayzata Parties at a price equal to the price contained in the Transfer Notice and on other terms and conditions not less favorable to the Wayzata Parties than those contained in the Transfer Offer.  The Wayzata Parties shall have the irrevocable right and option (the "Right of First Refusal Offer") to accept the First Refusal Offer as to all, but not less than all, of the shares of the Transfer Stock pursuant to the First Refusal Offer.  If the Wayzata Parties desire to purchase the Transfer Stock, any Wayzata Party or Parties shall provide the Right of First Refusal Stockholder with an irrevocable written notice of acceptance of the First Refusal Offer, which shall be binding on such Wayzata Party or Parties for all of the Transfer Stock, within five (5) business days after the date of the Transfer Notice (the "Notice Period"), and such Wayzata Party or Parties shall simultaneously provide a copy to the Company.

(b)    The closing of the purchase of the Transfer Stock by any Wayzata Party pursuant to this Section 2.3 shall take place at the principal office of the Company on the date specified in the Transfer Offer (which date shall not be less than the later of (i) thirty (30) business days following the date of the Transfer Notice and (ii) ten (10) days following the receipt of all

necessary governmental approvals).  The purchase price for the purchase of Transfer Stock shall be paid in cash (by wire transfer of immediately available funds to an account specified in writing by the recipients thereof at least three (3) business days prior to the date of such closing) or by certified or official bank check, against delivery of certificates representing the Transfer Stock so purchased, duly endorsed in blank for transfer or accompanied by a stock power duly executed in blank.

(c)     If the provisions of this Section 2.3 have been complied with in all respects, the Right of First Refusal Stockholder shall have the right for a 90-day period following the expiration of the Notice Period to Transfer the shares of Transfer Stock to the third party on the terms set forth in the Transfer Notice (or on other terms no more favorable to the Right of First Refusal Stockholder) without further notice to the Wayzata Parties, but after such 90-day period no such Transfer may be made without again giving notice to the Wayzata Parties of the proposed Transfer and complying with the requirements of this Section 2.3; provided, however, that in the event such Transfer of the Transfer Stock by the Right of First Refusal Stockholder pursuant to this Section 2.3(c) shall (i) be prohibited by law or (ii) require the approval of any governmental authority, the 90-day period described above shall be suspended until such time as (x) in the case of (i) above, such prohibition first lapses or (y) in the case of (ii) above, such approval is granted.

(d)     The provisions of this Section 2.3 shall (i) not apply to any Transfer pursuant to Article IV and (ii) expire upon the consummation of an IPO.

Section 2.4     Right of First Offer.

(a)     If any of the Wayzata Parties or any of their Permitted Transferees (each, solely for purposes of this Section 2.4, a "Right of First Offer Stockholder") desires to Transfer any or all of its Common Shares (solely for purposes of this Section 2.4, the "ROFO Stock") to any Person, such Right of First Offer Stockholder shall first deliver to the Company and DDJ (on behalf of the DDJ Parties) a writing (the "ROFO Notice"), which shall (i) state the Right of First Offer Stockholder's intention to propose a Transfer of ROFO Stock to one or more third parties and (ii) offer the DDJ Parties the option (in accordance with this Section 2.4) to acquire up to one hundred percent (100%), but no fewer than fifty percent (50%), of the maximum number of shares of ROFO Stock that are proposed to be Transferred (the "Right of First Offer").  The Right of First Offer shall remain open and irrevocable for the periods set forth below (and, to the extent the Right of First Offer is accepted during such periods, until the consummation of the sale contemplated by the Right of First Offer in accordance with Section 2.4(b)).  The DDJ Parties shall have the right and option, for a period of five (5) business days after receipt of the Right of First Offer Notice (the "Right of First Offer Acceptance Period"), to submit to the Right of First Offer Stockholder the proposed terms and conditions of the Transfer of up to one hundred percent (100%), but no fewer than fifty percent (50%), of the maximum number of shares of ROFO Stock contained in the ROFO Notice (the "Offered ROFO Stock") (including, without limitation, the purchase price thereof and a summary of the other material terms and conditions of the proposed Transfer) pursuant to which the DDJ Parties propose to acquire the Offered ROFO Stock (the "ROFO Proposal").  The ROFO Proposal shall constitute an irrevocable offer by the DDJ Parties to purchase the Offered ROFO Stock at a price equal to the price contained in the ROFO Proposal.  The Right of First Offer Stockholder shall have the irrevocable right and option to accept the ROFO Proposal as to the Offered ROFO Stock pursuant to the ROFO Proposal.  If the Right of

First Offer Stockholder desires to sell the Offered ROFO Stock to the DDJ Parties, it shall provide the DDJ Parties with an irrevocable written acceptance notice (the "ROFO Acceptance Notice"), which shall be binding on the Right of First Offer Stockholder for all of the Offered ROFO Stock, within fifteen (15) days after the date of the ROFO Proposal (the "ROFO Proposal Notice Period"), and the Right of First Offer Stockholder shall, simultaneously with its delivery of the ROFO Acceptance Notice to the DDJ Parties, provide a copy of the ROFO Acceptance Notice to the Company and a Tag-Along Sale Notice to each Holder in accordance with Section 3.1 hereto (to the extent applicable).

(b)     If the DDJ Parties submit a ROFO Proposal to purchase the Offered ROFO Stock within the Right of First Offer Acceptance Period, but elect not to purchase all of the ROFO Stock that is proposed to be Transferred, then the Right of First Offer Stockholder may proceed to consummate a Transfer of the remaining number of Common Shares that is equal to the difference between (x) the shares of ROFO Stock that are proposed to be Transferred by the Right of First Offer Stockholder and (y) the shares of Offered ROFO Stock (the "Remaining ROFO Stock") to any Person at a price per share and on such other terms and conditions as are acceptable to the Right of First Offer Stockholder in its sole discretion, within 120 days after the expiration of the Right of First Offer Acceptance Period (the "Sale Period"). In the event that the Right of First Offer Stockholder determines, at any time during the Sale Period, that the terms and conditions of the proposed Transfer are undesirable, the Right of First Offer Stockholder may terminate the offer and reinstate the procedure in this Section 2.4 without waiting for the expiration of the Sale Period.

(c)     If the DDJ Parties elect not to submit a ROFO Proposal within the Right of First Offer Acceptance Period, then the Right of First Offer Stockholder may proceed to consummate a Transfer of the ROFO Stock to any Person at a price per share and on such other terms and conditions as are acceptable to the Right of First Offer Stockholder in its sole discretion, within the Sale Period.

(d)     If the provisions of this Section 2.4 have been complied with in all respects and the DDJ Parties have provided a ROFO Proposal that has not been accepted by the Right of First Offer Stockholder, the Right of First Offer Stockholder shall have the right for a 120-day period following receipt of the ROFO Proposal to Transfer the shares of Offered ROFO Stock at a price not less than the price, and on terms and conditions not more favorable to the purchaser thereof than the terms and conditions, stated in the ROFO Proposal, without further notice to the DDJ Parties, but after such 120-day period no such Transfer may be made without again giving notice to the DDJ Parties of the proposed Transfer and complying with the requirements of this Section 2.4; provided, however, that in the event such Transfer of the Offered ROFO Stock by the Right of First Offer Stockholder pursuant to this Section 2.4(d) shall (i) be prohibited by law or (ii) require the approval of any governmental authority, the 120-day period described above shall be suspended until such time as (x) in the case of (i) above, such prohibition first lapses or (y) in the case of (ii) above, such approval is granted.

(e)     The closing of the purchase of the Offered ROFO Stock by the DDJ Parties pursuant to this Section 2.4 shall take place at the principal office of the Company on the date specified in the ROFO Proposal (which date shall not be less than the later of (i) thirty (30) business days following the date of the ROFO Proposal and (ii) ten (10) days following the receipt

of all necessary governmental approvals), which date shall also be the Tag-Along Sale Date, to the extent applicable. The purchase price for the purchase of Offered ROFO Stock shall be paid in cash (by wire transfer of immediately available funds to an account specified in writing by the recipients thereof at least three (3) business days prior to the date of such closing) or by certified or official bank check, against delivery of certificates representing the Offered ROFO Stock so purchased, duly endorsed in blank for transfer or accompanied by a stock power duly executed in blank.

(f)　　Prior to any Transfer of Common Shares by a Right of First Offer Stockholder pursuant to this Section 2.4, the Right of First Offer Stockholder shall, in addition to complying with the provisions of this Section 2.4, comply with the provisions of Section 3.1 hereof, if applicable.

(g)　　The provisions of this Section 2.4 shall (i) not apply to any Transfer pursuant to Article IV of this Agreement, (ii) not apply to Transfers to Permitted Transferees, (iii) not apply to any Transfer or Transfers by any Wayzata Party to any Person or Persons (other than Permitted Transferees) of up to five percent (5%) (in the aggregate of all such Transfers) of the issued and outstanding Common Shares as calculated as of the date of this Agreement and (iv) expire upon earlier to occur of (A) the date on which the DDJ Parties and their Permitted Transferees cease to own at least fifteen percent (15%) of the issued and outstanding Common Shares or (B) the consummation of an IPO.

Section 2.5　　Compliance with Securities Laws. No Holder shall Transfer any Common Shares, and the Company shall not transfer on its books any Common Shares, unless:

(a)　　such Transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended (together with the rules and regulations promulgated thereunder, the "Securities Act"), and is in compliance with any applicable state securities or blue sky laws, or, if requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Company (it being acknowledged that Latham & Watkins LLP shall be deemed to be reasonably satisfactory to the Company), to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and any applicable state securities or blue sky laws;

(b)　　the certificates, if any, representing such Common Shares issued to the transferee shall bear the following legend (or one to substantially similar effect):

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS CONTAINED IN A STOCKHOLDERS AGREEMENT (AS SUCH

AGREEMENT MAY BE AMENDED FROM TIME TO TIME, THE "STOCKHOLDERS AGREEMENT"). THE STOCKHOLDERS AGREEMENT CONTAINS, AMONG OTHER THINGS, CERTAIN PROVISIONS RELATING TO THE TRANSFER OF THE SECURITIES SUBJECT TO SUCH AGREEMENT. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE HYPOTHECATION OR OTHER DISPOSITION OF THE SHARES REPRESENTED BY THIS CERTIFICATE, DIRECTLY OR INDIRECTLY, MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT APPLICABLE TO THE SECURITIES REPRESENTED BY THIS CERTIFICATE."; and

(c)     such Transfer shall not require the Company to register any Common Shares (or any other of the Company's equity securities) under the Exchange Act or applicable state securities or blue sky laws.

Section 2.6     <u>Improper Transfer</u>. Any attempt to Transfer or otherwise encumber any Common Shares in violation of this Agreement shall be null and void and neither the Company nor any registrar or transfer agent of such Common Shares shall give any effect to such attempted Transfer or encumbrance in its stock records.

Section 2.7     <u>Involuntary Transfer</u>. In the case of any Transfer of title or beneficial ownership of Common Shares upon default, foreclosure, forfeit, court order or otherwise than by a voluntary decision on the part of a Holder (an "<u>Involuntary Transfer</u>"), such Holder (or such Holder's legal representatives) shall promptly (but in no event later than five (5) days after such Involuntary Transfer) furnish written notice to the Company indicating that the Involuntary Transfer has occurred, specifying the name of the Person to whom such Common Shares has been Transferred, giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the Involuntary Transfer. Nothing in this Section 2.7 shall be deemed to vest any Person who becomes a holder of Common Shares pursuant to an Involuntary Transfer with any rights under this Agreement.

Section 2.8     <u>Certain Definitions</u>. For purposes of this Agreement:

(a)     An "<u>Affiliate</u>" of any Person means any other Person directly or indirectly controlling, controlled by or under common control with the first Person.

(b)     "<u>Competitor</u>" means any Person that, directly or indirectly, engages in, or possesses an equity interest in, any business enterprise or other venture that competes with any business that the Company or any of its subsidiaries currently engages in or, with the consent of the Board of Directors, will engage in after the date of this Agreement; provided, however, that no Person shall be deemed to be a Competitor solely as a result of such Person's beneficial ownership for investment purposes of less than an aggregate of five percent (5%) of any class of equity securities of another Person which are registered under Section 13 of the Exchange Act.

(c)     The term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, a natural person cannot be "controlled by" another Person.

(d)     "Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

(e)     "Permitted Transferee" means, with respect to any Holder, (i) any Affiliate of such Holder, (ii) any funds or accounts under common management with, or operated by, such Holder, (iii) with respect to the Wayzata Parties, any other Person controlled, directly or indirectly, by Wayzata Investment Partners LLC, a Delaware limited liability company, or (iv) with respect to the DDJ Parties, any other Person controlled, directly or indirectly, by DDJ Capital Management, a Delaware limited liability company ("DDJ").

## ARTICLE III.

## TAG ALONG RIGHTS

Section 3.1     Tag-Along Rights.

(a)     Right to Participate in Sale. Should any Wayzata Party or any of its Permitted Transferees propose to Transfer any Common Shares, other than Transfers to Permitted Transferees (a "Tag-Along Sale", and such Holder, the "Transferor"), the Transferor shall afford each other Holder the opportunity to participate proportionally in such Tag-Along Sale in accordance with this Section 3.1. Each Holder shall have a proportionate right, but not the obligation, to participate in such Tag-Along Sale. The number of Common Shares (the "Tag-Along Allotment") that each Holder will be entitled to include in such Tag-Along Sale shall be determined by multiplying (a) the number of Common Shares held by such Holder as of the close of business on the day immediately prior to the Tag-Along Notice Date by (b) a fraction (the "Tag-Along Fraction"), the numerator of which shall equal the number of Common Shares proposed by the Transferor to be sold or otherwise disposed of pursuant to the Tag-Along Sale and the denominator of which shall equal the total number of Common Shares that are beneficially owned by the Transferor as of the close of business on the day immediately prior to the Tag-Along Notice Date.

(b)     Sale Notice. The Transferor shall provide each Holder with written notice (the "Tag-Along Sale Notice") not more than sixty (60) nor less than twenty (20) days prior to the proposed date of the Tag-Along Sale (the "Tag-Along Sale Date"). Each Tag-Along Sale Notice shall set forth: (i) the number of shares proposed to be transferred or sold by the Transferor; (ii) the proposed amount and form of consideration to be paid for such shares and the terms and conditions of payment offered by each proposed purchaser; (iii) the aggregate number of Common Shares held of record by the Transferor as of the close of business on the day immediately preceding the date of the Tag-Along Notice (the "Tag-Along Notice Date"); (iv) such Holders'

Tag-Along Allotment assuming such Holder elected to sell the maximum number of Common Shares as possible; (v) confirmation that the proposed purchaser or transferee has been informed of the "Tag-Along Rights" provided for in this Section 3.1 and has agreed to purchase the Common Shares in accordance with the terms hereof; and (vi) the Tag-Along Sale Date.

  (c) <u>Tag-Along Notice</u>.

    (i) If a Holder wishes to participate in the Tag-Along Sale, such Holder shall provide written notice (the "<u>Tag-Along Notice</u>") to the Transferor within fourteen (14) days following the receipt of the Tag-Along Sale Notice. The Tag-Along Notice shall set forth the number of Common Shares that such Holder elects to include in the Tag-Along Sale, which shall not exceed such Holder's Tag-Along Allotment. During such fourteen (14) day period, the Company shall provide the Holders, as applicable, with such financial data and information as the Holders, as applicable, shall reasonably request; provided, however, that any such Holder, as applicable, shall agree to hold in confidence and trust all information so provided; and, provided, further, that the Company may withhold any such financial data and information as may be reasonably necessary (in the Company's sole discretion) to preserve the attorney-client privilege between the Company and its counsel or to protect confidential proprietary information. The Tag-Along Notice shall also specify the aggregate number of additional Common Shares owned of record as of the close of business on the day immediately preceding the Tag-Along Notice Date by such Holder, if any, which such Holder desires also to include in the Tag-Along Sale ("<u>Additional Shares</u>") in the event there is any under-subscription for the entire amount of all Holders' Tag-Along Allotments. The Tag-Along Notice given by each Holder shall constitute such Holder's binding agreement to sell the Common Shares specified in such Tag-Along Notice (including any Additional Shares to the extent such Additional Shares are to be included in the Tag-Along Sale pursuant to the apportionment described above) on the terms and conditions applicable to the Tag-Along Sale, subject to the provisions of Section 3.1; provided, however, that in the event that there is any material change in the terms and conditions of such Tag-Along Sale applicable to any Holder after delivery of a Tag-Along Notice or in the event that the Transferor reduces the number of shares which they intend to Transfer in the Tag-Along Sale, then, notwithstanding anything herein to the contrary, such Holder shall have the right to withdraw from participation in the Tag-Along Sale with respect to all of its Common Shares affected thereby.

    (ii) If the aggregate number of Common Shares proposed to be included by a Holder in any Tag-Along Sale (without taking into account any Additional Shares) is less than the aggregate Tag-Along Allotments of all of the Holders (such difference, the "<u>Excess Allotment</u>"), then the Excess Allotment shall be allocated among the Transferor and each Holder who has indicated a desire to sell Additional Shares pursuant to a Tag-Along Notice *pro rata* based upon the number of Common Shares owned by each of them as of the close of business on the day immediately prior to the Tag-Along Notice Date; provided, that if application of the foregoing provision does not result in allocation of the entire Excess Allotment, then the balance shall be allocated among the Transferor and each Holder with remaining Additional Shares *pro rata* based upon the number of Common Shares owned by each of them as of the close of business

on the day immediately prior to the Tag-Along Notice Date and so on until the entire Excess Allotment has been allocated. The Transferor shall notify each Holder with Additional Shares to be included in the Tag-Along Sale of the number of such Additional Shares to be so included no later than the fifth (5th) day prior to the Tag-Along Sale Date.

(iii) If a Tag-Along Notice is not received by the Transferor from any Holder within the 14-day period specified above, the Transferor shall have the right to sell or otherwise transfer the number of shares specified in the Tag-Along Sale Notice to the proposed purchaser or transferee without any participation by such Holder, but only on terms and conditions which are no more favorable in any material respect to the Transferor than as stated in the Tag-Along Sale Notice and only if such Tag-Along Sale occurs on a date within sixty (60) business days of the Tag-Along Sale Date. If such Tag-Along Sale does not occur within such 60-day period, the Common Shares that were to be subject to such Tag-Along Sale thereafter shall continue to be subject to all of the provisions of this Section 3.1.

(d)     Terms of Tag-Along Sale; Cooperation. Any sales of Common Shares by a Holder as a result of the "Tag-Along Rights" provided under this Section 3.1 shall be on the same terms and conditions as the proposed Tag-Along Sale by the Transferor. It is acknowledged that each Holder participating in such Tag-Along Sale will be entitled to receive the same form of consideration for each of its Common Shares as is received by the Transferor, unless any Transferor is given an option as to the form and amount of consideration to be received in connection with such Tag-Along Sale, in which case all Holders of Common Shares will be given the same such option. Each Holder participating in any Tag-Along Sale shall cooperate in good faith with the Transferor and the Company in connection with the consummation of such Tag-Along Sale, including, without limitation, by executing a document containing customary representations, warranties, indemnities and agreements as requested by the purchaser in connection with such Tag-Along Sale, which shall be in substantially the same form that is executed by the Transferor in connection with such Tag Along Sale; provided, however, that no Holder participating in such Tag-Along Sale shall be required to make any representations and warranties as to itself other than representations as to its good standing, due authorization, due execution, enforceability, lack of conflicts, title to Common Shares and investment qualifications (provided, that, for the avoidance of doubt, the foregoing shall in no way serve as a restriction on the indemnification obligations of such Holders in connection with such Tag-Along Sale); and provided, further, that, notwithstanding the foregoing, the liability for any indemnity obligations of any Holder under such document shall be several and not joint and, to the extent applicable, with respect to representations and warranties of the Company and such Holder, shall not exceed the aggregate cash consideration received by such Holder in connection with such transaction except with respect to claims related to (a) fraud, willful misconduct or willful breach by the Company or any such Holder and (b) a breach of any representation or warranty of such Holder relating to its good standing, due authorization, due execution, enforceability, lack of conflicts, title to Common Shares and investment qualifications.

(e)     Authority to Record Transfer/Delivery of Certificates. On the Tag-Along Sale Date, each Holder, if a participant in the applicable Tag-Along Sale, (a) authorizes the Company (or the Company's transfer agent, if any) to record in the Company's books and records the transfer of all of such Holder's Common Shares included in such Tag-Along Sale which are

not represented by one or more certificates from the Holder to the purchaser in the Tag-Along Sale and (b) shall deliver all certificates, if any, which represent Common Shares owned by such Holder included in such Tag-Along Sale, duly endorsed for transfer with signatures guaranteed, to the purchaser in the Tag-Along Sale, in the manner and at the address indicated in the Tag-Along Notice, in each case against delivery of the purchase price for such shares. In addition, each Holder, if a participant in the applicable Tag-Along Sale, shall take all action as the Transferor or the purchaser in the Tag-Along Sale shall reasonably request as necessary to vest in the purchaser in the Tag-Along Sale all Common Shares owned by such Holder included in such Tag Along Sale, whether in certificated or uncertificated form, free and clear of all liens, charges and encumbrances of any kind.

(f)     Exempt Transfers. The provisions of this Section 3.1 shall not apply (i) to any Transfer or Transfers (other than purchases by the Company described in clause (iii) below) by any Wayzata Party to any Person or Persons (other than Permitted Transferees) of up to five percent (5%) (in the aggregate of all such Transfers) of the issued and outstanding Common Shares as calculated as of the date of this Agreement, (ii) to any sale of Common Shares in a bona fide underwritten offering of Common Shares pursuant to an effective registration statement under the Securities Act, and (iii) to any purchase by the Company of its Common Shares; provided, that such purchase is made *pro rata* among all Holders of Common Shares.

(g)     Termination of Tag-Along Rights. The provisions of this Section 3.1 shall expire upon the consummation of an IPO.

## ARTICLE IV.

## DRAG-ALONG SALES

Section 4.1     Right to Require Sale. Notwithstanding any other provision of this Agreement, if the Wayzata Parties desire to (a) Transfer such number of Common Shares of the Company held by the Wayzata Parties equal to at least a majority of the then issued and outstanding Common Shares to a third Person or third Persons who are not Affiliates of the Wayzata Parties (a "Third Party"); (b) effect a business combination of the Company (whether by merger, consolidation or otherwise) with such Third Party; or (c) sell all or substantially all the assets of the Company to such Third Party (any of the transactions described in clauses (a), (b) and (c), an "Acquisition Proposal"), then, upon the demand of any Wayzata Party, each other Holder (solely for the purpose of this Article IV, an "Other Holder") shall be required, as the case may be, (x) to sell to such Third Party a number of Common Shares, if any, equal to the number of shares specified in the applicable Drag-Along Notice (as defined below) (it being expressly agreed and understood that in connection with any Acquisition Proposal for less than 100% of the total outstanding Common Shares, each Other Holder shall be required to sell that percentage of its Common Shares equal to the percentage of Common Shares then held by the Wayzata Parties that are being sold by the Wayzata Parties in connection with such Acquisition Proposal), for the same consideration and on the same purchase terms and conditions as the Wayzata Parties have agreed to with such Third Party and (y) to vote all of the Common Shares beneficially owned by such Other Holder in favor of such Acquisition Proposal and take all other necessary or desirable actions within such Other Holder's control (including, without limitation, by attending meetings in person or by proxy for the purpose of obtaining a quorum, executing

written consents in lieu of meetings and refraining from exercising appraisal rights with respect to any such Acquisition Proposal), to cause the approval of such Acquisition Proposal.

Section 4.2    Drag-Along Notice. Prior to consummating any Acquisition Proposal, if any Wayzata Party elects to exercise the option described in this Article IV, the Wayzata Parties shall provide each Other Holder with written notice (the "Drag-Along Notice") not more than sixty (60) nor less than twenty (20) days prior to the proposed closing date (the "Drag-Along Sale Date") therefor. The Drag-Along Notice shall be accompanied by a copy of any written agreement relating to the Acquisition Proposal and shall set forth, if applicable: (a) the proposed amount and form of consideration to be paid per share of Common Shares and the terms and conditions of payment offered by the Third Party; (b) the aggregate number of Common Shares held by the Wayzata Parties as of the close of business on the day prior to the date of the Drag-Along Notice; (c) the number of Common Shares held by the Wayzata Parties that are proposed to be Transferred in the Acquisition Proposal; (d) the Drag-Along Sale Date; and (e) confirmation that the Third Party has agreed to purchase the Other Holders' Common Shares in accordance with the terms hereof.

Section 4.3    Authority to Record Transfer/Delivery of Certificates. On the Drag-Along Sale Date, each Other Holder, if a participant in the applicable Drag-Along Sale, (a) authorizes the Company (or the Company's transfer agent, if any) to record in the Company's books and records the transfer of all of such Other Holder's Common Shares included in such Drag-Along Sale which are not represented by one or more certificates, from such Other Holder to the purchaser in the Drag-Along Sale and (b) shall deliver all certificates, if any, which represent Common Shares owned by such Other Holder included in such Drag-Along Sale, duly endorsed for transfer with signatures guaranteed (if applicable or required), to the purchaser in the Drag-Along Sale, in the manner and at the address indicated in the Drag-Along Notice, in each case against delivery of the purchase price for such shares. In addition, each Other Holder, if a participant in the applicable Drag-Along Sale, shall take all action as the Wayzata Parties or the purchaser in the Drag-Along Sale shall reasonably request as necessary to vest in the purchaser in the Drag-Along Sale all Common Shares owned by such Other Holder included in such Drag Along Sale, whether in certificated or uncertificated form, free and clear of all liens, charges and encumbrances of any kind.

Section 4.4    Consideration. The provisions of this Article IV shall apply regardless of the form of consideration received in the Drag-Along Sale. It is acknowledged that each Other Holder will be entitled to receive the same form of consideration for each of its Common Shares as is received by the Wayzata Parties in connection with such Drag-Along Sale, unless the Wayzata Parties are given an option as to the form and amount of consideration to be received in connection with such Drag-Along Sale, in which case all Other Holders will be given the same such option.

Section 4.5    Cooperation. Each Other Holder shall cooperate in good faith with the Wayzata Parties in connection with the consummation of the Drag-Along Sale, including, without limitation, by executing a document containing customary representations, warranties, indemnities and agreements as requested by any Third Party in connection with the Drag-Along Sale; provided, however, that no Other Holder shall be required to make any representations and warranties as to itself other than representations as to its good standing, due authorization, due

execution, enforceability, lack of conflicts, title to its Common Shares and investment qualifications (provided, that, for the avoidance of doubt, the foregoing shall in no way serve as a restriction on the indemnification obligations of an Other Holder in connection with a Drag-Along Sale); and provided, further, that, notwithstanding the foregoing, the liability for any indemnity obligations of any Other Holder under such document shall be several and not joint and, to the extent applicable, with respect to representations and warranties of the Company and such Other Holder, shall not exceed the aggregate cash consideration received by such Other Holder in connection with such transaction except with respect to claims related to (a) fraud, willful misconduct or willful breach by the Company or such Other Holder and (b) a breach of any representation or warranty of such Other Holder relating to its good standing, due authorization, due execution, enforceability, lack of conflicts, title to its Common Shares and investment qualifications.

Section 4.6 _Termination of Drag-Along Rights_. The provisions of this Article IV shall expire upon the consummation of an IPO.

## ARTICLE V.

## REGISTRATION RIGHTS

Section 5.1 _Definitions_. For purposes of this Agreement:

(a) "Commission" means the United States Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(b) "Exchange Act" means the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated by the Commission thereunder.

(c) "Registrable Securities" means Common Shares.

(d) "Short-Form Registration" means any registration statement effected on Form S-3 or any comparable or successor form or forms or any similar short-form registration.

Section 5.2 _Demand Registration_.

(a) Commencing on that date that is six (6) months after the consummation of an IPO, subject to the terms and conditions of this Agreement, upon written notice delivered by any Wayzata Party (a "Wayzata Demand") requesting that the Company effect the registration (a "Wayzata Demand Registration") under the Securities Act of any or all of the Registrable Securities held by the Wayzata Parties or any of their Permitted Transferees, which Wayzata Demand shall specify the number of such Registrable Securities to be registered and the intended method or methods of disposition of such Registrable Securities, the Company shall promptly give written notice of such Wayzata Demand to all Persons who may have piggyback registration rights with respect to such Wayzata Demand Registration and shall use its best efforts to effect the registration under the Securities Act and applicable state securities laws of:

(i) the Registrable Securities which the Company has been so requested to register by such Persons in the Wayzata Demand, and

(ii)     all other Registrable Securities which the Company has been requested to register by the Holders thereof by written request given to the Company within thirty (30) days after the giving of such written notice by the Company, all to the extent requisite to permit the disposition (in accordance with such intended methods of disposition) of the Registrable Securities to be so registered.

(b)     If the filing, initial effectiveness or continued use of a Registration Statement with respect to a Wayzata Demand Registration would require the Company to make a public disclosure of material non-public information, which disclosure in the good faith judgment of the Board of Directors (after consultation with external legal counsel) (i) would be required to be made in any Registration Statement so that such Registration Statement would not be materially misleading, (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such Registration Statement and (iii) would reasonably be expected to be materially adverse to the Company or its business or on the Company's ability to effect a material proposed acquisition, disposition, financing, reorganization, recapitalization or similar transaction, then the Company may, upon giving prompt written notice of such action to the Holders participating in such registration, delay the filing or initial effectiveness of, or suspend use of, such Registration Statement; provided, that the Company shall not be permitted to do so for periods exceeding, in the aggregate, 90 days during any 12-month period. In the event the Company exercises its rights under the preceding sentence, such Holders agree to suspend, promptly upon their receipt of the notice referred to above, their use of any prospectus relating to such registration in connection with any sale or offer to sell Registrable Securities. If the Company so postpones the filing of a prospectus or the effectiveness of a Registration Statement, such Wayzata Party shall be entitled to withdraw its request. The Company will pay all Registration Expenses incurred in connection with any such aborted registration or prospectus. The Company shall not be obligated to take any action to effect or complete any registration pursuant to this Section 5.2 following the filing of, and for 180 days immediately following the effective date of, any Registration Statement or offering document pertaining to Registrable Securities of the Company (other than a registration pursuant to Form S-3), if such Registration Statement has become effective or the Company is actively employing in good faith commercially reasonable best efforts to cause such Registration Statement to become effective.

Section 5.3     Piggyback Registration. Other than pursuant to an IPO, whenever the Company proposes to register any of its securities, including any registration or listing pursuant to Section 5.2, and the registration form to be filed may be used for the registration, listing or qualification for distribution of Registrable Securities, the Company will give prompt written notice (the "Registration Notice") to all Holders of its intention to effect such a registration at least ten (10) business days before the anticipated registration date and will include in such registration all Registrable Securities held by the Holders with respect to which the Company has received written requests for inclusion therein within ten (10) business days after the date of such Registration Notice (a "Piggyback Registration"). The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 5.3 (and not pursuant to Section 5.2) prior to the effectiveness of such registration whether or not any Holder has elected to include any Registrable Securities in such registration.

Section 5.4    Priority on Registrations.  Notwithstanding anything to the contrary in this Agreement, if the managing underwriters of an underwritten offering of Registrable Securities informs the Company that the number of securities requested to be included in such offering, including pursuant to this Article V, exceeds the number which can be sold without materially adversely affecting the marketability of such offering (including a material adverse effect on the per Share offering price) (a "Cutback Event"), the Company will include in such registration or prospectus only such number of securities that in the reasonable opinion of such underwriters can be sold without causing a Cutback Event, which securities will be so included in the following order of priority:

(a)    for registrations pursuant to Section 5.2, first, Registrable Securities of the Holders who have requested registration of their Registrable Securities pursuant to Section 5.2 or Section 5.3 and second, any securities proposed to be registered by the Company or any other Person, in each case *pro rata* on the basis of the aggregate number of such Registrable Securities or securities, as applicable, proposed to be registered by the applicable holders thereof; and

(b)    for any other registrations, first, Registrable Securities of the Holders who have requested registration of their Registrable Securities pursuant to Section 5.3 and second, any securities proposed to be registered by the Company or any other Person, in each case *pro rata* on the basis of the aggregate number of such Registrable Securities or securities, as applicable, proposed to be registered by the applicable holders thereof.

Section 5.5    Registration Procedures.

(a)    In the event that Holders request that any of their Registrable Securities be registered pursuant to this Article V, the Company will use its reasonable best efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of disposition thereof and as soon as possible:

(i)    prepare and file with the Commission a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective as soon as practicable thereafter; and before filing a Registration Statement or prospectus or any amendments or supplements thereto, furnish to Demand Counsel (as defined below) and the underwriter or underwriters, if any, copies of all such documents proposed to be filed, including documents incorporated by reference in the prospectus and the exhibits thereto, and Demand Counsel (and the underwriter(s), if any) shall have the opportunity to review and comment thereon, and the Company will make such changes and additions thereto as reasonably requested by such Holders (and the underwriter(s), if any) prior to filing any Registration Statement or amendment thereto or any prospectus or any supplement thereto;

(ii)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the prospectus used in connection therewith as may be required to keep such Registration Statement effective for a period of not less than 180 days, or such shorter period as is necessary to

18

complete the distribution of the securities covered by such Registration Statement and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the seller or sellers of such Registrable Securities set forth in such Registration Statement;

(iii)    furnish to the seller or sellers of such Registrable Securities such number of copies of such Registration Statement, each amendment and supplement thereto, the prospectus included in such Registration Statement (including each preliminary prospectus), any and all transmittal letters or other correspondence with the Commission and such other documents as such sellers and any underwriter(s) may reasonably request in order to facilitate the disposition of the Registrable Securities;

(iv)    use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller of such Registrable Securities and any underwriter(s) reasonably requests and do any and all other acts and things that may be reasonably necessary or advisable to enable any such seller and any underwriter(s) to consummate the disposition in such jurisdictions of the Registrable Securities, provided that the Company will not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction;

(v)    notify each seller of such Registrable Securities and Demand Counsel and any underwriter(s), at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the occurrence of any event as a result of which the prospectus included in such Registration Statement contains an untrue statement of a material fact or omits any material fact necessary to make the statements therein not misleading, and, at the request of such sellers or any underwriter(s), the Company shall prepare a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading;

(vi)    in the case of an underwritten offering, (A) enter into such agreements (including underwriting agreements in customary form) as are customary in an underwritten offering and all of the representations and warranties by, and the other agreements on the part of, the Company in the underwriting agreement and other agreements to and for the benefit of such underwriters, shall also be made for the benefit of each seller of Registrable

19

Securities for the limited purpose of its participation in such offering, (B) take all such other actions as such Holders or the underwriter(s) reasonably request in order to expedite or facilitate the disposition of such Registrable Securities and (C) use its reasonable best efforts to cause its counsel to issue opinions of counsel in form, substance and scope as are customary in primary underwritten offerings, addressed and delivered to the underwriter(s) and such sellers;

(vii)    make available for inspection by such Holders, any underwriter participating in any disposition pursuant to such Registration Statement, and any attorney, accountant or other agent retained by such Holders or underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and use its reasonable efforts to cause the Company's officers, directors, employees and independent accountants to supply all information reasonably requested by such Holders, underwriter, attorney, accountant or agent in connection with such Registration Statement;

(viii)    use its reasonable best efforts to cause all such Registrable Securities to be listed on each securities exchange on which Common Shares is then listed or, if it is not listed, on the New York Stock Exchange or the Nasdaq Global Market, as determined by the Company;

(ix)    provide a transfer agent and registrar for all Registrable Securities not later than the effective date of such Registration Statement;

(x)    if requested, use its reasonable best efforts to cause to be delivered, immediately prior to the pricing of any underwritten offering, immediately prior to effectiveness of each Registration Statement (and, in the case of an underwritten offering, at the time of closing of the sale of Registrable Securities pursuant thereto), letters from the Company's independent registered public accountants addressed to the sellers of Registrable Securities and each underwriter, if any, stating that such accountants are independent public accountants within the meaning of the Securities Act or other applicable rule or regulation, and otherwise in customary form and covering such financial and accounting matters as are customarily covered by letters of the independent registered public accountants delivered in connection with primary underwritten public offerings; and

(xi)    promptly notify the sellers of Registrable Securities and Demand Counsel and the underwriter or underwriters, of the following events, if any:

(A) when the Registration Statement, any pre-effective amendment, the prospectus or any prospectus supplement or post-

effective amendment to the Registration Statement has been filed and, with respect to the Registration Statement or any post-effective amendment, when the same has become effective;

(B) of any written request by the Commission for amendments or supplements to the Registration Statement or prospectus;

(C) of the notification to the Company by the Commission of its initiation of any proceeding with respect to, or the issuance by the Commission of any stop order suspending the effectiveness of, the Registration Statement; and

(D) of the receipt by the Company of any notification with respect to the suspension of the qualification of any Registrable Securities for sale under the applicable securities or blue sky laws of any jurisdiction.

(b) The Company shall furnish to Demand Counsel, sellers of Registrable Securities or any underwriter (i) promptly after the same is prepared and publicly distributed, filed with the Commission, or received by the Company, copies of each Registration Statement and any amendment thereto, each preliminary prospectus and prospectus and each amendment or supplement thereto, each letter written by or on behalf of the Company to the Commission, and each item of correspondence from the Commission, in each case relating to such Registration Statement, and (ii) such number of copies of a prospectus, including a preliminary prospectus, and all amendments and supplements thereto and such other documents as Demand Counsel, sellers of Registrable Securities or any underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities. The Company will promptly notify sellers and Demand Counsel of the effectiveness of each Registration Statement or any post-effective amendment. The Company will respond reasonably promptly to any and all comments received from the Commission, with a view towards causing each Registration Statement or any amendment thereto to be declared effective by the Commission as soon as practicable and shall file an acceleration request as soon as practicable following the resolution or clearance of all comments by the Commission, if applicable, following notification by the Commission that any such Registration Statement or any amendment thereto will not be subject to further review.

Section 5.6    Expenses.

(a) All expenses incurred in connection with each registration pursuant to, and incident to the Company's performance of or compliance with, this Article V, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, listing application fees, printing expenses, transfer agent's and registrar's fees, cost of distributing prospectuses in preliminary and final form as well as any supplements thereto, fees and disbursements of counsel for the Company and all accountants and other Persons retained by the Company and the reasonable fees and disbursements of one U.S. counsel for all of the Holders participating in the applicable registration (the "Demand Counsel") (all such expenses being

herein called "Registration Expenses") (but not including any underwriting discounts or commissions or transfer taxes, if any, attributable to the sale of Registrable Securities, which shall be borne by the applicable seller of Registrable Securities), shall be borne by the Company. In addition, the Company shall pay its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which they are to be listed.

(b)     The obligation of the Company to bear the expenses described in Section 5.6(a) shall apply irrespective of whether a registration, once properly demanded, if applicable, becomes effective, is withdrawn or suspended, is converted to another form of registration and irrespective of when any of the foregoing shall occur.

Section 5.7     Indemnification.

(a)     The Company shall indemnify and hold harmless, to the fullest extent permitted by law, each Holder and each of their respective officers, directors, employees and Affiliates and each Person who controls such Holder (within the meaning of the Securities Act) against any losses, claims, damages, liabilities, joint or several, and expenses (each, a "Loss") arising out of or based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application for listing on a national securities exchange, or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus, in light of the circumstances under which they were made) not misleading or (iii) any violation by the Company of the Securities Act, the Exchange Act or applicable "blue sky" laws, except insofar as the same are made in reliance and in conformity with information relating to such Holder, furnished in writing to the Company by such Holder, expressly for use therein.

(b)     In connection with any Registration Statement that includes Registrable Securities owned by any Holder, such Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or prospectus and shall indemnify and hold harmless the Company, its directors and officers, and each other Person who controls the Company (within the meaning of the Securities Act) against any Losses to which the Company or any such director or officer or controlling Person may become subject under the Securities Act or otherwise, insofar as such Losses arise out of or are based upon (i) any untrue or alleged untrue statement of material fact contained in the Registration Statement, prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application for listing on a national securities exchange or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is made in such Registration Statement, any such prospectus or preliminary prospectus or any amendment or supplement thereto, or in any such application, in reliance upon and in conformity with written information prepared and furnished to the Company by a Holder expressly for use therein, and such Holder will reimburse the Company and each such director, officer and controlling Person for any legal or any other expenses actually and reasonably incurred by them in connection with investigating, defending or settling any such loss, claim, liability,

action or proceeding; <u>provided</u> that the obligation to indemnify and hold harmless will be limited to the net amount of proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement.

(c) In case any proceeding (including any governmental investigation) will be instituted involving any Person in respect of which indemnity may be sought pursuant to Section 5.7(a) or (b), such Person (hereinafter called the "<u>indemnified party</u>") will promptly notify the Person against whom such indemnity may be sought (hereinafter called the "<u>indemnifying party</u>") in writing and the indemnifying party, upon request of the indemnified party, will retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and will pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party will have the right to retain its own counsel, but the fees and expenses of such counsel will be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party will have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impeded parties) include both the indemnifying party and the indemnified party and the indemnified party will have been advised by counsel that representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party will not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) at any time for all such indemnified parties, and that all such reasonable fees and expenses will be reimbursed as they are incurred. In the case of the retention of any such separate firm for the indemnified parties, such firm will be designated in writing by the indemnified parties. The indemnifying party will not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an indemnified party will have requested an indemnifying party to reimburse the indemnified party for reasonable fees and expenses of counsel as contemplated by the third sentence of this Section 5.7(c), the indemnifying party agrees that it will be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by such indemnifying party of the aforesaid request and (ii) such indemnifying party will not have reimbursed the indemnified party in accordance with such request or reasonably objected in writing, on the basis of the standards set forth herein, to the propriety of such reimbursement prior to the date of such settlement. No indemnifying party will, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party, unless such settlement includes an unconditional release of such indemnified party from all liability on claims that are the subject matter of such proceeding.

(d) The provisions of this Section 5.7 shall survive the transfer of securities and any termination of this Agreement.

(e) If the indemnification provided for in or pursuant to this Section 5.7 is due in accordance with the terms hereof, but is held by a court to be unavailable or unenforceable in respect of any Losses, then each applicable indemnifying party, in lieu of indemnifying such

indemnified party, shall contribute to the amount paid or payable by such indemnified Person as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and of the indemnified party, on the other hand, in connection with the statements or omissions that result in such Losses as well as any other relevant equitable considerations. The relative fault of the indemnifying party, on the one hand, and of the indemnified Person, on the other hand, shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party, and by such party's relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(f)     The parties agree that it would not be just and equitable if contribution pursuant to Section 5.7(e) were determined by *pro rata* allocation or by any other method of allocation that does not take into account the equitable considerations referred to in Section 5.7(e). No Person guilty of "fraudulent misrepresentation" (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(g)     If indemnification is available under this Section 5.7, the indemnifying party will indemnify each indemnified party to the full extent provided in Sections 5.7(a) and (b) without regard to the relative fault of said indemnifying party or indemnified party or any other equitable consideration provided for in Section 5.7(e).

Section 5.8     Participation in Underwritten Registrations.

(a)     No Holder may participate in any registration hereunder that is underwritten unless such Holder (i) agrees to sell its Registrable Securities on the basis provided in any customary underwriting arrangements (including pursuant to the terms of any over-allotment or "green shoe" option requested by the underwriter(s), provided that no Holder will be required to sell more than the number of Registrable Securities that such Holder has requested the Company to include in any registration), (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements, and (iii) cooperates with the Company's reasonable requests in connection with such registration or qualification (it being understood that the Company's failure to perform its obligations hereunder, which failure is caused by such Holder's failure to cooperate, will not constitute a breach by the Company of this Agreement). Notwithstanding the foregoing, no Holder will be required to agree to any indemnification obligations on the part of such Holder that are greater than its obligations pursuant to Section 5.7(b).

(b)     Each Holder that is participating in any registration hereunder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 5.5(a)(v), such Holder will forthwith discontinue the disposition of its Registrable Securities pursuant to the Registration Statement until such Holder receives copies of a supplemented or amended prospectus as contemplated by such Section 5.5(a)(v). In the event the Company gives any such notice, the applicable time period mentioned in Section 5.5(a)(ii) during which a Registration Statement is to remain effective will be extended by the number of days during the period from and including the date of the giving of such notice pursuant to

Section 5.5(a)(v) to and including the date when each seller of a Registrable Security covered by such Registration Statement will have received the copies of the supplemented or amended prospectus contemplated by Section 5.5(a)(v).

Section 5.9    Rule 144.  The Company covenants that, to the extent applicable, it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder, and it will take such further action as any Holder may reasonably request to make available adequate current public information with respect to the Company meeting the information requirements of Rule 144(c) under the Securities Act, to the extent required to enable such Holder to sell Registrable Securities without registration under the Securities Act pursuant to the exemption provided by Rule 144.  Upon the request of any Holders, the Company will deliver to such Holder a written statement as to whether it has complied with such information and requirements.

Section 5.10    Transfer of Registration Rights.

(a)    Subject to the restrictions on Transfers set forth in this Agreement, the Holders may transfer all or any portion of their then remaining registration rights under this Article V to any Transferee of such Person.  In connection with any such transfer, the term "Holder" as used in this Article V shall, where appropriate to assign such rights to such Transferee, be inclusive of the Holder and such Transferee.

(b)    After any such Transfer and assignment, such Holder shall retain its rights under this Article V with respect to all other Registrable Securities owned by such Holder.  Upon the request of such Holder, the Company shall execute a registration rights agreement with such transferee (or a proposed transferee) substantially similar to the applicable subsections of this Article V.

Section 5.11    Holdback.  In consideration for the Company agreeing to its obligations under this Agreement, each Holder agrees in connection with any registration of the Company's securities (whether or not such Holder is participating in such registration) upon the request of the Company and the underwriters managing any underwritten offering of the Company's securities, not to effect, and to cause their respective Controlled Affiliates not to effect (other than pursuant to such registration) any public sale or distribution of Registrable Securities, including any sale pursuant to Rule 144 or Rule 144A, or make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any Registrable Securities, any other equity interests or capital stock of the Company or any securities convertible into or exchangeable or exercisable for any equity interests or capital stock of the Company without the prior written consent of the Company or such underwriters, as the case may be, for a customary period (which shall be the same for all Holders) to be determined after consultation among the managing underwriter or underwriters for such offering and the Company (the "Holdback Period"); provided that nothing herein will prevent any Holder from making a Transfer of Registrable Securities to a Permitted Transferee, so long as any such Permitted Transferee agrees to be so bound.  The Company further agrees not to effect (other than pursuant to such registration) any public sale or distribution, or to file any Registration Statement (other than such registration) covering any of its equity securities or any securities convertible into or exchangeable or exercisable for such securities, during the Holdback Period with respect to an

underwritten offering, if required by the managing underwriter, _provided_ that notwithstanding anything to the contrary herein, the Company's obligations under this Section 5.11 shall not apply during any 12-month period for more than an aggregate of 180 days with respect to any Short-Form Registrations.

### ARTICLE VI.

### NOTICES

All notices or other communications under this Agreement shall be given in writing and shall be deemed duly given and received on the third full business day following the day of the mailing thereof by registered or certified mail or when delivered personally or sent by facsimile transmission as follows:

(i)     if to the Company, at its principal executive offices at the time of the giving of such notice, or at such other address as the Company shall have designated by notice as herein provided the Holders, Attention: The Chairman of the Board of Directors;

(ii)     if to any DDJ Party, to:

DDJ Capital Management, LLC
Attention:  James R. Kime
130 Turner Street
Building 3, Suite 600
Waltham, MA  02453
Telephone: (781) 283-8500
Facsimile:  (781) 283-8555

with a copy to:

DDJ Capital Management, LLC
Attention:  Legal Department
130 Turner Street
Building 3, Suite 600
Waltham, MA  02453
Telephone: (781) 283-8500
Facsimile:  (781) 283-8541


or at such other place as each DDJ Party shall have designated by notice as herein provided to the Company and the Holders; and


(iii)     if to any Wayzata Party, to:

Wayzata Investment Partners LLC

701 East Lake Street
Suite 300
Wayzata, Minnesota 55391
Attention: General Counsel
Facsimile No.: 952-345-8901

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention: Howard A. Sobel, Esq. and John Giouroukakis, Esq.
Facsimile No.: 212-751-4864

or at such other place as each Wayzata Party shall have designated by notice as herein provided to the Company and the Holders; and

(iv)    if to any Holder other than a DDJ Party or a Wayzata Party, at the address of such person as set forth in the stock records of the Company or at such other address as such person shall have designated by notice as herein provided to the Company.

## ARTICLE VII.

## SPECIFIC PERFORMANCE

Due to the fact that the securities of the Company cannot be readily purchased or sold in the open market and for other reasons, the parties will be irreparably damaged in the event that this Agreement is not specifically enforced. In the event of a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any of the parties hereto, the other parties shall, in addition to all other remedies, be entitled (without any bond or other security being required) to a temporary and/or permanent injunction, without showing any actual damage or that monetary damages would not provide an adequate remedy, and/or a decree for specific performance, in accordance with the provisions hereof.

## ARTICLE VIII.

## MISCELLANEOUS.

Section 8.1    Entire Agreement; Amendments. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be modified or amended except by a written agreement signed by the Company and approved by a majority (on the basis of the number of Common Shares then held by all Holders) of all Holders; provided, however, that none of the provisions (and related definitions) of Article I, Section 2.2, Section 2.3, Section 2.4, Article III, Article IV, Section 5.2 and Section 5.3 of this Agreement may be modified, amended or eliminated, except by agreement of sixty-six and two-thirds percent (66-2/3%) (on the basis of the number of Common Shares then held by all Holders) of all

Holders, which agreement shall bind each Holder whether or not such Holder has agreed thereto; provided, further, that no modification or amendment which would materially and disproportionately adversely affect the rights of any Holder as compared to other Holders shall be effective as to such Holder if such Holder shall not have consented in writing thereto. At any time hereafter, Persons acquiring Common Shares in accordance with the terms of this Agreement may be made parties hereto by executing a signature page in the form attached as Exhibit A hereto, which signature page shall be countersigned by the Company and shall be attached to this Agreement and become a part hereof without any further action of any other Party hereto. Anything in this Agreement to the contrary notwithstanding, any modification or amendment of this Agreement by a written agreement signed by, or binding upon, any Holder shall be valid and binding upon any and all persons or entities who may, at any time, have or claim any rights under or pursuant to this Agreement in respect of Common Shares acquired from such Holder.

Section 8.2    No Waiver. No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature. Anything in this Agreement to the contrary notwithstanding, any waiver, consent or other instrument under or pursuant to this Agreement signed by, or binding upon, any party shall be valid and binding upon any and all Persons who may, at any time, have or claim any rights under or pursuant to this Agreement in respect of Common Shares acquired from such party.

Section 8.3    Successors and Assigns. Except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Company, the Holders and their respective heirs, personal representatives, successors and assigns; provided, however, that nothing contained herein shall be construed as granting to any Holder the right to Transfer any Common Shares except in accordance with this Agreement.

Section 8.4    Severability. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein.

Section 8.5    Headings; Interpretation. The Article and Section headings contained herein are for the purposes of convenience only and are not intended to define or limit the contents of said sections. Words in the singular shall be read and construed as though in the plural and words in the plural shall be read and construed as though in the singular in all cases where they would so apply.

Section 8.6    Business Day. For purposes of this Agreement, "business day" means any day other than Saturday, Sunday or a day on which banks are authorized by law to be closed in New York, NY. In the event any deadline for the taking of any action or delivery of any notice hereunder falls on a day which is not a business day, then such deadline shall be deemed to be extended until 5:00 p.m., New York City time, on the next business day.

Section 8.7    Further Actions. Each party hereto shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

Section 8.8    Counterparts. This Agreement may be executed in one or more counterparts, all of which taken together shall be deemed one original.

Section 8.9    Consent to Jurisdiction; Waiver of Jury Trial. The Company, the Wayzata Parties, the DDJ Parties and each other Holder hereby irrevocably and unconditionally consents to the jurisdiction of, and agrees, for the benefit of each party, that any legal action, suit or proceeding against it with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement and with respect to the enforcement, modification, vacation or correction of an award rendered in an arbitration proceeding may be brought in, any New York State court or federal court of the United States sitting in the State of New York in any action or proceeding relating to this Agreement and consents to service of process in connection therewith by the delivery of notice to such Person's or Holder's address at the address for notices to such Person pursuant to this Agreement. **TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HERETO WAIVES ANY AND ALL RIGHTS THE PARTY MAY HAVE TO A JURY TRIAL WITH RESPECT TO ANY DISPUTE ARISING UNDER THIS AGREEMENT OR IN CONNECTION THEREWITH.** Each party hereto waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings brought in any such New York Court and hereby further waives and agrees not to plead or claim in any such New York Court that any such action, suit or proceeding brought therein has been brought in an inconvenient forum. Each party agrees that (i) to the fullest extent permitted by law, service of process may be effectuated hereinafter by mailing a copy of the summons and complaint or other pleading by certified mail, return receipt requested, at its address set forth herein and (ii) all notices that are required to be given hereunder may be given by the attorneys for the respective parties. Furthermore, each Holder agrees to vote its Common Shares to cause the Company to at any time make the foregoing consents, agreements and waivers in respect of any legal action, suit or proceeding against the Company by a Holder.

Section 8.10    Governing Law. This Agreement, and the rights and obligations of the parties hereunder, shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to the conflicts of laws principles thereof.

Section 8.11    (a)    Preemptive Rights. Except for Excluded Issuances, if the Company (or any subsidiary of the Company) wishes to issue and sell any equity interests or shares of capital stock or any equity security convertible into or exchangeable for equity interests or capital stock (each, a "New Security" and together, the "New Securities") to any Wayzata Party or any of its Permitted Transferees (collectively, the "Subject Purchasers"), then the Company shall also offer such New Securities to the DDJ Parties and any other Holder that is an "accredited investor" (as defined in Rule 501 of Regulation D promulgated under the Securities Act) (for the purposes of this Section 8.11, each a "Stockholder") by sending written notice (the "New Issuance Notice") to such Persons at least fifteen (15) days prior to the issuance and sale of the New Securities. The New Issuance Notice shall state (i) the number of shares, notes or other securities, as applicable, of New Securities proposed to be issued and sold and the terms of

such New Securities, (ii) the proposed purchase price per share, note or other security, as applicable, of the New Securities that the Company is willing to accept (the "Proposed Price") and the terms and conditions of the purchase of such New Securities, (iii) the proposed date on which the New Securities will be sold (the "New Issuance Closing Date"), and (iv) each Stockholder's Proportionate Percentage. For purposes hereof, each Stockholder's "Proportionate Percentage" means, with respect to any Stockholder, the percentage of the New Securities allocated to such Stockholder to be determined as follows:

(x)     with respect to New Securities which are of the same class as any class of equity interests or capital stock outstanding on the date of the New Issuance Notice ("Shares"), by dividing (a) the total number of Shares of the same class of equity interests or capital stock as the New Securities then owned by the respective Stockholder, by (b) the total outstanding number of Shares of the same class of equity interests or capital stock as such New Securities on such date; or

(y)     with respect to New Securities which are of a new class of equity interests or capital stock different from any class of equity interests or capital stock outstanding on the date of the New Issuance Notice or any New Securities offered pursuant to Section 8.11(a), by dividing (a) the total number of Common Shares held by the respective Stockholder on such date, by (b) the total number of Common Shares outstanding on such date.

(b)     Option. For a period of fifteen (15) days after the giving of the New Issuance Notice pursuant to Section 8.11(a), each Stockholder shall have the right to purchase any or all of its Proportionate Percentage of each or any class of the New Securities at a purchase price equal to the Proposed Price and upon the terms and conditions set forth in the New Issuance Notice.

(c)     Exercise of Options. The right of each Stockholder to purchase the New Securities under Section 8.11(a) shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the 15-day period referred to in Section 8.11(b), to the Company, which notice shall state the amount of each class of New Securities that such Stockholder elects to purchase. The failure to respond within such 15-day period shall be deemed to be a waiver of such Stockholder's rights under Section 8.11(b) with respect to such New Securities (but not future issuances).

(d)     Closing. The closing of the purchase of New Securities subscribed for or purchased by the Stockholders under this Section 8.11 shall be held at the principal office of the Company at 11:00 a.m. local time on the New Issuance Closing Date or at such other time and place as the parties to the transaction may agree. The Company shall make such other representations and warranties, enter into such other agreements and provide such other rights for the benefit of the participating Stockholders, in each case on terms no less favorable than any terms described in the New Securities Notice or on which the Company shall provide any of such representations and warranties, rights or agreements for the benefit of any Subject Purchaser. Each Stockholder purchasing the New Securities shall deliver at the closing payment in full in immediately available funds for the New Securities purchased by him, her or it and shall agree to the same terms and conditions, as agreed to by the Subject Purchasers, including, but not limited to, with respect to representations, warranties and covenants. At such closing, all of the parties

to the transaction shall execute such additional documents as are otherwise necessary or appropriate to consummate such transaction.

(e)     "Excluded Issuances" means any issuance of equity interests or capital stock of the Company (i) pursuant to a stock split, reclassification, subdivision or similar transaction or dividend applicable to all of the Common Shares, or (ii) pursuant to a public offering of securities.

(f)     The provisions of this Section 8.11 shall expire upon the consummation of an IPO.

Section 8.12     Information Rights. (a) The Company shall provide to each Holder for so long as such Holder owns any of the Common Shares, the following information:

(i)     as soon as available, but no later than forty-five (45) days after the end of each quarterly accounting period in each fiscal year of the Company (other than any quarterly accounting period ending on the last day of a fiscal year of the Company), unaudited consolidated statements of income and cash flows of the Company and its consolidated subsidiaries for such quarterly period (as well as unaudited consolidated statements of income of the Company and its consolidated subsidiaries for the period from the beginning of the fiscal year to the end of such quarter) and unaudited consolidated balance sheets of the Company and its consolidated subsidiaries as of the end of such quarterly period (and such financial statements shall set forth in each case comparisons to the Company's and its consolidated subsidiaries' corresponding period in the preceding fiscal year, with an explanation of any material differences between them). Such financial statements shall be prepared in accordance with GAAP, subject to the absence of footnote disclosures and to normal year-end adjustments; and

(ii)     as soon as available, but no later than one hundred and twenty (120) days after the end of each fiscal year of the Company, audited consolidated statements of income and cash flows of the Company and its consolidated subsidiaries for such fiscal year, and audited consolidated balance sheets of the Company and its consolidated subsidiaries as of the end of such fiscal year (and such financial statements shall set forth in each case comparisons to the Company's and its consolidated subsidiaries' corresponding period in the preceding fiscal year), and accompanied by the report of the Company's independent certified public accountants. Such financial statements shall be prepared in accordance with GAAP.

(b)     All information disclosed by the Company to any Holder pursuant to Section 8.12 shall be confidential information of the Company (other than information which is publicly available) and, unless as otherwise provided in this Agreement or consented by the Board of Directors in writing in advance, shall not be used by the recipients thereof for any purpose other than to monitor and manage their investment in the Company, and shall not be disclosed to any third party other than (i) employees, accountants and attorneys of such recipient to the extent that they are bound by similarly restrictive confidentiality obligations with respect to such information or (ii) as otherwise permitted pursuant to any other written agreement by and between the Company and the recipient of such confidential information. The obligations of the parties hereunder shall not apply to the extent that the disclosure of information otherwise determined to be confidential is required by applicable law, regulations, subpoena, civil investigative demand or other process or compulsion, provided, that: (x) prior to disclosing such

confidential information, a party shall notify the Company thereof, which notice shall include the basis upon which such party believes the information is required to be disclosed; and (y) such party shall, if requested by the Company and at the sole cost and expense of the Company, provide reasonable cooperation with the Company to protect the continued confidentiality thereof.

(c)     The provisions of this Section 8.12 shall expire upon the consummation of an IPO.

Section 8.13     Certain Tax Issues. Each Holder has reviewed with its, his or her own tax and legal advisors the federal, state, local and foreign tax consequences of such Holder's acquisition of Common Shares and the transactions of and contemplated by this Agreement. Each Holder is relying solely on such advisors and not on any statements of the Wayzata Parties, the DDJ Parties, the Company or any of their respective agents with respect to such tax consequences. Each Holder understands that it, he or she (and not the Wayzata Parties, the DDJ Parties or the Company) shall be responsible for their own tax liability that may arise as a result of such Holder's acquisition of Common Shares or the transactions contemplated by this Agreement.

Section 8.14     Other Businesses; Waiver of Certain Duties.

(a)     Each Holder and each general partner thereof, each member, limited or general partner of each such general partner and each of their Affiliates, officers, directors, shareholders, employees and agents may engage in or possess an interest in any other business venture of any nature or description (including any business venture that is a Competitor), on its own account, or in partnership with, or as an employee, officer, director or shareholder of any other Person. Each Holder and each general partner thereof, each member, limited or general partner of each such general partner and each of their Affiliates, officers, directors, shareholders, employees and agents  may (i) engage in, and shall have no duty to refrain from engaging in, separate businesses or activities from the Company or any of its subsidiaries, including business or activities that are the same or similar to, or compete directly or indirectly with, those of the Company or any of its subsidiaries,  (ii) do business with any potential or actual customer or supplier of the Company or any of its subsidiaries and (iii) employ or otherwise engage any officer or employee of the Company or any of its subsidiaries.

(b)     None of the Holders or any of their respective Affiliates shall have any obligation to present any business opportunity to the Company or any of its subsidiaries, even if the opportunity is one that the Company or any of its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and no such Person shall be liable to the Company, its stockholders or any of Company's subsidiaries or any Holder for breach of any fiduciary or other duty, as a shareholder, by reason of the fact that such Person pursues or acquires such business opportunity, directs such business opportunity to another Person or fails to present such business opportunity, or information regarding such business opportunity, to the Company or any of its subsidiaries.

Section 8.15     Other Securities. In the event any equity interests or capital stock of the Company or any other Person shall be distributed on, with respect to, or in exchange for

Common Shares as a stock dividend, stock split, spin-off, reclassification or recapitalization, or in connection with any merger or reorganization (including, without limitation, in connection with an IPO), the restrictions, rights and options set forth in this Agreement shall apply with respect to such other equity interests or capital stock to the same extent as they are, or would have been applicable, to the Common Shares on, or with respect to, such other equity interests or capital stock was distributed.

Section 8.16    Treatment of SPV's.  Each Holder that is an entity that does not hold any substantial assets other than Common Shares (each, an "SPV") agrees that (a) certificates for shares of its common stock or other instruments reflecting equity interests in such entity (and the certificates for shares of common stock or other equity interests in any similar entities controlling such entity) will note the restrictions contained in this Agreement on the restrictions on transfer of shares as if such common stock or other equity interests were Common Shares, (b) no shares of such common stock or other equity interests may be transferred to any Person other than in accordance with the terms and provisions of this Agreement as if such common stock or other equity interests were Common Shares and (c) any Transfer of such common stock or other equity interests shall be deemed to be a transfer of a *pro rata* number of Common Shares hereunder and subject to the provisions of this Agreement.

\* \* \* \* \*

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the first date written above.

To be completed by Holder:

_____

[INSERT NAME OF HOLDER]


By:_____
      [Signature]

Name:_____
      [Print Name]

Its:_____
      [Title]

EXHIBIT A

KEY PLASTICS CORPORATION
STOCKHOLDERS AGREEMENT

IN WITNESS WHEREOF, the undersigned, hereby agrees to become a party to, and subject to the terms and conditions of, that certain stockholders agreement, dated as of [_____], 2009, by and among Key Plastics Corporation, a Delaware corporation (the "Company") and each of the Holders (as defined in the Stockholders Agreement) party thereto (the "Stockholders Agreement"). The undersigned acknowledges and agrees that he, she or it, as the case may be, will have the rights, and be subject to the obligations, of a "Holder" as defined in the Stockholders Agreement.

_____

By: _____
Name:
Title:

Accepted:

KEY PLASTICS CORPORATION

By: _____
Name:
Title:

## SCHEDULE A

GMAM Investment Funds Trust II, for the account of the Promark Alternative High Yield Bond Fund (Account No. 7M2E)

GMAM Investment Funds Trust – Promark High Yield Bond Fund

General Motors Welfare Benefit Trust (VEBA)

GMAM Investment Funds Trust II for the account of the Promark Alternative High Yield Bond Fund (Account No. 7MWD)

DDJ High Yield Fund

Multi-Style, Multi-Manager Funds PLC The Global Strategic Yield Fund

DDJ Total Return Loan Fund, L.P.

DDJ Capital Management Group Trust

Stichting Pensioenfonds Hoogovens

Caterpillar Inc. Master Retirement Trust

J.C. Penney Corporation, Inc. Pension Plan Trust

The October Fund, Limited Partnership

SCHEDULE B

OTHER INVESTORS